

**RECEIVED**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

APR 1 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
APR 1 1 2008

_Mitchell M. Owens Sr,_
)
)
)
)
(Name of the plaintiff or plaintiffs)
)
)
v.
)
_City of Chicago_
)
_Forestry Department or_
)
_MARA S. Georges_
)
(Name of the defendant or defendants)
)

08CV2090
JUDGE DOW
MAGISTRATE JUDGE COX

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is _Mitchell M. Owens Sr._ of the county of _Cook_ in the state of _Illinois_.

3. The defendant is _City of Chicago Forestry Department_, whose street address is _30 north LaSalle Suite 1020_, (city) _Chicago_ (county) _Cook_ (state) _Illinois_ (ZIP) _60604_ (Defendant's telephone number) _(312) - 744 - 7630_

4. The plaintiff sought employment or was employed by the defendant at (street address) _119 South Ashland_ (city) _City Chicago_ (county) _Cook_ (state) _Illinois_ (ZIP code) _60628_

5. The plaintiff [**check one box**]

(a) ☐ was denied employment by the defendant.

(b) ☐ was hired and is still employed by the defendant.

(c) ☒ was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about, (month)____/____, (day)_14_, (year) _2000_

7._1_   *(Choose paragraph 7.1 or 7.2, do not complete both.)*

      (a) The defendant is not a federal governmental agency, and the plaintiff [*check one box*] m.O. _is not_ [X] has ~~not~~ [ ] *has* filed a charge or charges against the defendant asserting the acts of discrimination indicated in this complaint with any of the following government agencies:

    (i)    [✓] the United States Equal Employment Opportunity Commission, on or about (month)____/____ (day)_22_ (year) _2008_.

    (ii)    [ ] the Illinois Department of Human Rights, on or about (month)_08_ (day)_4_ (year) _2000_

  (b) If charges *were* filed with an agency indicated above, a copy of the charge is attached.  [✓] YES.  [ ] NO, **but plaintiff will file a copy of the charge within 14 days.**

It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

7.2    The defendant is a federal governmental agency, and

    (a) the plaintiff previously filed a Complaint of Employment Discrimination with the defendant asserting the acts of discrimination indicated in this court complaint.

        [ ]    Yes (month)_____ (day)_____ (year) _____

        [ ]    No, did not file Complaint of Employment Discrimination

    2.    The plaintiff received a Final Agency Decision on (month)_____ (day) _____ (year) _____.

    c.    Attached is a copy of the

        a.  Complaint of Employment Discrimination,

        [✓] YES    [ ] NO, but a copy will be filed within 14 days.

    (ii) Final Agency Decision, m.O.

    [ ] YES    [ ] NO, but a copy will be filed within 14 days. *really I need Help with this Question*

8.    *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☐ the United States Equal Employment Opportunity Commission has not issued a

*Notice of Right to Sue.*

(b) ☒ the United States Equal Employment Opportunity Commission has issued a *Notice*

*of Right to Sue*, which was received by the plaintiff on (month)____*1*____

(day)___*22*___ (year) *2008*___ a copy of which *Notice* is attached to this
complaint.

9.    The defendant discriminated against the plaintiff because of the plaintiff's [*check only those
that apply*]:

(a) ☐ Age (Age Discrimination Employment Act).

(b) ☐ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(c) ☒ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☐ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☐ Sex (Title VII of the Civil Rights Act of 1964)

10.   If the defendant is a state, county, municipal (city, town or village) or other local
governmental agency, plaintiff further alleges discrimination on the basis of race, color, or
national origin (42 U.S.C. § 1983).

11.   Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims
by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981
and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation
Act, 29 U.S.C. § 791.

12.   The defendant [*check only those that apply*]

(a) ☐ failed to hire the plaintiff.

(b) ☒ terminated the plaintiff's employment.

(c) ☐ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☐ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☐ failed to stop harassment;

(g) ☐ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☒ other (specify): all I can say I was terminated From my Job while I was hurt on The Job, under doctor Care my doctor also the letter they Sent Jan 14, 2000 gave me 5 or 10 Days To repone in which my Doctor Sent a letter said i I also went to the Job with the doctor Statement and I was Terminated on that Date of the letter Jan 14, 2000

13.    The facts supporting the plaintiff's claim of discrimination are as follows:

how could they make a statement in writing in a an Form a letter on the time an plus ask me to give information why I was of an Say they dont Kyow an did not now what happen to me and why I was oFF which was a lis I am asking For Justice.

14.    [*AGE DISCRIMINATION ONLY*]  Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15.    The plaintiff demands that the case be tried by a jury. ☒ YES    ☐ NO

16.    THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ☐    Direct the defendant to hire the plaintiff.

(b) ☐    Direct the defendant to re-employ the plaintiff.

(c) ☐    Direct the defendant to promote the plaintiff.

(d) ☐    Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ☐    Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ☐    Direct the defendant to (specify): *Give my Job Back Back pay over time pay, pay all Court Cost, put and add my time on the Job Back. also put me Back Civil service a pay Back my unemployment also Health benifits back. an $500,000.00 Five Hundred thousand For pain and Suffering or 10 million Dollars an I will walk*

(g) ☒    If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees. *Both*

(h) ☒    Grant such other relief as the Court may find appropriate. *Both I have IT amended 200 + Fifth thousand dollor For pain + Suffering I lost it all and Time I lost put Back, I lost everything*

(Plaintiff's signature)
*Mitchell M Owens Sr.*

(Plaintiff's name)
*Mitchell M Owens Sr.*

(Plaintiff's street address)
*730 EAST 84 place Apartment 2 north*

(City *Chicago*      (State *Illinois* (ZIP *60619*
(Plaintiff's telephone number) (*773*) – *994-0848 or 773 318 2 618*

Date: _____

# IN THE NAME OF THE PEOPLE OF THE STATE OF ILLINOIS
## INOIS INDUSTRIAL COMMISSION
## SUBPOENA

MITCHELL M. OWENS, SR.
**Employee/Petitioner**

Case # ___ 00 ___ WC ___ 19989 ___

v.

CITY OF CHICAGO
**Employer/Respondent**

TO:   John Koziol

YOU ARE COMMANDED TO APPEAR TO TESTIFY BEFORE _____ Arbitrator Robert Williams
                                                     **Name of arbitrator or commissioner**

OF THE ILLINOIS INDUSTRIAL COMMISSION AT  100 W. Randolph St., 8th Floor, Chicago  , ILLINOIS
                                          **Street address**                    **City**

ON ___ August 29 ___ , AT __ 9:00 a.m __ . YOU ARE ALSO COMMANDED TO BRING THE FOLLOWING ITEMS
   **Date**              **Time**

IN YOUR POSSESSION OR CONTROL:

_____

_____

_____

_____

YOUR FAILURE TO RESPOND TO THIS
SUBPOENA WILL SUBJECT YOU TO THE
PENALTIES PRESCRIBED BY LAW.
STATUTE: 820 ILCS 305/16;
RULES: 7100.100d)3)B).

**Signature**

_08_ / _04_ / _2000_
**Date**

_an Karpel
Lewis, Davidson & Hetherington, Ltd.
**Name of person requesting this subpoena**

Mitchell M. Owens, Sr.
**Name of person represented by attorney**

One N. Franklin Street, Suite 1850
**Attorney's street address**

Chicago                IL        60606
**City**               **State**  **Zip code**

(312) 726-3054
**Telephone number**   AK/mat

To the personel City of Chicago  Date Jan 12, 2001

To Whom it May Concern

I Mitchell M. Owens will be off.
Work because of My injuries that
happen on the Job Nov. 11. 1999,
because right Now I am Under doctor's
Care. you Can Contact My doctor at
5725 South Archer Ave. Chicago Il. 60638
Phone (773) 735-0665, or My Supervisor
Bill Brewn. 7, 3-119 SO. Ashland (312)-747
0429.

yours truly

Mr. Mitchell M. Owens

EX H; B, +
B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MITCHELL M. OWENS,        )
                          )
         Plaintiff,       )
                          )
                          )
                          )        Case No.  02 L 506
   V.                     )
                          )
                          )        Judge Ronald F. Bartkowicz
CITY OF CHICAGO,          )
                          )
         Defendant.       )

## NOTICE OF MOTION

To the UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS to the EASTERN DIVISION: EVERETT McKINLEY DIRKSEN, UNITED STATES
COURTHOUSE 20TH FLOOR, 219 SOUTH DEARBORN STREET, CHICAGO, ILLINOIS
60604 pleading the courts and the Honorable Judge Ronald F. Bartkowicz. The court that will
put this case on the guide lines of the law of the state of Illinois city of Chicago

                              Mitchell M. Owens
                              Prose

                         BY: _____

Prose
730 East 84th Place
Chicago, Illinois 60619
(773) 994-0484 (hm)
(773) 318-2618 (cell)

A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

MITCHELL M. OWENS,                 )
                                   )
          Plaintiff,               )
                                   )
                                   )    Case No.  02 L 506
     V.                            )
                                   )    Judge Ronald F. Bartkowicz
CITY OF CHICAGO,                   )
                                   )
          Defendant.               )

### PLAINTIFF MOTION TO TRANSFER

To the UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS to the EASTERN DIVISION: EVERETT McKINLEY DIRKSEN, UNITED STATES
COURTHOUSE 20TH FLOOR, 219 SOUTH DEARBORN STREET, CHICAGO, ILLINOIS
60604 pleading the courts and the Honorable Judge Ronald F. Bartkowicz. The court that will
put this case on the guide lines of the law of the state of Illinois city of Chicago

                              Mitchell M. Owens
                              Prose


                    BY: _____

prose
730 East 84th Place
Chicago, Illinois 60619
(773) 994-0484 (hm)
(773) 318-2618 (cell)



**U.S. Departmen    Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
5054 2214

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

January 22, 2008

Mr. Mitchell M. Owens, Sr.
730 E. 84th Place, Apt. 2 North
Chicago, IL  60619

Re:  EEOC Charge Against City of Chicago Forestry Dept.
     No. 440200707151

Dear Mr. Owens, Sr.:

Because you filed the above charge with the Equal Employment
Opportunity Commission, and the Commission has determined that it
will not be able to investigate and conciliate that charge within
180 days of the date the Commission assumed jurisdiction over the
charge and the Department has determined that it will not file any
lawsuit(s) based thereon within that time, and because you have
specifically requested this Notice, you are hereby notified that you
have the right to institute a civil action under Title I of the
Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq.,
against the above-named respondent.

If you choose to commence a civil action, such suit must be
filed in the appropriate Court within 90 days of your receipt of
this Notice. If you cannot afford or are unable to retain an
attorney to represent you, the Court may, at its discretion, assist
you in obtaining an attorney. If you plan to ask the Court to help
you find an attorney, you must make this request of the Court in the
form and manner it requires. Your request to the Court should be
made well before the end of the time period mentioned above. A
request for representation does not relieve you of the obligation to
file suit within this 90-day period.

This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is
meritorious.

                              Sincerely,

                         Grace Chung Becker
                    Acting Assistant Attorney General
                         Civil Rights Division

              by  *Karen J. Ferguson*

                         Karen L. Ferguson
                    Supervisory Civil Rights Analyst
                    Employment Litigation Section

cc:  Chicago District Office, EEOC
     City of Chicago Forestry Dept.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison St., Suite 2800
Chicago, IL 60661
PH: (312) 353-2713
TDD: (312) 353-2421
ENFORCEMENT FAX: (312) 846-1168
LEGAL FAX: (312) 353-8555

CHARGE NUMBER: _440-2007-07151_

CHARGING PARTY: _Mitchell Owens_

RESPONDENT: _City of Chicago Forestry Dept_

I request that the Commission issue me a Notice of Right to Sue
against the above named Respondent. I understand that when the
Notice of Right to Sue is issued the Commission will cease
processing my charge.

DATE: _11/28/2007_

_M.L.W.M.Owens, Sr_
(Signature)

RECEIVED EEOC
NOV 28 2007
CHICAGO DISTRICT OFC

_730 EAST 84 place Apt 2 north_
(Address)

_Chicago Illinois  zip 60619_
(City, State & Zip Code)

_(773) 994-0848 or (773) 318-2618_
(Telephone Number)

# INFORMATION ON EMPLOYMENT DISCRIMINATION

This information is being given to you to help you decide whether your employment problem can be handled by the United States Equal Employment Opportunity Commission (EEOC). The EEOC was created by Congress to investigate allegations of employment discrimination engaged in by private employers, public state and local governments, labor unions and employment agencies. The EEOC can only investigate allegations of employment discrimination because of one or more of the reasons listed below:

Your race,
Your color (darkness or lightness of skin),
Your sex,
Your religion,
Your national origin,
Your age (if you are 40 or older), or
Your disability (includes employer's belief that you are disabled),
Opposing or protesting an act violating one of the laws enforced by EEOC,
Participating in an investigation or proceeding relating to one of the laws enforced by EEOC,
Associating with someone protected by one of the laws enforced by EEOC.

*Mr. Lil Owens*
*730 E 84th Pl*
*Apt. 3 South*
*Chicago 60619*

Some of these terms may have different meanings under the laws we enforce than elsewhere. EEOC can provide you with information regarding the meaning of the terms concerning your situation.

The EEOC does not accept complaints of discrimination against the Federal Government. Such complaints must be filed with the EEO office of the agency alleged to have engaged in discrimination.

The EEOC does not investigate charges alleging unfairness unrelated to race, color, sex, religion, national origin, age or disability.

The laws EEOC enforces against employment discrimination based on race, color, religion, sex, national origin, and disability require that an employer must employ 15 or more employees, and a charge must be filed within 300 days of the alleged discriminatory act.

The law that prohibits employment discrimination against persons 40 years of age or older requires that the employer must employ 20 or more employees, and a charge must be filed within 300 days of the alleged discriminatory act.

A law that prohibits discrimination based on sex in the payment of wages for substantially equal work, requires that a lawsuit must be filed within two years of the alleged discriminatory act. The employer must employ at least one employee other than the employee complaining of discrimination. A charge may be filed within the same two year period but is not required.

EEOC accepts charges of discrimination from the public and depending on the circumstances, may take one or more of the following actions regarding a charge:

1. Investigate to the extent EEOC deems necessary to determine whether illegal employment discrimination probably has occurred;

2. Attempt to work out a settlement of the dispute between the individual who filed the charge (Charging Party) and the organization accused of employment discrimination (Respondent); or

3. Provide the Charging Party with a notice which permits him/her to sue the Respondent.

# CHARGE QUESTIONNAIRE

Office Appt.
6/12/03
2:00 pm

Form is affected by the Privacy Act of 1974; see Privacy Act Statement before completing this form.

you **must** completely fill out this form and sign the last page.

he Commission will then determine if it has the right under the law to investigate your employment claim.

/hether you complete this form in our office or mail it to the EEOC, it must be received by the Commission within 300 days of the ate of the alleged discrimination.

NAME _Mitchell_ _MARTIN_ _OWENS SC._ (Please Print)     DATE _____
   (First)    (Middle Name or Initial)    (Last)

ADDRESS _730 EAST 84 place. Apt 3 south_     CITY _Chicago_

STATE _Illinois_     ZIP _60619_     COUNTY _Cook_

-ME TELEPHONE NUMBER _073 994-0848_     DAYTIME TELEPHONE NUMBER _(073) 994-0848_
.CIAL SECURITY NUMBER _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_     SEX _MALE_

DATE OF BIRTH _9/25/62_     CURRENT AGE _40_

Please provide the name of an individual at a different address who is always able to reach you.

NAME _Mildred Owens_     ADDRESS _6609 South Aberdeen_

CITY _Chicago_     STATE _IL_     ZIP _60627_     TELEPHONE NUMBER _073 846-5471_

Type of organization that you believe discriminated against you.

_City of Chicago_
✓ Private Company   _____ State Government   _____ County Government   _____ City Government

Educational Institution: _____ Public   _____ Private   _____ Employment Agency   _____ Union

What is the nature of organization's business (what does the company do _Trim & cut down Trees all over the city of Chicago Forestry Dept._

Provide the **full** name of the organization that you believe discriminated against you. Provide the address and telephone number of the location where the alleged discrimination occurred.

Name of organization _Forestry Dept. City of Chicago_     Address _City Hall 7FL Personal_

City _Chicago_     State _IL_     Zip Code _60601_

Telephone Number _(312) 747-0429_     County _Cook_

Total number of employees _200_

If you are, or have been, employed by the organization provide the following information.

Job Title _TREE Trimer 1 ONE_     Dates of Employment: From _6/1/92_     To _11/11/99_

Present or Last Salary _958.56 week 40 hrs_     Department _Forestry Dept_     Name of Supervisor _Carlos Adams_

In the spaces below, please list each issue and basis (Race, Color, Sex, Religion, National Origin, Age, Disability or Equal Pay).

**Examples of some common issues** (action taken): Discharge; **Layoff**; Harassment; Transfer; Unequal Pay; Demotion; Job Eliminated; Failure to Recall; Failure to Hire; Failure to Accommodate (**Disability** and Religion Only); Unequal Terms and Conditions; Failure to Promote.

Fill in a separate section for each issue and basis.    **ISSUE AND BASIS**

Issue/Action taken _To go Back to work while i was on Doctors Care_     Date of Action _11/16/99_

F 's/type of discrimination _For me to stay off F_

Reason given for action _not showing up For work I was under doctor care no light duty_

Explain why you feel the action taken against you was discriminatory _They knew i was off & they toll_

From page 1:

**ISSUE AND BASIS**

Action taken _I no longer work ther_     Date of Action _Feel/2000_

Basis/type of discrimination _Disability_

Reason given for action _not showing up would not give me my leave I need to First m_

Explain why you feel the action taken against you was discriminatory _Because when I went For my_
_leave papers sharon young didnt give it to me because she said Tim von said no_
_and I had my Doctor papers + a broken arm at the time_

If you believe you were discriminated against because of a disability, state your disability.
_I was hequt on the Job a door Fell oFF the truck hit me in the head while_
_Fing oFF I Broke my arm all so, so I Asked for a leave + went to thewwen_

If you believe the action taken against you occurred because you opposed unlawful discrimination, filed a discrimination charge, participated in an investigation of one of the <u>laws enforced by EEOC</u> or associated with someone protected by one of the laws enforced by EEOC, tell us what you did. Include dates, charge numbers and/or the name and title of the person top whom you mplained of discrimination.

_I mitchell M. Owens or the date oF 11/16/99 Took my Job all so mercy_
_workers Hospital For city Employee. My Doctors information + Sharen young + Bill Brown_
_Sharon young- is puyroll  Bill Brown  super intendant_

Do you have any documents to support your claim of discrimination?
_Dept. oF Forestry_
_oF my Area he_
_is over my superi..._

Yes _✓_     No _____
_Carlos Adams_

Have you filed a charge regarding this situation with the Illinois Department of Human Rights (IDHR)?

Yes_____ No _✓_     If yes, provide charge number_____

Have you filed a charge with the EEOC before?

Yes_____ No _✓_     If yes, provide charge number_____

If you are represented by an attorney, please provide name, address and telephone number.

_Dave Comton, My attorney_
_9650 ~~Co~~ Crandon chicago Illinois_     _60617_
_Phone (773) 731-8481_

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE _Mitch O. M. Owens Sr._     DATE _6/12/2003_

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

1. FORM NUMBER/TITLE/DATE. EEOC Form 283, Charge Questionnaire (12/93).

2. AUTHORITY. 42 U.S.C. § 2000e-5(c), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)

3. PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information in an acceptable form consistent with statutory requirements to enable the Commission to act on matters within its jurisdiction. When this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 CFR 1601.12(b) and 29 CFR 1626.89b), consider it to be a sufficient charge of discrimination under the relevant statute(s).

4. ROUTINE USES. Information provided on this form will be used by Commission employees to determine the existence of facts relevant to a decision as to whether the Commission has jurisdiction over allegations of employment discrimination and to provide such charge filing counseling as appropriate. Information provided on this form may be disclosed to other State, local and federal agencies as may be riate or necessary to carrying out the Commission's functions. Information may also be disclosed to charging parties in consideration of or in connection with litigation.

5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. The providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge of



**U.S. Equal Employment Opportunity Commission**
**Chicago District Office**

500 West Madison St
Suite 2800
Chicago, IL 60661
(312) 353-2714
TTY (312) 353-2421
FAX (312) 353-4041
1-800-669-4000

Mitchell Owens
730 East 84 Place
2 North
Chicago, IL 60619

Dear Mr. Owens:

The Equal Employment Opportunity Commission has received your request for a Notice of Right to Sue in the above referenced charge.

Your request has been forwarded to the U.S. Department of Justice (DOJ) for action. That Agency will act on your request and issue the Notice directly to you.

Sincerely,

12/20/2007
Date

Tyrone Irvin
Enforcement Supervisor

Enclosures:
    EEOC Form 257 and
    Its attachments

cc:    Eileen Geary, Esq.
    Chief Assist. Corporation Counsel
    CITY OF CHICAGO
    30 N. Lasalle St.
    Rm 1020
    Chicago, IL 60602

    Karen Ferguson, Civil Rights Analyst
    Employment Litigation Section
    Civil Rights Division
    U. S. Department of Justice
    10th & Constitution Avenue. N.W.
    Patrick Henry Building, Room 4239
    Washington, D.C. 20530

**ACCIDENT DATA:**

DATE OF ACCIDENT, LAST EXPOSURE OR DISABLEMENT: _Nov 11, 1999_

TIME: _~10am_ LOCATION: _93rd St in. Beverly_

INJURY AND PART OF BODY: _Right temple_

HANDEDNESS: (right or left) _right_

HOW OCCURRED: _After trimming a tree, (went to put tools away in back of truck. When opened truck door, → door fell off its hinges & onto π. Knocking him down & gashed open the right side of his head_

_185 lb door - Steel door._
_concussion)_ _Compact_

NOTICE GIVEN TO: _Sup. John Kosco_ ON: _immediately_
(name and position)

METHOD OF NOTICE: _oral_
(oral or written)

NAMES OF WITNESSES AND THEIR EMPLOYERS: _doesn't remember their names Hubbard Fields & Tom?_

STATEMENTS GIVEN: (to whom, when, oral, written or reported, insurance forms completed?)
_Bill Brown - Area Sup. → written from Doctr_
_Sharon Young - Payroll → "_

TREATMENT: (Include dates treated, nature of treatment, diagnosis, and amount of bill)

| | | |
|---|---|---|
| 1) _Mercy Works_ (Doctor/Hospital) | _Pulaski_ (Address) | (Phone) |

_Nov 11-99 and subseq._ _X-ray, Stitches (5)_ _treated for a concussion_

| | | |
|---|---|---|
| 2) _Dr. Symanski:_ (Doctor/Hospital) | _53rd by Midway_ (Address) | (Phone) |

_11-17-99_ _X-rays, ice pack, recommended Therapy_
_referred to Dr. Jamrozik_

| | | |
|---|---|---|
| 3) _Tony Machsoudi @ Jamecha_ (Doctor/Hospital) | _5725 S Archer_ (Address) | (773) 735- (Phone) |

_11-23-99_
_2/12/00_ _w/a, Knee was bruised._
_Tylenol w/ Codine, Rest_

| | | |
|---|---|---|
| 4) (Doctor/Hospital) | (Address) | (Phone) |

_E X H B, t  A_

STATE OF ILLINOIS )
                  )    SS:
COUNTY OF C O O K )

BEFORE THE INDUSTRIAL COMMISSION OF ILLINOIS

MITCHELL M. OWENS, SR.,        )
                               )
    Petitioner,                )
                               )
    vs.                        ) No. 00 WC 19989
                               )
CITY OF CHICAGO,               )
                               )
    Respondent.                )

August 2nd, 2000
Chicago, Illinois

TRANSCRIPT OF EVIDENCE
ON ARBITRATION

I N D E X

| WITNESSES | Direct | Cross | Re-D. | Re-C. |
|-----------|--------|-------|-------|-------|
| Mitchell M. Owens | 7 | 65 | 81 | 86 |
| William Brown | 92 | 101 | 125 | |
| Catharine Mullen-Hennessey | 127 | 144 | 174 | 178 |
| | | | 181 | 183 |

Victoria L. Babbe, C.S.R.
Lic. No. 084-002833
Official Reporter
Industrial Commission of Illinois

ExHiBit C   Hascor around
193 pages
1

COPY

STATE OF ILLINOIS )
                ) SS:
COUNTY OF C O O K )

    BEFORE THE INDUSTRIAL COMMISSION OF ILLINOIS

MITCHELL M. OWENS, SR.,    )
                                    )
    Petitioner,            )
                                    )
    vs.                    ) No. 00 WC 19989
                                    )
CITY OF CHICAGO,          )
                                    )
    Respondent.          )

            BE IT REMEMBERED that heretofore, to wit, on the 2nd day of August, 2000, the above-entitled matter came on for hearing before ARBITRATOR ROBERT WILLIAMS in one of the hearing rooms of the Industrial Commission of Illinois, 100 West Randolph Street, Chicago, Illinois;

    WHEREUPON, the following proceedings were had herein and evidence taken:

    APPEARANCES:

    MR. ALAN KARPEL,
    appeared for Petitioner;
    MS. ROBERTA MARTIN,
    appeared for Respondent.
    MR. JOHN LEOVY,
    appeared as co-counsel for Respondent.

Victoria L. Babbe, C.S.R.
Lic. No. 084-002833
Official Court Reporter
Industrial Commission of Illinois

(SESSION OF AUGUST 2, 2000)

## EXHIBIT INDEX

<u>EXHIBITS RECEIVED IN EVIDENCE</u>                    <u>PAGE</u>

Arbitrator's Exhibit No. 1                    5

Petitioner's Exhibit No. 1                    90

Petitioner's Exhibit No. 2                    90

Petitioner's Exhibit No. 3                    90

Petitioner's Exhibit No. 4                    90

Respondent's Exhibit No. 1                    143

Respondent's Exhibit No. 2                    143

3

THE ARBITRATOR:  This is the claim of Mitchell Owens versus City of Chicago, 00 WC 19989, appearing for the Petitioner is Alan Karpel and for the Respondent, Roberta Martin.

The parties have entered into a stipulation which they have agreed that on November 11, 1999 there existed an employee/employer relationship between the parties.

That the Petitioner sustained accidental injuries arising out of and in the course of his employment on said date.

That timely notice of the accident was given to the Respondent, that the Petitioner had an annual salary of $41,516.80, and average weekly wage of 798.40, that he was 37 years old, single, and had 3 children under 18 years of age at the time of this injury.

That parties agree that no benefits have been paid on account of this injury.

There is a penalty petition for fees

4

and -- for penalties and fees filed.

The issues in dispute are nature and extent, temporary total disability, medical expenses and penalties and fees.

Counsel, does that correctly state the issues for the Petitioner and the agreements of the parties for the Petitioner?

MR. KARPEL:  Yes, it does, your Honor.

THE ARBITRATOR:  And for the Respondent?

MS. MARTIN:  Yes, your Honor.

THE ARBITRATOR:  Arbitrator's Exhibit No. 1 is admitted in evidence.

(WHEREUPON, SAID DOCUMENT WAS THEREUPON MARKED AND RECEIVED IN EVIDENCE AS ARBITRATOR'S EXHIBIT NO. 1, AND IS IN WORDS AND FIGURES AS FOLLOWS, TO-WIT:)

# ILLINOIS INDUSTRIAL COMMISSION
## REQUEST FOR HEARING

ATTENTION: Please give this form to the arbitrator after you obtain a trial date.

*00 APR 26 PM 3: 12*

*ILL. STATE*

MITCHELL M. OWENS, SR.
Employee/Petitioner

Case # _0012_ WC _19989_

v.

CITY OF CHICAGO
Employer/Respondent

County _____Cook_____

The petitioner and respondent are prepared to try this matter to completion on the date _8_/_2_/_2000_, unless the arbitrator approves other arrangements.
or about

1. The petitioner claims that, on the date _11_/_11_/_1999_, the petitioner and respondent were operating under the Illinois Workers' Compensation or Occupational Diseases Act, and their relationship was one of employee and employer.

Respondent agrees _X_ disputes ____ for the following reason: _____.

2. The petitioner claims that, on the above date, he or she sustained accidental injuries or was last exposed to an occupational disease that arose out of and in the course of employment.

Respondent agrees _X_ disputes ____ for the following reason: _____.

3. The petitioner claims his or her condition of ill-being is causally connected to this injury or exposure.

Respondent agrees ____ disputes _X_ for the following reason: INJURY WAS TREATED AND RESOLVED

4. The petitioner claims that the respondent was given notice of the accident within the time limits stated in the Act.

Respondent agrees _X_ disputes ____. If in dispute, the petitioner states that on ____/____/_____,

notice was given to _____, with the job title _____.

5. The petitioner claims his or her earnings during the year preceding the injury were $ _41,516.80_, and the average

weekly wage, calculated pursuant to Section 10 of the Act, was $ _798.40_.

Respondent agrees _X_ disputes ____. The respondent claims the earnings in the year preceding the injury were

$ _____, and the average weekly wage was $ _____.

6. At the time of injury, the petitioner was _37_ years old; married ____ single _X_; with _3_ children under 18 years old.

Respondent agrees _X_ disputes ____ for the following reason: _____.

7. All necessary medical services have been paid by the respondent. Petitioner agrees ____ disputes _X_. (Explain)

_A. Jamrocha Chiropractic, P.C.; Dr. Szymanski_

_Medical expenses to be shown at trial._

8. The petitioner claims he or she was temporarily totally disabled from ___11/12/99___ through ___2/17/00___,
First day of lost time                     Last day of lost time

representing ___13-6/7___ weeks.

Respondent agrees ___ disputes __X__. The respondent claims the petitioner was disabled from __11/12/99__
First day of lost time

through __11/16/99__, representing __5/7__ weeks, **3 WORKING DAYS**
Last day of lost time

9. The petitioner claims the amount of workers' compensation benefits paid on account of this injury was $ ___-0-___.

Respondent agrees __X__ disputes ___. The respondent claims the amount paid was $ _____.

The amount of group, nonoccupational disability benefits paid by the respondent for which credit may be allowed under

Section 8(j) of the Act is $ ___-0-___.

Respondent agrees ___ disputes ___. The respondent claims the amount paid was $ _____.

10. The petitioner claims to be entitled to additional compensation under Section 19(k) __X__  19(l) __X__, and/or attorneys'
fees under Section 16 __X__ of the Act. The petitioner has __X__ has not ___ filed a penalty petition.

11. The nature and extent of the injury is __X__ is not ___ in dispute. Additional issues are: ___temporary___

___total disability, medical expenses, penalties, attorneys' fees___

_____

12. A petition for attorneys' fees by a current or former attorney is ___ is not __X__ pending.

13. The petitioner will submit any depositions by ___/___/_____.

The respondent will submit any depositions by ___/___/_____.

14. STENOGRAPHIC STIPULATION. Both parties agree that if either party files a Petition for Review of Arbitration Decision
and orders a transcript of the hearings, and if the Commission's court reporter does not furnish the transcript within the time
limit set by law, the other party will not claim the Commission lacks jurisdiction to review the arbitration decision because
the transcript was not filed timely.

__8__/__2__/__2000__
submitted

_____          Self-insured
Signature of petitioner or petitioner's attorney      Name of respondent's insurance or service company (please print)

Alan Karpel                    #328    _____
Name (please print; attorneys, please include IIC code number)   Signature of respondent or respondent's attorney

LEWIS, DAVIDSON & HETHERINGTON, LTD.    Roberta Martin
Name of law firm                Name (please print; attorneys, please include IIC code number)

                        CORPORATION COUNSEL    -
One North Franklin Street, Suite 1850    Name of law firm
Street address

                        30 North LaSalle Street, Suite 800
                        Street address

Chicago        IL    60606    Chicago        IL    60602
City        State    Zip code    City        State    Zip code

(  ) 726-3054
Phone number                Telephone number

NOTE: The arbitration decision will be sent by certified mail to the addresses listed above.

IC9 page 2

THE ARBITRATOR:  Any preliminary matters?

MR. KARPEL:  Yes, I would like to note for the record that the Respondent has a witness who is going to be sitting during the testimony of the Petitioner, and I assume during the entire trial today, and I understand that his name is Bill Brown; is that correct?

MS. MARTIN:  That's correct.

MR. KARPEL:  And I thought that actually would be useful for your Honor because I think the crux of the case centers around conversations that took please between these two men.

MS. MARTIN:  It's my understanding that he had no objection to it, I would be happy to exclude him, but I believe he had no objection.

MR. KARPEL:  That's correct, I have no objection.

THE ARBITRATOR:  Any other preliminary matters?

MR. KARPEL:  I don't believe so.

THE ARBITRATOR:  Any opening statements?

6

MR. KARPEL:  Not for Petitioner.

MS. MARTIN:  None for Respondent.

THE ARBITRATOR:  You are calling as your first witness the Petitioner, Mr. Owens?

MR. KARPEL:  Yes, your Honor.

THE ARBITRATOR:  Mr. Owens, would you raise your right hand, please?

THE WITNESS:  Yes, sir.

(WITNESS SWORN)

MR. MITCHELL M. OWENS,

(called as a witness in his own behalf, the Petitioner herein, having been first duly sworn on his oath, was examined and testified as follows:)


DIRECT EXAMINATION

BY MR. KARPEL:

Q.    Mr. Owens, would you spell your name for us?

A.    Mitchell, M-i-t-c-h-e-l-l, Martin, M-a-r-t-i-n, middle initial M., Owens, O-w-e-n-s.

7

Q.    How old are you?

A.    I am 37.

Q.    On November 11 of 1999 you were employed by the City of Chicago; is that correct?

A.    Yes.

Q.    And what department were you employed by?

A.    Forestry department.

Q.    And how long had you been working in the forestry department on that day?

A.    It was about 10, 11 years, 10 years, 11 years.

Q.    And what was your job title on November 11, 1999?

A.    That day I was an acting foreman.

Q.    What does that mean?

A.    That mean where acting is I am just taking a position as a foreman, but I didn't have a crew truck that day, I had a compose truck.

Q.    Did you have a crew working for you on that day?

8

A.   Yes, two people -- three people is considered a crew, a driver and two laborers or acting foreman and foreman considered as a crew.

Q.   Would you tell us who was working with you on that day?

A.   It was Herbert, me, and I can't think of his name.  I can't think of his name right off.

Q.   But there were three of you including yourself?

A.   Yes.

Q.   What were your job duties on November 11 of 1999?

A.   Low branch trimming, I & I's.

Q.   What does that mean?

A.   I & I's what I feel is when you go around and they give you specific trees to do.

Q.   What are you doing to these specific trees?

A.   Trimming them.

Q.   What neighborhood were you in on November

9

11, 1999?

      A.    Beverly.

    MS. MARTIN:  I'm sorry?

    THE WITNESS:  Beverly.

    MR. KARPEL:  Beverly.

    MS. MARTIN:  Thank you.

BY MR. KARPEL:

    Q.    Okay, you said that you were assigned to a compose truck that day; is that correct?

    A.    Yes, sir.

    Q.    Would you describe to us the compose truck in general, and specifically I wanted you to describe the doors, paying attention to the door that was involved in the accident that you are going to describe.

    MS. MARTIN:  Objection, assuming facts not in evidence yet.

BY MR. KARPEL:

    Q.    Describe first the truck.

    A.    It's like a big dump truck with a chipper

10

hooked up to the back, and what the chipper does it
shoots the brush inside the back of the truck.

Q.   Are there doors on the back of the truck?

A.   Yes, there is.

Q.   How many doors?

A.   It's three doors.

Q.   What are each of the doors for?

A.   One door is to open up the hatch back that
you actually lift the truck up to dump it.  There is
another door on the side where we put our tools in,
and there is another door completely on the opposite
side of that door where you can also put your tools
at.

Q.   All right, describe for me the door that
you put your tools in.

Well, you actually described two doors
that you put your tools in; is that right?

A.   Yes.

Q.   Did one of those two doors malfunction at
some point in the day?

11

A.    Yes, it did.

MS. MARTIN:  Objection, leading, Judge.

THE ARBITRATOR:  Counsel, that's sustained.

MR. KARPEL:  I am just trying to get him to describe the door.

THE ARBITRATOR:  I understand what you are doing but refrain from leading, and he knows what he is here for.

MR. KARPEL:  All right.

MS. MARTIN:  Your Honor, just for the record I would ask that his response be stricken from the record.

THE ARBITRATOR:  Whatever response that the witness gave is stricken from the record.

MS. MARTIN:  Thank you, your Honor.

BY MR. KARPEL:

Q.    Which of the two doors were you using that day to put your equipment in?

A.    Passenger's side door.

Q.    All right.

12

Would you describe for us the passenger's side door?

A.    Um, it's about a four-foot door.

Q.    Let me stop you.

A.    It's very heavy and it's metal, but.

Q.    You said it's made of metal; is that correct?

A.    Yes, steel.

Q.    Okay.

And how is it attached to the truck?

A.    They have two hinges, and it also have a flap, a flap doorknob that you open up the door and it's I believe like a right hand out-swing door.

Q.    Okay.

Would you describe the dimensions of the door?

In other words, how long and how wide is the door?

A.    It's about three feet wide and about four and a half feet long.

13

Q.    When you are accessing that door do you have to get on any steps, or are you doing that from ground level?

A.    I am doing it from ground level.

Q.    How high is that door off the ground?

A.    I'd say about 6 and a half feet, 6 feet, somewhere around there.

Q.    So the bottom of the door when you are standing at ground level, where is it in relationship to your body?

A.    I'd say about to below my waistline (indicating).

Q.    And the top of the door then?

A.    It's like up above me (indicating), I'd say a good foot.

Q.    When you say above you, is it above your head?

A.    Yes.

Q.    Did anything unusual happen that day with that door?

14

A.    Yes, it did.

Q.    Would you tell us -- First of all, about what time did this unusual event occur?

A.    About 11:00, something after 11:00, I believe.

Q.    All right.

Would you tell us what happened?

A.    I was putting up the tools, I opened up the door, we was going to our next 1020, and when I turned around it like just fell off and it felt like, you know, like somebody took my picture, you know.

MS. MARTIN:    Objection, nonresponsive as to the last part, he asked him what happened.

THE WITNESS:    The door fell off the hinges.

THE ARBITRATOR:    I am going to overrule that objection.

MS. MARTIN:    Yes, Judge.

BY MR. KARPEL:

Q.    Okay, the door completely came off the

15

hinges?

    A.    Completely.

    Q.    All right.

And what happened to the door after it came off the hinges?

    A.    It struck me in the head, and then it made me fall to the ground.  And the other guy that was in the truck, the one I couldn't think of his name, he ran told me, he said my eye was still there, and he said everything will be all right.

    And he was --

MS. MARTIN:  Objection, hearsay.

THE ARBITRATOR:  Objection sustained, strike as to what the gentlemen said.

MS. MARTIN:  Thank you.

BY MR. KARPEL:

    Q.    What part of your body was struck by the door?

    A.    My head, my face.

    Q.    Where in your head and face?

16

A.    About a quarter inch over my eye.

Q.    Which eye?

A.    My right eye.

Q.    All right.

Do you know how much the door weighs?

A.    Yes, it was a heavy door.

Q.    Well, give us some idea of how heavy that door was.

A.    It took two of them to put it in the truck.

Q.    Okay.

After you were struck by the door what did you notice, what did you notice about yourself?

A.    I couldn't see, and the other guy was holding me, he was telling me everything would be all right.

MS. MARTIN:  Objection to what somebody else told him.

MR. KARPEL:  Just you.

THE WITNESS:  I couldn't see, I couldn't focus.

17

THE ARBITRATOR:  Sustained, strike the part of the answer as to what the other guy said.

MR. KARPEL:  I'm sorry, your Honor.

BY MR. KARPEL:

Q.   Where was your body at the point that, you know, you noticed that you can't see?

A.   I was like a big daze like --

Q.   I am asking you tell us where your body was.  What was the position of your body at that time?

A.   I was down on the ground.

Q.   Now, you have described to us after the door struck you in the head and face that you went down on the ground.

Did any part of your body strike the ground when you went down on the ground?

A.   Yes.

MS. MARTIN:  Objection, leading.

THE WITNESS:  Yes.

MR. KARPEL:  Your Honor, let me respond to that

18

one.

I don't know that that's leading.  He has described already hitting the ground, and I am asking if a part of his body struck the ground.  I guess I could say what if any part of your body struck the ground, but.

THE ARBITRATOR:  I am going to overrule the objection, it may stand.

MR. KARPEL:  I don't know if he answered.

THE ARBITRATOR:  He did answer, he said yes.

BY MR. KARPEL:

Q.    What part of your body struck the ground?

A.    My hands and my knee.

Q.    Which knee?

A.    My right knee.

Q.    How long were you on the ground?

A.    I'd say about 5 seconds, 6 seconds.

Q.    What happened next?

A.    I went to stand up.

Q.    And then what happened?

19

A.    The guy ran toward me and he grabbed me, and he was telling me, you still got --

MS. MARTIN:   Objection.

BY MR. KARPEL:

Q.    Just tell us what happened, what did he do?

THE ARBITRATOR:   Okay, objection is sustained, strike the answer as to what the guy told him.

Go ahead.

BY MR. KARPEL:

Q.    Tell us what happened, what did he do?

A.    He just grabbed me and hugged me.

Q.    All right.

How long did he hug you or hold you?

A.    I'd say about two, three minutes.

Q.    What were you noticing during the time he was holding you or hugging you?

A.    I couldn't focus, I couldn't stand up like.

Q.    What happened next?

20

A.    An area supervisor came up, they called an area supervisor, Koz, and he came up.

Q.    You said an area supervisor?

A.    Yes.

Q.    All right.

And do you know how to spell his name?

A.    No.  K-o-z-o, K-o-z-i, K-o-z, something like that.

Q.    Is that his first name or last name?

A.    Last name.

Q.    How long after the accident did he come?

A.    About 10 minutes.

Q.    Did you have a chance to look in a mirror at that point?

A.    Yes.

Q.    What did you see when you looked in the mirror?

A.    I saw a big cut off my eye, my eye was swelling up.

Q.    Was there any blood?

21

A.    Yes.

Q.    Where was the blood?

A.    All over me, all over my face and shirt.

Q.    What happened after the supervisor arrived?

A.    He told me that -- He told me to apply pressure, and I have to go back to 119th to get a ticket to go to the doctor.

Q.    Did you then go ahead and do that?

A.    Yes.

Q.    Did you speak with any other supervisors back at 119th?

A.    I don't even remember.

Q.    Did you get a ticket to go to the doctor?

A.    Yes, because I was still out there in the parking lot.

Q.    And is the doctor you went to see a doctor at MercyWorks?

A.    Yes.

Q.    And that's the City's company clinic, if

22

you know, the City's clinic?

    A.    Yes, it is.

    Q.    Just tell me, what did the doctor at MercyWorks do?

    A.    He told me I am going to need some stitches --

    MS. MARTIN:  Objection, Judge.

    THE ARBITRATOR:  Sustained.

    MR. KARPEL:  Your Honor, this is the City's clinic, I think that a doctor is in the nature of an agent of the City.

    THE ARBITRATOR:  Let's go off the record.

           (WHEREUPON A BRIEF DISCUSSION WAS

           HAD OFF THE RECORD.)

    THE ARBITRATOR:  Let's go back on the record.

BY MR. KARPEL:

    Q.    Okay, Mr. Owens, you were just describing your first visit to MercyWorks after the accident, would you tell us what the doctor did on that first visit?

23

A.     He gave me a shot, and then he put stitches in my head, and then he gave me off for a couple of days, and then he sent me back to work.

Q.     Okay, one second.

Okay, and that was on November 11th, the date of the accident; is that correct?

A.     Yes, sir.

Q.     And the doctor at that visit gave you a release to return to work full duty as of November 15th, 1999?

A.     Yes.

MS. MARTIN:  Objection.

Okay, fine.

MR. KARPEL:  All right.

THE ARBITRATOR:  Your objection is what?

MS. MARTIN:  My objection is that it is apparent from the medical records what happened on that date, but I will withdraw the objection, Judge.

THE ARBITRATOR:  All right.

BY MR. KARPEL:

24

Q.    Did you go back to work on November 15th,
1999?

A.    Yes.

Q.    All right.

Did you report to a supervisor before you
started working that day?

A.    Yes, I reported to Carlos Adams
(phonetic), and then I seen Bill Brown.

Q.    All right, where did you see Bill Brown?

A.    Oh, he was in his office.

Q.    What is Bill Brown's position with the
Department of Forestry?

A.    Superintendent.

Q.    He is a supervisor of you?

A.    Assistant superintendent or something like
that.

Q.    And he has supervisory control or duties
with respect to you; is that correct?

A.    Yes, sir.

Q.    And where did you see Mr. Brown that day?

25

A.    In his office at 119th and Marshfield.

Q.    Was anyone else present during the meeting between you and Mr. Brown that day?

A.    No.

Q.    Tell us as best you can remember exactly what you said to Mr. Brown and what he said to you in that conversation?

MS. MARTIN:   Objection to what Mr. Brown said to him, it's hearsay.

MR. KARPEL:   This is clearly Respondent's agent, this is the superintendent of the department, the assistant superintendent.

THE ARBITRATOR:   All right.

MS. MARTIN:   If he wishes to call him he is present to be asked.

THE ARBITRATOR:   He is going to testify to rebuttal anyway, so for the sake of time Mr. Carlos testifies to what he says and then he is going to be called to testify to rebuttal.

MS. MARTIN:   I hadn't planned to call Mr.

Carlos, Mr. Brown.

THE ARBITRATOR:  Oh, okay.  Okay, I got the
wrong name.

THE ARBITRATOR:  You are not planning on
calling him as a witness?

MS. MARTIN:  That was the first time I heard of
Mr. Carlos, I am calling Mr. Brown?

THE ARBITRATOR:  So you are going to call him?

MS. MARTIN:  Yes.

THE ARBITRATOR:  Then he is going to testify as
to rebuttal anyway.

MS. MARTIN:  It's my position, your Honor, that
he is calling for hearsay testimony.  The statements
that he is testifying about Mr. Brown stating are
out-of-court statements.

THE ARBITRATOR:  I understand it's hearsay, I
don't disagree with you, Counsel.

All I am saying is that eventually he is
going to testify as to rebuttal.  Also there is an
exception to the hearsay rule, statements of party

27

opponents, okay?

MS. MARTIN:  Yes, Judge.

THE ARBITRATOR:  If Mr. Brown is going to be
called as a witness and he is the superintendent,
that could probably come under as a party opponent.

MS. MARTIN:  Yes, but it first needs to be
established that it's adverse to one --

THE ARBITRATOR:  No, statements of party
opponent are exception to the hearsay rule.  A
statement against interest is admissible against any
witness, it doesn't have to be a party opponent,
but.

MS. MARTIN:  Okay, Judge.

THE ARBITRATOR:  And, Counsel, the way I see it
for the sake of time, even if I felt that he wasn't
a party opponent, and that would mean I had to find
that he is not high enough up the chain and
considered an agent of the Respondent being the City
of Chicago, at some point he is going to testify,
and then he is going to be called back to do

28

rebuttal.  So it's going to come out anyway, all
right?

MS. MARTIN:  I understand you are going to
sustain the objection, if you could just note my
objection for the record.

THE ARBITRATOR:  Before I do, he is the
superintendent, he is the assistant superintendent.

THE WITNESS:  Of forestry.

MS. MARTIN:  Assistant general.

THE ARBITRATOR:  And I got the name "Brown", is
it "Brown"?

MR. BROWN:  William Brown.

THE ARBITRATOR:  I thought I heard somebody say
Carlos.

MR. KARPEL:  The first guy he went to see was
Carlos, Carlos sent him in to Mr. Brown.

THE WITNESS:  That's my supervisor.

THE ARBITRATOR:  I don't want to preclude you
if he is not high enough on the chain that he is not
considered an agent so that I can consider him a

29

party opponent.

    MS. MARTIN:  Okay.

    THE ARBITRATOR:  Do you have any objection on those lines?  Because if you do then I will sustain the objection and make sure that he lays a proper foundation to show that Mr. Brown has the authority to make the statements that he made and so forth, whatever the statements are that are about to come out.

    If Mr. Brown does not have that authority or if he is not that high up then I will sustain the objection, but I don't know.  It sounds like when you say "superintendent" I used to work for the City, and you have to be kind of high up to have those titles.

    MS. MARTIN:  It's not my position that that's the objection I am making.

    THE ARBITRATOR:  So I don't have to worry about foundation?

    MS. MARTIN:  No, Judge.

THE ARBITRATOR:  All right, we will go back on the record -- Oh, we are on the record.

In that case then I will overrule the objection and allow the testimony as an exception to the hearsay rule, statement of party opponent.

All right, you may answer if you remember what the question was.

MR. KARPEL:  Let me repeat the question.

BY MR. KARPEL:

Q.    Tell us as best you can remember exactly what you said to Mr. Brown and what Mr. Brown said to you in that conversation.

A.    I came in the office, Carlos said go see Brown, I said all right.

So I went to see Mr. Bill Brown and I said, "Mr. Brown, I really don't feel too good.  I got this patch over my eye."

And he said, "You can't work like that." He said, "Why are you here?"  I said, "MercyWorks sent me back to work."  He said, "Well, if they sent

31

you back to work and you can't work like that then
go see your own doctor."

Q.    Did anything else occur in that
conversation?

A.    He say just go home and relax and go see
your own doctor and talk to Sharon Young.

Q.    Okay.    Anything else said in the
conversation?

A.    No.

Q.    All right.

A.    I told him to have a nice day.

Q.    Did you then go back to see the
MercyWork's doctor?

A.    Yes.

Q.    And that was that same day, November 15th,
1999; is that right?

A.    Yes.

Q.    And what did the MercyWork's doctor do on
that day?

A.    I believe --

32

Q.    This is the second visit?

A.    I believe they took some stitches out.
The 15th of November?  I think they took the
stitches out, and they told me to put some ice on my
head and they gave me some medicine.

Q.    Okay.

Is it possible that the stitches were
actually taken out the following day, February 16th,
1991?

A.    Yes, one of them days.

Q.    All right.

Did he take you off of work on November
15th, 1999?

MS. MARTIN:  Objection, Judge.

THE ARBITRATOR:  Sustained.

MR. KARPEL:  Can I have the basis for the
objection, your Honor?

THE ARBITRATOR:  Hearsay, I can tell you.

MR. KARPEL:  I am not asking what he said, I am
asking what he did.

33

THE ARBITRATOR:  Same thing, he communicated at some point, Counsel.

MR. KARPEL:  Okay.

BY MR. KARPEL:

Q.    Did he give you a prescription or make a recommendation to you in the nature of a prescription with regard to whether you should return to work that day?

A.    He just told me --

MS. MARTIN:  Objection, Judge.

THE WITNESS:  -- to relax and gave me a prescription --

MR. KARPEL:  Hold on, one second.

THE ARBITRATOR:  Hearsay as to what he told him, is that your objection?

MS. MARTIN:  Yes.

THE ARBITRATOR:  And I think his testimony was along the lines of what he told him, so I will sustain the objection and strike the testimony.

MR. KARPEL:  Okay.

34

THE ARBITRATOR:  Let's go off the record.

(WHEREUPON A BRIEF DISCUSSION WAS

HAD OFF THE RECORD.)

THE ARBITRATOR:  All right, let's go back on the record.

MR. KARPEL:  All right.

BY MR. KARPEL:

Q.   Did you return to work that day?

A.   Yes.

MS. MARTIN:  If I may ask, what day?

BY MR. KARPEL:

Q.   You testified that Bill Brown told you to go back to the doctor, correct?

A.   Yes.

Q.   You went back to see the MercyWork's doctor that day; is that correct?

A.   Yes.

Q.   Did you then that same day go back to work?

A.   No.

35

Q.    Okay.

On the following day you went back to the MercyWork's doctor; is that correct?

A.    Yes.

Q.    All right.

And at that time did he remove your stitches?

A.    Yes, I believe so.

Q.    Okay.

A.    15th or the 16th.

Q.    Okay.

And did you then return to work on that day?

A.    Yes, I believe.

Q.    And this was November 16th, 1999; is that right?

A.    (Nodding).

Q.    Yes?

A.    He removed the stitches I believe it was like in the afternoon, so I believe it was probably

36

the next day probably.

    Q.   And that's what we are saying, November 16th?

    A.   Yes.

    Q.   That was your third and last visit to the MercyWork's doctor?

    A.   Yes.

    Q.   So on November 16th after he removed the stitches you went back to work; is that right?

    A.   Yes.

    MS. MARTIN:  Objection, leading.

    MR. KARPEL:  I'll ask it in a non-leading fashion, your Honor.

    THE ARBITRATOR:  All right.

BY MR. KARPEL:

    Q.   What did you do after he removed the stitches, after you left MercyWorks that day?

    A.   I went home, slept, got up the next day and went to work.

    Q.   So that's November 17th then, right?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    Where did you report to work on November 17th?

A.    119th and Marshfield.

Q.    Who did you see that day?

A.    Mr. Brown again.

Q.    Did you talk with Mr. Brown?

A.    Yes.

Q.    And where did that conversation take place?

A.    You can't work like that --

Q.    No, no, where did the conversation take place?

A.    His office.

Q.    Was anyone else present during the conversation?

A.    No.

Q.    Tell us as best you can remember exactly

38

what he said and exactly what you said.

A.    I said, "Mr. Brown, I got my stitches out,
I am back to work but I don't feel good, and I got
swollen plus my knee killing me."

He said, "Well, if they sent you back to
work like that you cannot work in that condition
because we don't have any light duty."  And he said,
"What you need to do is go see your own doctor, Mr.
Owens, or do something because you cannot work in
that predicament."

So that day I left --

Q.    Wait one second.

Did you or he say anything else in that
conversation?

A.    Not really, no.

Q.    What did you do after the conversation?

A.    I said, "Okay, thank you."  And I left.

Q.    Okay.

All right, on that day tell us what were
you noticing about yourself?

39

A.   I wasn't no hundred percent.

Q.   Tell us what did you notice, what was wrong?

A.   My knee was hurting, my face was hurting. My right knee, my head was killing me.

Q.   What were you noticing about the right knee, just pain?

MS. MARTIN:   Objection, Judge, leading.

THE ARBITRATOR:   Okay, sustained.

BY MR. KARPEL:

Q.   What were you noticing about the right knee that day?

A.   Any time I take a step or go up it was killing me.

Q.   What other parts of your body?

A.   My head, my neck.

Q.   What were you noticing about your head?

A.   Dizzy, light-headed.

Q.   All right.

What about your neck?

40

A.    It felt like -- it felt like -- I don't know, just shock like coming from my shoulder like behind my ear like.

Q.    All right.

A.    Like a shock like.

Q.    How about the laceration site, the part that you were cut, what were you noticing about that, if anything?

A.    It was just swollen and real tender, real tender.

Q.    Your eye you described earlier having some blurred vision, and was it the right eye?

A.    Yes, and it was red, like the white part.

Q.    Okay.

Did you have a family doctor at that time?

A.    No, I didn't.

Q.    On November 22, 1999 you went to see --

MS. MARTIN:    Objection, leading.

THE ARBITRATOR:    Sustained.

BY MR. KARPEL:

41

Q.   Did you eventually go to see a doctor?

A.   Yes, I did.

Q.   How did you find that doctor?

A.   I was looking through the Yellow Pages and I was calling people, and I called him up and he told me to come in immediately.

Q.   Do you recall the doctor's name?

A.   It's a hard name.

THE ARBITRATOR:  Can he lead on the name?

MS. MARTIN:  He can lead on the name, I understand why.

THE WITNESS:  It's on 53rd and Cicero.

MR. KARPEL:  Hold on, hold on.

THE ARBITRATOR:  Counsel, do you want to go through the medical records?

MR. KARPEL:  We are probably 5 minutes from the end here, I am just going to do this quickly, all right?

BY MR. KARPEL:

Q.   Would that have been a Doctor Symanski,

42

S-y-m-a-n-s-k-i?

    A.   Yes.

    Q.   And is that located at 5301 Cicero, in Chicago?

    A.   Yes.

    Q.   Did Doctor Symanski examine you on that day?

    A.   Yes, he did.

    Q.   Did he refer you to another physician?

    A.   Yes, he did.

    Q.   On that day?

    A.   Yes, he did.

    Q.   What physician did he refer you to?

    A.   His name was --

MS. MARTIN:  Objection, we haven't established what day, where.  I mean we actually just know that some doctor treated him on some day.

MR. KARPEL:  He testified November 22, we know the doctor, we know where he is, he examined him. Now he is just testifying to a referral to another

43

doctor.

MS. MARTIN:   The objection was sustained as to
what day.   He said did there come a day that you saw
a doctor, the witness never testified what day he
saw the doctor.

THE ARBITRATOR:   Counsel, why don't you ask him
what day he saw the doctor?

BY MR. KARPEL:

Q.    What day did you see Doctor Symanski?

A.    The 22nd.

Q.    November?

A.    Yes.

Q.    Did Doctor Symanski refer you to another
doctor on that day?

A.    Yes.

Q.    Who did he refer you to?

A.    Tony.

Q.    Do you know Tony's last name?

A.    I keep forgetting his last name.

Q.    Would that be Tony Maghsoudi?

44

A.   Yes.

MR. KARPEL:  And I will spell that for you, one second.

MS. MARTIN:  Your Honor, I am going to object. I actually --

THE WITNESS:  I have a card here, it's M-a-g-h-s-o-u-d-i.

MS. MARTIN:  Judge, I was not able to read the last name, but I just realized I have those records.

MR. KARPEL:  Thank you very much

BY MR. KARPEL:

Q.   Okay, and did you see Doctor Maghsoudi?

A.   Yes.

Q.   Would that have been the first time on December 6th of 1999?

A.   Yes, I had to set an appointment up.

Q.   All right.

Was that the first appointment you could get with him?

A.   Yes.

45

Q.    And then you treated with Doctor Maghsoudi from December 6th, 1999 until February 17th of 2000; is that correct?

MS. MARTIN:  Objection, Judge, leading.

THE WITNESS:  Yes.

MR. KARPEL:  Your Honor, the records are going in.

THE WITNESS:  Yes.

THE ARBITRATOR:  Counsel, as we said before, if you want to go ahead and submit the records and then you can highlight them --

MR. KARPEL:  Okay.

THE ARBITRATOR:  -- otherwise I am going to sustain the objection.

MR. KARPEL:  All right.

MS. MARTIN:  Thank you, Judge.

BY MR. KARPEL:

Q.    During the time that -- Off the record for a moment, please.

THE ARBITRATOR:  Off the record.

46

(WHEREUPON A BRIEF DISCUSSION WAS

HAD OFF THE RECORD.)

BY MR. KARPEL:

    Q.    While you were treating with I am going to call him Doctor Tony, how many days a week would you see him?

    A.    Three times a week.

    Q.    What -- Strike that.

    During the time that you were seeing Doctor Tony, what if anything unusual did you notice about yourself?

    A.    My knee and my vision.

    Q.    All right.

    Let's start with the knee, what was bothering you with respect to the knee?

    A.    When I bent it and put force on it it hurt, but when I keep it stiff and straight it bothered me but not as much.

    Q.    Were you walking unassisted during the time you were treating with Doctor Tony?

47

MS. MARTIN:   Objection, Judge, leading.

THE ARBITRATOR:   Sustained.

BY MR. KARPEL:

Q.    Describe for us how you were walking when you were treating with Doctor Tony?

A.    With a crutch.

Q.    Okay.

All right, you also described to us your eye, what were you noticing about your eye during that time?

A.    It wouldn't focus like and it kept tearing.

Q.    Tearing as in drops of tears?

A.    Yes.

Q.    All right.

Did you notice anything else about yourself during the time, unusual about yourself during the time he was treating you?

A.    Pain in my neck, my eye, and I was just sad all the time.

48

Q.    All right.

What parts of the body was he giving you treatment to while you were treating with him?

A.    My knee, my neck.

Q.    Okay.

Your last visit with Doctor Tony was February 17th; is that correct?

A.    Yes.

MS. MARTIN:  Leading, Judge.

MR. KARPEL:  I'm sorry, forgot about that.

THE ARBITRATOR:  Sustained.

BY MR. KARPEL:

Q.    What day was your last visit with Doctor Tony?

A.    About February 17th.

Q.    All right.

Did he release you to go back to work on that day?

A.    Yes.

MS. MARTIN:  Objection, I will withdraw it, the

49

records will go in, they will speak for themselves.

THE ARBITRATOR:  Did you get the answer, Vicki?

THE COURT REPORTER:  Yes.

BY MR. KARPEL:

Q.    Have you received any treatment for any injuries you sustained in this accident since that last visit with Doctor Tony?

A.    Yes --

Q.    Do you understand my question?

A.    No.

Q.    Have you seen any other physicians for your neck or your knee or your eye or your face or your head since that last visit on February 17th with Doctor Tony?

A.    (No response).

Q.    Strike that.

Tell us what if anything unusual you notice about yourself now?

A.    My eyes start tearing --

MR. KARPEL:  Okay, and --

50

THE WITNESS:  -- and my knee is still bothering me --

THE ARBITRATOR:  One at a time.

How often does your eye tear?

THE WITNESS:  Every day.

BY MR. KARPEL:

Q.   And this is your right eye you are referring to?

A.   Yes, yes.

Q.   And what other things do you notice unusual about yourself?

A.   My shoulder and my knee.

Q.   All right, what shoulder?

A.   My right shoulder.

Q.   What do you notice about your right shoulder?

A.   It's like I have to have somebody to rub it, if not I have got to like rub it myself.

Q.   Okay.

Well, I am asking what are you

51

experiencing, what are you noticing, describe for us what it is you feel.

A.    It feels like a tightness.

Q.    How often do you notice the tightness?

A.    Like every other day.

Q.    Do you notice anything else besides tightness in your right shoulder?

A.    No, just pain.

Q.    Okay.

You described still having some problems with your knee; is that correct?

A.    Yes.

Q.    Which knee is that?

A.    My right knee.

Q.    What do you notice about your right knee?

A.    It ain't never act right no more.

Q.    Tell us what is wrong with it.

A.    You know, if I just walk up steps, you know, or if you turn too fast, you know, walking, turning corners, stuff like that.

52

Q.    What do you notice when you walk up steps
or turn too fast or walk around of turn the corner?

A.    Like it's going to give out.

Q.    Do you notice anything else besides the
feeling like it's going to give out?

A.    It hurts before I do it.

Q.    How often do you notice pain in your neck?

A.    That's like an everyday thing almost.

Q.    Okay.

One second, your Honor.

Did you receive any workers' compensation
while you were off of work?

A.    No.

Q.    Did the City ever provide you with a
written or oral explanation of the reason that you
were not receiving workers' compensation benefits?

A.    No.

Q.    Have your medical bills from Doctor Tony
and Doctor Symanski been paid?

A.    No.

53

MR. KARPEL:  Are you going to have an objection
to the bills being submitted?

MS. MARTIN:  Yes.

MR. KARPEL:  What is your objection?

THE COURT REPORTER:  Do you want this on the
record?

MS. MARTIN:  No.

(WHEREUPON A BRIEF DISCUSSION WAS

HAD OFF THE RECORD.)

THE ARBITRATOR:  Let's take a recess.

(WHEREUPON A SHORT RECESS WAS

TAKEN.)

THE ARBITRATOR:  Okay, go ahead.

MR. KARPEL:  So we have established that you
have gotten the bills.

MS. MARTIN:  I have no objection, your Honor.

THE ARBITRATOR:  What was your objection?

MS. MARTIN:  That we had notice of the bills,
your Honor.

THE ARBITRATOR:  All right.

54

BY MR. KARPEL:

Q.    Mr. Owens, you have described to us two conversations that you had with Mr. Brown?

A.    Uh-huh.

Q.    From the time of the last conversation you described until your last visit with Doctor Tony, did you have any other meetings with Mr. Brown?

A.    No, not really, no.

Q.    So you didn't see Mr. Brown after that last conversation until February 17th?

MS. MARTIN:    Objection, asked and answered.

MR. KARPEL:    I am just making sure I understand this.

MS. MARTIN:    Okay, Judge.

THE ARBITRATOR:    Withdraw the objection?

MS. MARTIN:    I withdraw the objection.

THE WITNESS:    When I went to go back to work

BY MR. KARPEL:

Q.    Excuse me?

A.    When I went to go back to work.

Q.   Okay.

When was the first time that you saw Mr.
Brown after he told you to go see your own doctor?

A.   It was around the 15th, 16th of November.

Q.   Okay.

A.   1999.

Q.   Okay, all right.

Let me make this a little more -- Let's
reference this to an event.

Did you see Mr. Brown after you first --
after you saw Doctor Symanski?  Did you ever see Mr.
Brown after your visit with Doctor Symanski?

A.   Yes, yes.

Q.   How long after your visit with Doctor
Symanski did you see Mr. Brown?

A.   About a week.

Q.   Okay.

Where did you see him?

A.   Saw him in the garage.

Q.   Was anyone else present when you saw him

56

in that garage?

    A.    Yes, but I don't believe they listened to the conversation.

    Q.    Okay.

    Who else was there in the garage at the time?

    A.    Coworkers.

    Q.    Okay.

    A.    And area supervisor, something like that.

    Q.    Did you have any communication with Mr. Brown at that time?

    A.    Yes.

    Q.    Would you tell us as best you can remember what you said to him and what he said to you?

    A.    It was sort of like how you doing, everything is all right now, going to another doctor, here is my paperwork.  I gave it to what's his name in the office.

    Q.    Did he use those words, "What's his name"?

    A.    9 out of 10, yes.

Q.    Did you and Mr. Brown say anything else to each other in that conversation?

A.    No.

Q.    What did you do after that conversation?

A.    I gave the papers up and I left.

Q.    Who did you give the papers to?

A.    The guy behind the desk with the glasses on, is his name Tony?

Q.    What's Tony's position, if you know?

A.    He is sort of like dispatcher, and what's his name?  I think that's his name.

Q.    Okay.

You said behind the desk.  Where is the desk?

A.    It's in the office.

Q.    And this is the same area that you had -- the same address that you had your other conversation with Mr. Brown; is that correct?

A.    Yes, same address.

Q.    All right.

What papers did you give Tony?

A.    My doctor papers and stuff like that.

Q.    Okay, doctor papers from Doctor Symanski?

A.    Yes.

MS. MARTIN:    Objection, leading.

BY MR. KARPEL:

Q.    From what doctor were the papers from?

A.    Tony.

Q.    No, no, I am asking you, this is the week after you saw Doctor Symanski, just now you testified you gave Tony some papers, who were those papers from?

A.    The other Doctor Tony.

Q.    Is that Doctor Symanski?

A.    Yes.

Q.    What were the papers, do you know?

A.    The paper was the type of therapy he was giving me and what was wrong with me, and he was taking me off of work.

Q.    Okay.

59

Did you have any other meetings with Mr. Brown after that one that you just described to us?

A.    No, he was never in the office when I came back.

Q.    Did you have any meetings -- Did you give papers from Doctor Tony, this is the Chiropractor, to anyone else at your -- at that office?

A.    Yes.

Q.    Okay, when did that happen?

A.    That happened a few more weeks later.

Q.    All right.

Who did you give papers to?

A.    To the same guy.

Q.    Who were the papers from?

A.    They was from a doctor's office, my doctor's office, Tony.

Q.    Doctor Tony Maghsoudi?

A.    Right.

Q.    What were in those papers?

A.    My diagnosis, and I was still off work.

60

MS. MARTIN:   Objection, we do have medical records going in.

MR. LEOVY:   He can identify them if he can.

THE ARBITRATOR:   He is asking him what documents he gave.

MS. MARTIN:   Your Honor, I don't have a problem with stating they are doctor's notes for treatment, and we can reference them and put them in; however, the medical records should speak for themselves and they will.   He can submit those records to the Arbitrator as to what they said.

THE ARBITRATOR:   But that wasn't identified what records he gave to them at that time.

MR. KARPEL:   I am trying to find out what records did he give to them.

MS. MARTIN:   The only problem is we are asking what records those are.

THE ARBITRATOR:   That's what he is asking the witness.

MS. MARTIN:   And I was asking that it be

61

identified, that's fine, Judge.

THE ARBITRATOR:  That's what he is asking the witness, Counsel.

MS. MARTIN:  Okay.

THE ARBITRATOR:  All right, overruled.

BY MR. KARPEL:

Q.    Tell us what records you gave Tony, the dispatcher?

A.    It was like for me being off of work, and why I was off work, and that was it.

MS. MARTIN:  Your Honor, that's still the same objection, which papers are these he is talking about?

He is stating what's in the records that he supposedly gave Tony behind the counter, we are asking to identify what papers he supposedly gave him.  He has not answered that question.

THE ARBITRATOR:  But, Counsel, he has.  He said he gave him the off-work slip.

Are you referring to what date?

62

MS. MARTIN:  Yes.

THE ARBITRATOR:  It was some Doctor Maghsoudi.

MS. MARTIN:  Fine, Judge.

THE ARBITRATOR:  I'm not sure what you are driving at.

Is there more than one off-work slip?  Is that what you are saying?

MS. MARTIN:  No, I am saying at this point we need to know what specifically -- if he is going to bring in medical records and he is putting in a foundation to put those in, then he should identify what date these records are from, the doctor, and what they are, Judge.

MR. KARPEL:  Your Honor, I think I have done all that, he has testified to the best of his recollection the date, he has given us at least a timeframe.

He told us who the records are from, and he told us his best description as to what they were.

63

THE ARBITRATOR:  I will overrule the objection.

MS. MARTIN:  Yes, Judge.

MR. KARPEL:  No further questions, your Honor.

THE ARBITRATOR:  Okay, Cross.

MS. MARTIN:  Thank you, your Honor.

If I may just have a minute to look over my notes.

THE ARBITRATOR:  All right.

The record should reflect that co-counsel for the Respondent is present and has made statements on the record.

Would you state your name for the record, please?

MR. LEOVY:  John Leovy.  That's spelled L-e-o-v-y.

THE ARBITRATOR:  Thank you.

MR. LEOVY:  Thank you.

MS. MARTIN:  Your Honor, if I may?

THE ARBITRATOR:  Yes.

64

CROSS EXAMINATION

BY MS. MARTIN:

Q.    Mr. Owens, you stated that the first time you went to MercyWorks was November 11th, 1999; is that correct?

A.    Yes.

Q.    And on November 11th, 1999 you received treatment at MercyWorks; is that correct?

A.    Yes.

Q.    And during that receiving of treatment you described certain symptoms; is that correct?

A.    Yes.

Q.    And at that time you stated that the door came off the truck and it hit you in the head, correct?

A.    Yes.

Q.    At no time did you describe to them -- withdrawn.

However, you made no mention of having

complaints of pain in the knee or shoulder; is that correct?

A.    No.

Q.    And you further went back to work on the 15th; is that correct?

A.    Yes.

Q.    And you stated that you first went to Mr. Adams; is that correct, and he directed you to Mr. Brown?

A.    Yes.

MR. KARPEL:   Let me stop the record.  I didn't say Mr. Adams, he said something else.

THE ARBITRATOR:   I thought it was Carlos.

THE WITNESS:   Carlos Adams.

MR. KARPEL:   I just wanted to make sure it was the same guy.

MS. MARTIN:   Okay.

BY MS. MARTIN:

Q.    And when you left MercyWorks, or when you left work you went back to MercyWorks for treatment;

is that correct?

    A.   Yes.

    Q.   And did you at that time state to MercyWorks that you had to wear a helmet, not that you had a bandage and couldn't see and that's why you were unable to work?

    A.   No.

    Q.   At that time you left MercyWorks you stated that you left and you went to sleep; is that correct?

    A.   Yes.

    Q.   Did you ever contact anyone after that time at your job site after going to MercyWorks on November 15th?

    MR. KARPEL:  Let me raise an objection, you are asking him about that day or any day?

    MS. MARTIN:  November 15th.

    THE WITNESS:  After it was over, yes, I went home and went to sleep.

BY MS. MARTIN:

67

Q.   And you presented again to MercyWorks on November 16th; is that correct?

A.   Yes.

Q.   That would be the following day; is that correct?

A.   Yes.

Q.   And at that time isn't it a fact that you actually stated that you were without complaint and that you were examined to determine whether your -- Excuse me, just to the first part, isn't it a fact that at that time you were presented to MercyWorks at that time and you were released to full duty?

A.   No.

MR. KARPEL:   That's a compound question.

MS. MARTIN:   Your Honor, I'll break it down, I will be happy to.

THE ARBITRATOR:   Okay.

BY MS. MARTIN:

Q.   In fact you presented on November 16th to MercyWorks; is that correct?

68

A.   Yes.

Q.   And at that time you presented to MercyWorks isn't it a fact that you presented without complaints?

A.   No.

Q.   And at that time you were released to full duty on that day for the next day, is that not correct?

A.   Yes.

Q.   You stated on Direct that your -- on November 17th you reported back to work pursuant to the full-duty discharge; is that correct?

A.   No.

Q.   Did you return to work on November 17th?

A.   Yes.

Q.   And you stated that you went to 119th and Marshfield; is that correct?

A.   Yes.

Q.   And you described at that time having some complaints with your knee; is that correct?

69

A.    Yes, and head.

Q.    And at that time you stated during Direct that your knee was killing you; is that correct?

A.    Yes.

Q.    However, the first time that you went for treatment was approximately November 22nd with Doctor Symanski; is that not correct?

A.    Yes.

Q.    You did not present to MercyWorks that day, on the 17th or any other doctor on the 17th; is that correct?

A.    Yes, that's correct.

Q.    You state that on November 22nd you went to Doctor Symanski.  Is that the individual that you found in the Yellow Pages?

A.    Yes, I believe so.

Q.    And you are currently covered by the City of Chicago insurance; is that not correct?

A.    No.  I'm not covered now.

Q.    I'm sorry?

70

A.    No.

Q.    On November 22nd you were covered by the City of Chicago group insurance; is that correct?

A.    Yes.

Q.    And there is a procedure for referrals under the City of Chicago group insurance where you can get referrals from your primary care physician; is that not correct?

A.    I didn't have a primary care physician.

Q.    At the time you were referred to Doctor Tony Maghsoudi your first appointment was when?

A.    (No response).

Q.    If you recall?

A.    I don't remember.  I think it was -- I don't remember.

Q.    If the records were to reflect that your history started on December 6th, 1999 with Mr. Maghsoudi; would that be correct?

A.    Might be, yes.

Q.    What type of doctor is Mr. Maghsoudi?

71

A.    Therapist.

Q.    What kind of therapist, please?

A.    Physical therapist.

Q.    So he would not be a doctor?

A.    He is a doctor.

Q.    Is he a medical doctor?

A.    Yes.

Q.    And what type of practice does Mr.
Maghsoudi have, Doctor Maghsoudi have?

A.    What I just told you, a physical
therapist.

MR. KARPEL:  If you want to stipulate to the
fact that Doctor Maghsoudi is a Chiropractor, I'll
be happy to do that, unless there is --

MS. MARTIN:  That was my point, Judge.

THE ARBITRATOR:  Counsel, are you agreeing that
he is a Chiropractor?

MR. KARPEL:  Yes.

THE ARBITRATOR:  Does that satisfy you?

MS. MARTIN:  That satisfies the question,

Judge.

BY MS. MARTIN:

Q.    And, if I may, December 6th if the records
reflect that your patient history states December
6th, 1999, would that be accurate to the first time
you received treatment from Doctor Maghsoudi?

A.    Yes.

Q.    And you stated during Direct that you
received treatment approximately three times a week
from Mr. Maghsoudi, Doctor Maghsoudi; is that
correct?

A.    Yes.

Q.    And Doctor Maghsoudi was treating you for
what ailment, Mr. Owens?

A.    My knee and my neck.

Q.    Were you seeing anyone for your vision
problems, Mr. Owens?

A.    Yes, I had an appointment set up but I
couldn't make it because then some more personal
things happened, that's it.

73

Q.    But you were having vision problems where you couldn't focus and you had tearing, but you did not receive treatment for your eye problem; is that correct?

MR. KARPEL:  Well, there is an objection as to time.

When did he have the problems that you were asking about?

MS. MARTIN:  Your Honor, he testified on Direct that he was treated from December 6th to February 17th.

THE ARBITRATOR:  I'm sorry, I missed the question.

Your objection is give a timeframe?

MR. KARPEL:  Yes, and that he had a problem with his vision, but he didn't see another doctor.

At what time?

THE ARBITRATOR:  Well, if he didn't see another doctor that includes all the time.

MR. KARPEL:  I think it's important if he is

74

having blurred vision after the accident and he

didn't see the doctor that's one thing, if the

blurred vision goes away rapidly and he doesn't see

a doctor, you know, on or after December 6th, you

know, that leads to a different conclusion there.

THE ARBITRATOR:  Well, I disagree, overruled,

he can answer the question.

BY MS. MARTIN:

Q.    Did you see a doctor for your vision

problems, Mr. Owens?

A.    I didn't get a chance because I had to go

downtown, but I set up an appointment.

Q.    But you never fulfilled that appointment?

A.    No, I did not.

Q.    Okay.

When you received your treatments three

times a week you were receiving Chiropractic

treatment for your knee; is that correct?

A.    Knee and muscle.

Q.    You stated that you gave your statement to

75

"What's his name behind the desk."   First name Tony,

do you have a last name for that gentlemen?

A.    No, the first statement I believe I gave

to Mr. Brown, one of them.

Q.    Referring to the statement that you stated

you went into the office and you gave your medical

records to Tony, do you have any --

A.    That was probably the second time I came

in --

MR. KARPEL:   Listen to her question, all right?

THE ARBITRATOR:   And wait until she finishes

the question, okay?

THE WITNESS:   Okay.

BY MS. MARTIN:

Q.    You stated that you gave your note to a

person behind the desk in the office; is that

correct?

A.    Yes.

Q.    And you gave that to a gentlemen, you gave

us only the first name, I am asking you now do you

76

have the last name of that gentlemen?

    A.    No, I do not.  I don't think I got his name right.

    Q.    To the best of your recollection it's the name that you gave us; is that correct?

    A.    Yes.

    Q.    What is the title of that gentlemen, if you know?

    A.    I think he is a dispatcher, because he calls the trucks and gives us certain locations to go to in case of emergency or something like that.

    Q.    Did you ever ask what happened to those papers by the dispatcher?

    A.    No, I did not.

    Q.    There came a time approximately 4 days after the accident that you filled out a report of occupational injury and illness; is that correct?

    A.    I don't know.

    Q.    Did you fill out an accident form?

    A.    Yes.

77

Q.    And that would have been approximately
four days later; is that correct?

A.    Yes, approximately --

Q.    I'm sorry, I thought you were finished; is
that correct?

A.    Yes.

Q.    And at that time you filled it out and you
signed and submitted that form; is that correct?

A.    Yes.

Q.    In it isn't it a fact that you actually
state that you were struck in the head by the door?

MR. KARPEL:  Okay, let me raise an objection
here.

First of all, I haven't seen the document
ever that she is Cross Examining on.  I would like
the opportunity to look it over.

(DOCUMENT TENDERED.)

MR. KARPEL:  Thank you.

THE ARBITRATOR:  Off the record.

(WHEREUPON A BRIEF DISCUSSION WAS

HAD OFF THE RECORD.)

THE ARBITRATOR:  Back on the record.

MS. MARTIN:  Thank you, Judge.

BY MS. MARTIN:

Q.    Mr. Owens, isn't it a fact that you never describe any injury to your neck, your shoulder, or your knee in that incident report?

A.    I don't remember.

MR. KARPEL:  Hold on, let me raise another objection.

I think that that's a mischaracterization of what happened here.  He didn't prepare it's obvious this incident report, he signed it.

I think that your question implies that he actually prepared this thing, and in that sense I think it's an inaccurate and unfair question.

THE ARBITRATOR:  Overruled, he can answer.

Did you get his answer, Vicki?

THE COURT REPORTER:  Yes.

79

BY MS. MARTIN:

    Q.    You stated earlier that there was an occupational injury report filled out, correct?

    A.    Yes.

    Q.    And that was pursuant to your giving information to the person who prepared the report, Mr. Aguilar; is that correct?

    A.    Yes.

    Q.    And at the time you signed it you signed line 34 that you state that the information given above is correct, and you signed on that dotted line; is that correct?

    A.    To the best of my knowledge at that time, yes.

    Q.    At that time isn't it a fact you stated you sustained a laceration on your forehead when you were struck in the head by the door?

    A.    Yes.

    Q.    And that was a form that you signed, is that not correct?

A.    Yes, I believe so, yes.

MS. MARTIN:  Your Honor, I have nothing further.

THE ARBITRATOR:  All right, any Redirect?

MR. KARPEL:  Yes, I have a few questions.


REDIRECT EXAMINATION

BY MR. KARPEL:

Q.    You recall talking with Mr. Aguilar about how the accident happened; is that correct?

A.    Yes.

Q.    Tell me, were these your exact words to Mr. Aguilar, that you "sustained a laceration on your forehead when tool box door on compose truck No. 11595 broke at the hinge and struck him on the head.  You went to MercyWorks and were put on duty disability as of 11/12/99 --

MS. MARTIN:  Objection.

MR. KARPEL:  Let me finish.

"His follow-up date on November 16th,

81

1999."

Were those the exact words that you said to Mr. Aguilar when you described what happened?

THE WITNESS:  No.

MS. MARTIN:  Objection, Judge.

A., there is no quote; and, B, as to the last two sentences that doesn't follow from Owen states, the other two sentences are he went to MercyWorks.  As to the first sentence I did say did you state; however, there is no quotation.

So his answer is correct that those were not his exact words then.

THE WITNESS:  No.

MS. MARTIN:  As to the second two statements.

MR. KARPEL:  I am just going to show him this report, that will make it easier.

THE ARBITRATOR:  The answer may stand, those were not his exact words.

MR. KARPEL:  Let me mark this as my Petitioner's Exhibit No. 1 for identification.

82

MS. MARTIN:   That's fine, Judge.

BY MR. KARPEL:

Q.   Mr. Owens, would you please take a look at that?

THE ARBITRATOR:   That's Petitioner's Exhibit what?

MR. KARPEL:   1, and this is the report of occupational injury, I will put it into evidence as well.

THE ARBITRATOR:   Okay.

THE WITNESS:   No.

BY MR. KARPEL:

Q.   No, I am first asking you just to look at it.

A.   Okay.

Q.   Is that your signature on line 34?

A.   Yes, it is.

Q.   And you have seen this before?

A.   No.

Q.   Well, how is your signature on it if you

haven't seen it before?

    A.    He was telling me --

    Q.    I am asking you have you seen the document before?

    A.    No -- I probably did see this document, but I didn't see what was written on there.

    Q.    I am not asking you this, you have seen this and you signed it; is that correct?

    A.    Yes.

    Q.    Do you know how to read?

    A.    Yes.

    Q.    This part on 21, would you read that outloud?

    A.    Yes.

    Q.    I am asking you to read it outloud.

    A.    "TT 1 Mitchell Owens stated that he sustained a laceration on the forehead when tool box door on the compose truck 11595 broke at the hinge and struck him on the head.  He went to MercyWorks and was put on duty disability as of 11/12/99.  His

84

follow-up date on 11/16/99."

Q.    Okay, was that the words you said to Mr.
Aguilar when you described the accident to him?

A.    No.

Q.    Okay, thank you.

This man that you described as a
dispatcher, his office is at 119th and Marshfield?

A.    Yes.

Q.    Tell us where he sits there.

A.    As you enter the door on the left-hand
side.

Q.    Okay, and is that at a desk --

A.    It's a long office desk, it's almost like
a bar-type desk.

Q.    You described before a window there?

A.    Yes.

Q.    Is there a window that separates you from
his desk?

A.    No, no.

Q.    Where is the window?

85

A.    The window is like across from you, you can look outside and that's it.

Q.    Okay.

And that's where he sits every day?

A.    Yes.

MR. KARPEL:  All right, I have no other questions.

MS. MARTIN:  Your Honor, one follow-up question.

THE ARBITRATOR:  Sure.


RECROSS EXAMINATION

BY MS. MARTIN.

Q.    You stated in fact though that you did sign it, and it's your signature; is that correct?

A.    Yes.

Q.    Did you read the form prior to signing the bottom of it on line 34 as to the information being supplied as being, and I will quote, "correct"?

A.    No, I did not read it.  He stated exactly

86

what this document was, and I was seeing a doctor at the time, and he said just sign it and I will talk to you some other time.  And I signed it --

THE COURT REPORTER:  Please repeat that.

MR. KARPEL:  Tell what you said about the duty disability.

THE ARBITRATOR:  Wait, wait, you don't have a right to ask questions at this point.

MS. MARTIN:  Your Honor, the question was had you read the form prior to signing it, I believe the answer was no.  I would ask to strike everything else as being nonresponsive.

He started the answer with no, and then he --

THE ARBITRATOR:  Counsel, I disagree, I think that's all his answer, so I will allow the answer to stand.  The objection is overruled.

MS. MARTIN:  Okay, Judge, I have nothing further.

MR. KARPEL:  Nothing further, your Honor.

87

THE ARBITRATOR:  Any other witnesses for the Petitioner?

MR. KARPEL:  No, your Honor.

THE ARBITRATOR:  Any exhibits?

MR. KARPEL:  The medical records.

THE ARBITRATOR:  Petitioner's 1, is there any objection to that?

MS. MARTIN:  No objection to Exhibit 1.

THE ARBITRATOR:  Okay, any other exhibits?

MR. KARPEL:  Yes, Petitioner's Exhibit No. 2 are the records of Doctor Symanski.

THE ARBITRATOR:  Any objection?

MS. MARTIN:  As long as we have seen it I have no objection, but I would like an opportunity to review it.

THE ARBITRATOR:  Give Exhibit 2 to Counsel, okay?

MR. KARPEL:  Exhibit 3 are the records of Doctor Jamrocha and Doctor Tony.

MS. MARTIN:  Your Honor, I had an opportunity

88

to review those records and I don't have an
objection to those records.

MR. KARPEL:  And then Exhibit 4 are the medical
bills from Doctor Tony and Doctor Jamrocha, the
Chiropractor.

MS. MARTIN:  I don't have an objection.

THE ARBITRATOR:  All right, and are there any
other exhibits?

MR. KARPEL:  No, your Honor.

THE ARBITRATOR:  Counsel?

MS. MARTIN:  Just a minute, your Honor.  I was
conferring to see if my co-counsel had seen it
before.

Okay, Judge, no objection to Petitioner's
Exhibit 2.

THE ARBITRATOR:  All right, Petitioner's
Exhibits Nos. 1, 2, 3 and 4 are admitted into
evidence.

89

(WHEREUPON, SAID DOCUMENT WAS
THEREUPON MARKED AND RECEIVED
IN EVIDENCE AS PETITIONER'S
EXHIBIT NO. 1-4, AND IS IN
WORDS AND FIGURES AS FOLLOWS,
TO-WIT:)

File Date: _____April 11, 2008_____

Case No: _____08cv 2090_____

ATTACHMENT # _____1_____

EXHIBIT _____

TAB (DESCRIPTION)

Complaint Continued

**Department**
STREETS AND SAN

**Bureau / Division**
FORESTRY

**Ward / Dist.**
SOUTH

A-HOD

**City of Chicago**
**Report of Occupational Injury or Illness**

| | |
|---|---|
| Social Security No. | Fund 100 | Depart. |
| Activity 2060 | Unit | Account 0005 | Object |
| Payroll No. 3803 | Federal Payroll No. | CBO |
| Pension Fund ☐ None ☒ Laborer's ☐ Municipal | |
| Health Ins. B.C. ☒ ☐ HMO ☐ | |

(5)

**INSTRUCTIONS: THIS PROPERLY COMPLETED REPORT MUST BE RECEIVED BY THE COMMITTEE ON FINANCE, WORKERS' COMPENSATION DIVISION WITHIN 5 DAYS OF THE INJURY OR ILLNESS.** This report is to be completed even if the injury does not require immediate medical treatment. Print or type all information. The proper completion of this form is required for the processing of Workers' Compensation Benefits. This report must be properly completed and investigated by the employee's immediate supervisor or foreman. The injured employee must report to or notify the City designated medical facility.

| 1. Name of Employee (Last, First, Middle Initial) OWENS, MITCHELL M. | | 2. Job Title TREE TRIMMER-1 | 3. Title Code 7972 |
|---|---|---|---|
| 4. Home Address (No., Street, City, Zip) 6326 S. THROOP CHGO. IL. 60636 | | | 5. Home Telephone No. (773) 434-3125 |
| 6. Sex M | 7. Date of Birth 9/25/62 | 8. Marital Status ☐ Married ☒ Single ☐ Divorced | 9. No. of Children under 18 __ 4 | 10. Wages ☒ hr. ☐ day ☐ mo. $ 19.97 |
| 11. Service Time with City 8 yrs. | 12. | | 13. Name of Immediate Supervisor JOHN KOZIOL |
| 14. Date and Time of Injury or Illness mo. 11 day 11 yr. 99 09:30 ☒ am ☐ pm | 15. Date and Time Injury or Illness Reported to Supervisor mo. 11 day 11 yr. 99 Time 09:40 ☒ am ☐ pm | 16. | ☐ no |
| 17. Location of Incident by Address 9308 S. PLEASANT | 18. Type of Area Where Incident Happened? ☐ Alley ☐ Yard ☐ Street ☐ Building ☐ Plant ☐ Shop ☒ Job-Site ☐ Vehicle Accident ☐ Other | | |
| 19. Will Injury Result In Lost Time? ☒ yes ☐ no | If "yes" First Full Day Off Work? Mo. 11 Day 12 Yr. 99 | 20. What is the Last Date for which Employee Received pay? Mo. 11 Day 11 Yr. 99 | |

21. Detailed Description of Injury or Illness. What Caused the Incident? What Duty was the Employee Performing? **BE SPECIFIC AND ACCURATE AS TO BODY PART.**

TT-1 MITCHELL OWENS STATES THAT HE SUSTAINED A LACERATION ON HIS FOREHEAD WHEN TOOLBOX DOOR ON COMPOST TRUCK #11595 BROKE AT THE HINGE AND STRUCK HIM ON THE HEAD. HE WENT TO MERCYWORKS AND WAS PUT ON DUTY DISABILITY AS OF 11/12/99. HIS FOLLOWUP DATE ON 11/16/99.

| 22. City Truck No. 11595 | 23. Driver's Name D N A | 24. Police Department R.D. No. D N A | 25. Fire Department Notified? Paramedic Amb. No. ☐ yes ☒ no |
|---|---|---|---|
| 26. Employee Hospitalized? ☐ yes ☒ no | 27. Was City Medical Provider Notified? ☒ yes ☐ no If "yes" Name of Employee who Gave Notice M. OWENS | | 28. Have Medical Services Been Rendered to Employee by: ☒ City Designated Medical Facility? |
| 29. Name, Address, and Telephone No. of Hospital, Clinic or Attending Physician MERCYWORKS 5635 S. PULASKI 284-5278 | | | ☐ Personal Physician? Address |
| 30. Name and Signature of Witnesses 1. | | | |
| 31. | | | |
| 2. | | | |
| 32. First Person Notified JOHN KOZIOL | Title F.S | | Business Telephone No. 747-0429 |
| 33. Report Prepared By—Name (Print or Type Only) AL AGUILAR | Date Month 11 Day 15 Year 99 | Title TT-2 | Signature |

34. **I HEREBY CERTIFY THAT THE INFORMATION GIVEN ABOVE IS CORRECT AND THAT THESE INJURIES WERE SUSTAINED IN THE COURSE OF MY EMPLOYMENT.** I hereby agree that in consideration of the payment by the City of Chicago of any workers' compensation expenses incurred as a result of the above injuries, I will:
1. NOTIFY THE DEPT. OF LAW as to the name and address of any attorneys I may retain for the purpose of pursuing a claim on my behalf because of said injuries involving a third party.
2. REIMBURSE THE CITY OF CHICAGO in full for any sums which it has or may expend on my behalf for said Workers' Compensation expenses from any recovery which I have or may effect from the person or party whom it is claimed is responsible for my injuries.

| If Injured Member is Unable To Sign, Record This in Signature Block. | Signature of Injured Member M. Owen | Date Month 11 Day 15 Year 99 |
|---|---|---|

35. _____ FURTHER INVESTIGATION SUGGESTED

| Signature of Immediate Supervisor John Koz | Business Telephone No. 747-0429 | Date Month 11 Day 15 Year 99 |
|---|---|---|

36. I HEREBY CERTIFY THAT AS A RESULT OF THE INVESTIGATION DESCRIBED ABOVE:
☒ I am satisfied that the injury described above was received in the course of this individual's employment.
☐ I am not satisfied that the injury described above was received in the course of this individual's employment.

| Commissioner's Signature | Date Month 11 Day 17 Year 99 | 37. Occupational Safety and Health Div. (Signature) Date Month 11 Day 22 Year 99 |
|---|---|---|

WHITE COPY-COMMITTEE ON FINANCE WORKERS' COMPENSATION DIVISION
PINK COPY-DEPARTMENT OF HEALTH, OFFICE OF CITY PHYSICIAN

YELLOW COPY-OCCUPATIONAL SAFETY AND HEALTH DIVISION
GOLDENROD COPY-REPORTING UNIT

Form DPGS 1480-1 (6/90)

STREETS & SAN. 99 NOV 22 AM 8: 22



PROGRESS NOTES — Mitchell Owens — DATE OF BIRTH — PG# — Formedic

DATE - TIME / CPT CODE — HT — WT — BMI — BP — P — ALLERGIES - NKA

Mitchell Owens

NOV 22 1999

Wt: 200 lb
BP: 130/76

- 37 y. old, check up after stiches removal above (R) eye.
- headache
- problems sleeping at night

[illegible]

[redacted]

π'' 2 [illegible] VB

FORMEDIC ... 1988 720 WORLDS FAIR DR., SOMERSET, N.J. 08873
APPROVED BY FORMEDIC'S PHYSICIAN ADVISORY BOARD PMLE

| E - TIME | HT | BMI | BP | P | ALLERGIES | |
| CPT CODE | WT | | | | | |

Owens, Mit... **Formedic**

The stroke came 11/16/99

It was soluble for was
of 11/16/90 but doely for
rell to reserve work

There no light duty war)

P.E.
   neck tender, rom
   Le posterior pur
   lumbar tender- song tender
   no pere whn
   wellday
   line - pawen, the

slt sit indl course
   wil send pt fu
   pool terry

Metmin 600 y 10 B.D
   @ per

J... doling
1/16 - 4/30/94

Fysch dry

ZAC

# A. JAMROCHA CHIROPRACTIC, P.C.
5725 South Archer Avenue
Chicago, Illinois 60638
(773) 735-9665

Patient: Mitchell Owens
DOB: 09/25/1962

DOI: 11/11/1999

Mitchell Owens began treatment at A. Jamrocha Chiropractic, P.C. for injuries sustained in a work related accident which occurred on 11/11/1999. Mr. Owens was first examines on 12/6/99 and his treatment continued until 2/17/00.

This patient presented with skull contusions and lacerations with stitches, facial edema, cervical sprain/strain, headaches, muscle spasms to the cervical region, knee contusions and knee pain. This patient was found to have marked dizziness associated with the headaches. His cervical region demonstrated severely restricted range of motion, pain upon palpation as well as muscle spasms. His knee was also found to demonstrate decreased range of motion, pain upon palpation, marked muscle weakness. Orthopedic and chiropractic testing revealed that the weakness and lack of range of motion to the knee required this patient to be non ambulatory.

This patient was treated according to normal medical/chiropractic guidelines and his treatment was consistent with his injuries. Once pain was controlled and then alleviated, therapy focused on increasing range of motion to the cervical and knee areas as well as reducing edema and soft tissue inflammation. Strengthening of the cervical and knee musculature was imperative to his return to normal activity.

Mitchell Owens treated through 2/17/00. Due to the severity of his conditions Mr. Owens was placed on complete disability from 12/6/99 through 2/17/00. It was imperative that Mr. Owens remain off of work to allow for total healing of the cervical and knee regions. For most of his treatment Mr. Owens was on crutches and ambulation was at a minimum. The nature and job duties performed by Mr. Owens on a regular basis were such that a return to work would have aggravated the areas injured. Not to mention Mr. Owens was not physically capable of performing most of his duties due to the injuries sustained and the lack of muscle strength and range of motion to the knee and cervical areas.

Mitchell Owens was released to return to work on 2/17/00 and was released to maintenance care at that time.

*Tony Maghent, JC.*

*Agnes A. Jamrocha, P.C.*

π" 3

# HISTORY

PATIENT NAME: Mitchell Owens    DATE: 12/6/99

**1. CURRENT COMPLAINT:** HA's + neck (P) ① (R) Side, (R) knee (P), (P) into (R) shoulder. Had nausea + vomiting for 2 days after accident.

**2. ONSET OF SYMPTOMS:**
☐ gradual    ☒ sudden

Date symptoms began: 11/11/99

**3. MECHANISM OF INJURY:**
☐ Auto accident    ☒ Work related accident    ☐ Other-specify below
Side steel door fell at work, hit head for about ~175 lbs, was taken to ER ⓧ + cut above (R) eye, had 3 stitches. Had x-rays of head.

**4. QUALITY OF SYMPTOMS: RATE PAIN ___/10**
☒ sharp    ☐ burning    ☐ tingling    ☐ throbbing
☒ dull ache    ☐ numbness    ☒ weakness    ☐ electrical
☒ tension    ☐ fatigue    ☐ stiffness    ☐ other-specify below
other: _____ in (R) leg

radiating to: (R) shoulder    referring to: _____

**5. FREQUENCY, DURATION & COURSE OF SYMPTOMS:**
☒ constant    ☐ intermittent    ☐ occasional
☐ getting worse    ☒ getting better    ☐ staying same
____ x PER _____    LASTING _____

**6. SYMPTOMS ARE WORSE WHEN:**
☐ sitting    ☐ bending    ☐ lifting    ☐ coughing    ☐ weather changes
☐ standing    ☒ walking    ☒ working    ☐ turning    ☐ lying down
other: _____ knee (R) w walking up/down stairs

**SYMPTOMS ARE BETTER WHEN:**
☐ resting    ☐ lying down    ☐ staying active    ☐ other-please specify
other: _____

HA's
3 stitches
removed

L    R

# PHYSICAL EXAMINATION

PATIENT NAME: _Mitchell M. Ocupus_      DATE: _12/6/49_

## VISUAL EVALUATION

| | | | | | |
|---|---|---|---|---|---|
| A. PATIENT BUILD | 1. SLIM_ | 2. WELL PROPORTIONED_ | 3. HUSKY_ | 4. SLIGHTLY OVERWEIGHT ✗ | 5. OBESE_ |
| B. CARRIAGE & GATE | 1. NORMAL ✗ | 2. SLIGHTLY DIFFICULT_ | 3. NOTICEABLY DIFFICULT_ | 4. EXTREMELY DIFFICULT_ | 5. UNABLE TO WALK |
| C. PATIENT MOVEMENTS | 1. NORMAL ✗ | 2. RESTRICTED | 3. SLOW | 4. GUARDED_ | |
| D. ANTALGIC POSITION | 1. HEAD LFT/RGHT | 2. ARM LFT/RGHT | 3. MIDBACK LFT/RGHT | 4. LOWBACK LFT/RGHT | |

## 1) HEIGHT & WEIGHT

Height Feet _5_ Inches _7_ Weight-lbs _200_

## 2) VITAL SIGNS

Temperature ___ Pulse ___ Respiration ___

Blood Pressure

Sitting ___ / ___
Supine ___ / ___
Standing ___ / ___

___ Artery Screen    Pos.___ Neg. Ⓝ b/L

## DEEP TENDON REFLEXES

| | Left | Right |
|---|---|---|
| Biceps | +2 | +2 |
| Triceps | +2 | +2 |
| Brachioradialis | +2 | +2 |
| Patellar | +2 | +2 |
| Achilles | +2 | +2 |
| Pathological | | |

*=ABSENT  1 = HYPO  2 = NORMAL  3 = HYPER  4 = VERY HYPER

## DYNOMOMETER

| | Left | Right |
|---|---|---|
| First Try | ___ | ___ |
| Second Try | ___ | ___ |
| Third Try | ___ | ___ |

Patient is:    left handed___    right handed___

## 5) MUSCLE TESTS

| | | Left | Right |
|---|---|---|---|
| Neck Flexors | (0-5) | +5 | +5 |
| Neck Extensors | (0-5) | +5 | +5 |
| Trapezius | (0-5) | +5 | +5 |
| Deltoids | (0-5) | +5 | +5 |
| Biceps | (0-5) | +5 | +5 |
| Triceps | (0-5) | +5 | +5 |
| Quadriceps | (0-5) | +5 | +5 |
| Gluteus | (0-5) | +5 | +5 |
| Hamstrings | (0-5) | +5 | +5 |
| Psoas | (0-5) | +5 | +5 |
| Anterior Tibial | (0-5) | +5 | +5 |
| Peroneus Longus | (0-5) | +5 | +5 |
| Extensor Hallucis | (0-5) | +5 | +5 |
| Gastrocnemis | (0-5) | +5 | +5 |
| wrist flexors | (0-5) | +5 | +5 |
| wrist extensors | (0-5) | +5 | +5 |
| grip | (0-5) | +5 | +5 |
| | (0-5) | | |
| | (0-5) | | |

overall weaker in UE @ R

## 6) NEUROLOGICALS  (Dermatomal Testing)

| Level | Left | Right |
|---|---|---|
| C1 | | |
| C2 | | |
| C3 | | |
| C4 | | |
| C5 | | |
| C6 | | |
| C7 | | |
| C8 | | |
| T1 | | |
| T2 | | |
| T3 | | |
| T4 | | |
| T5 | WNL | |
| T6 | | |
| T7 | | |
| T8 | | |
| T9 | | |
| T10 | | |
| T11 | | |
| T12 | | |
| L1 | | |
| L2 | | |
| L3 | | |
| L4 | | |
| L5 | | |

| | Normal | R.O.M. | Cause |
|---|---|---|---|
| *Flexion* | (45) | | |
| Extension | (45) | | |
| Left Rotation | (80) | | |
| Right Rotation | 80 | | |
| Left Lateral Flexion | 45 | 70 | (P) or (R) |
| Right Lateral Flexion | (45) | 30 | (P) or (R) |

P = Pain          S = Spasm          I = Inflexibility

|  | Neg. | Pos. | R/L |
|---|---|---|---|
| Straight Leg Raise | | | |
| Braggard's | | | |
| Well Leg Raise | | | |
| Sitting Root | | | |
| Valsalva | | | |
| Milgram's | | | |
| Kemp's | | | |
| Yeoman's | | | |
| Active Extension | | | |
| Sacroiliac Compression | | | |
| Trendelenburg | | | |
| Patrick/Fabere | | | |
| Hibb's | | | |

## 8) ORTHOPEDICS-CERVICAL

|  | Neg. | Pos. | R/L/B |
|---|---|---|---|
| Cervical Compression | (—) | | (B) |
| Maximum Cervical Rotary | | (+) | (P) or (R) |
| Cervical Distraction | | | |
| Shoulder Depression | | (+) | (P) or (R) |
| Soto Hall | | | |
| Adson's | | | |
| Costoclavicular | | | |
| Wright's | | | |
| Allen's | | | |
| Phalen's | | | |
| Tinel's | | | |
| Eden's | | | |
| Finkelstein's | | | |
| Naffziger's | | | |
| Compression c ext. | | (+) | (P) or (R) |
| Speeds | | (+) | (P) or (R) |

## 11) PALPATION

| PARAVERTEBRAL | Left | Right |
|---|---|---|
| Suboccipital | | + |
| Upper Cervical | | ++ |
| Lower Cervical | | ++ |
| Upper Thoracic | | |
| Mid Thoracic | | |
| Thoraco/Lumbar | | |
| Mid Lumbar | | |
| Lumbo/Sacral | | |
| Sacrum | | |
| Coccyx | | |
| Trapezius | | +++ |
| Levator Scapulae | | |
| Rhomboids | | |
| Quadratus Lumborum | | |
| Gluteus Medius | | |
| Piriformis | | |

P = Pain          S = Spasm          I = Inflexibility

NOTES: Tenderness to palp
abox (R) eye , minor
edema abor. (R) eye

## 9) RANGES OF MOTION-LUMBAR

| | Normal | R.O.M. | Cause |
|---|---|---|---|
| Flexion | 90 | | |
| Extension | 30 | | |
| Left Rotation | 30 | | |
| Right Rotation | 30 | | |
| Left Lateral Flexion | 30 | | |
| Right Lateral Flexion | 30 | | |

P = Pain          S = Spasm          I = Inflexibility

12-6-99

# PATIENT PROGRESS NOTES

[illegible]IENT NAME: OWENS, MITCHELL FILE # ____________

| DATE | |
|---|---|
| 12/4/99 | S: pt with c/c/pc of (R) neck (R) and HA's, (R) shoulder and (R) knee (P) that started after an accident at his job, pt states that [illegible] the result that [illegible] with [illegible] [illegible] his (R) eye and face and head causing him to fall backward to his (R) knee and leg and pt states that he felt a very sharp (P), tightness at his (R) neck and shoulder and (P) at his (R) eye and noticed that there was blood coming to his face and that he had a cut over his (R) eye after the impact. The [illegible] away he was taken to E.R. and Xray of the head was taken and [illegible] the (R) eye was Rx and [illegible] stitches were given for (R) eye cut. pt was told to see his primary doctor after which he was referred to and chiro for further therapy. For complete Hx see Hx sheet dated 12/4/99. |
| | O: pt is 37 y/o [illegible] slightly overweight with normal [illegible] movement of his [illegible] but limited motion and [illegible] to (R) side at his cervical region. There is an area of about 1½ inches over (R) eye which is the point of contact [illegible] stitches given at E.R. pt has very hypertonic [illegible] (R) > (L) side hypertonic [illegible] (R) > (L) side [illegible] noted at the same area and as well as his back [illegible] [illegible] was examined and [illegible]. There was EXT fix at $C_1$, and $C_3$-$C_5$, (R) lat flex fix at $C_3$-$C_5$ also noted, [illegible] EXT fix at C.T. junction and $T_3$-$T_4$, minor bruising noted at (R) knee. minor hypertonicity noted at [illegible] (P) with palpation at ant. sup. aspects of [illegible] (R) shoulder [illegible] [illegible] test. For complete (Rx) see (Rx) sheet dated 12/4/99. |
| | A: sprain/strain cervical [illegible] (R) shoulder and (R) knee [illegible] radiculopathy to (R) arm. pt was informed of the findings and consented to (Rx). |
| | P: [illegible] [illegible] 15 min. to pt's [illegible] U.S. [illegible] cervical upper thoracic (R) shoulder and (R) knee. EXT [illegible] findings. |
| | [signature] |
| 12/[illegible] | S: pt for cont. care and states that he is feeling about the same and that he has been trying to rest as much as he could [illegible] [illegible] [illegible] |
| | O: pt's muscles are still hypertonic at cervical upper thoracic [illegible] and [illegible]. EXT fix $C_1$-$C_5$ and CT junctions (R) lat flex $C_3$-$C_5$ and EXT fix $T_3$ only. |
| | A: pt's condition is about the same as 12/4 and his progress will be monitored. |
| | P: Cont. (Rx) as planned. |
| | [signature] |

# PATIENT PROGRESS NOTES

PATIENT NAME: Owens, Mitchell FILE # ____________

DATE

12/1/99 S: pt presents for cont. care and states that his knee is feeling little better but he still has (R) arm, his neck and (R) shoulder and HA on occasion, but his nausea and vomiting is not there anymore.
O: pt's (R) knee has improved in [illegible] and [illegible] tenderness with [illegible] is noted, hypertonic cervical [illegible] area, Ext fix $C_5$-$C_6$ and (R) lat flex $C_3$-$C_4$ is still noted. Ext T fix $T_2$-$T_4$ and [illegible] noted.
A: pt is improving
P: cont. (Rx) as planned
[signature]

12/14/99 S: pt presents for cont. care states his knee feels better but only going up and down the stairs is what causes some (R) and feels as if (R) knee is not strong at all, pt's states that his HA's is not bothering him at all at this time.
O: no bruising or [illegible] noted at pt's (R) knee, very minor tenderness with palpation at superior aspect of the patella. hypertonic [illegible] traps. R/ [illegible] and suboccipital area, [illegible] hypertonic mostly on (R) side.
A: pt is improving as expected.
P: cont. (Rx) as planned.
[signature]

12/14/99 S: pt presents for cont. care states that his knee feels very good and that his low back is feeling better also but his shoulder and neck still hurts him.
O: [illegible] bruising [illegible] at his upper [illegible] and [illegible].
are relaxed [illegible] hypertonicity noted, hypertonic cervical, suboccipital and traps, [illegible] noted at [illegible] area, Ext fix $C_5$-$C_6$ and (R) lat flex $C_3$-$C_4$ also noted. Ext fix $T_3$-$T_4$.
A: pt's progress will be [illegible] and is improving.
P: cont. (Rx) as planned.
[signature]

12/22/99 S: pt [illegible] for cont. care and states that most of the time [illegible] his head is [illegible] and that he feels that his shoulder is [illegible] he also states that he has been doing his home stretches and that he still feels that his [illegible] is stiff.
O: hypertonic suboccipital area and traps (R) > (L) side, [illegible] noted. Some [illegible] with tenderness to palpation at [illegible] area. (R) shoulder ROM has improved but still limited to ERM with (R) [illegible] the ERM actively.
A: pt's knee and low back problem has resolved and will cont. (Rx).
P: Cont. (Rx) as planned
[signature]

# PATIENT PROGRESS NOTES

PATIENT NAME: Duane [illegible] FILE # ______

| DATE | |
|---|---|
| 12/27/99 | S: pt presents for cont. care and states that he feels better and that his [illegible] are [illegible] he has been doing his stretching and that his shoulder feels a lot better. |
| | O: no edema [illegible] around the shoulder area. [illegible] is still tender but less than [illegible] and ROM has increased, pt's cervical spine ROM has also improved but still needs more (Rx) and pt to have the problem resolved. |
| | A: pt's shoulder problem is nearly resolved and only requires some stretching and minor adjustments at A.C. joint, cervical spine still needs to be addressed. |
| | P: ↑ ROM exercises for shoulder and neck and cont. (Rx) as planned. |
| | [signature] |
| 1/4/00 | S: P/t for cont care and states that shoulder is fine and that neck is still the problem and he has been [illegible] his neck as much as possible. |
| | O: pt's shoulder is nontender to palpation and ROM is full. [illegible] cervical spine [illegible] still mildly hypertonic and [illegible] also [illegible] (R) trap, EXT. flx [illegible] and (L) lat flex $C_3$-$C_7$, EXT. flx $T_3$-$T_4$. |
| | A: pt's improvement is as expected. |
| | P: cont (Rx) as planned. |
| | [signature] |
| 1/13/00 | S: f/u for care states that he feels good and the neck has improved but still has some difficulty turning his head. |
| | O: pt is [illegible] cervical spine ROM has improved but not full [illegible] (R) [illegible] palpation and [illegible] hypertonic [illegible] EXT flx [illegible] still [illegible] tender [illegible] that area. Traps are relaxed and are tender also. |
| | A: pt's improvement is as expected and will be treated again on his next visit and reevaluated to be released after that day. |
| | P: cont. (Rx) as planned. |
| | [signature] |
| 1/1?/00 | S: pt presents for a re-eval and states that his neck has been feeling good also and feels that his ROM has [illegible]. |
| | O: no hypertonicity noted at cervical [illegible] ROM is nearly full and no tenderness at end range of motion. EXT flx [illegible] |
| | A: pt will be reevaluated on his next visit and will be released back to work and normal activities if everything stays as it is. he has reached [illegible] (Rx) |
| | P: Reevaluate on next visit. Cont. (Rx) as planned. |
| | [signature] |

## PATIENT PROGRESS NOTES

PATIENT NAME: _Owens, Mitchell_    FILE # _____

| DATE | |
|------|---|

2/4/00  S: _pt points to low back (R) and states that he feels good and/or that he feels he can go back to work._

O: _pt is A&O x3 resolves w distress, pt's BM is verbal and unremarkable, no antalgic position noted at any body posture, all reflexes well, neurologic tests well, compl. of dizziness on lumbar ROM full without any (R), no tenderness on (R) with palpation at any injured area, cervical compression, over cervical R/O shoulder depression (R) & R/L compression with ext (R) spurls superior notes (R) all can flex shoulder to full and painlessly both above and tenderness over the (R) eye has subsided._

A: _pt has reached the most I and with no apparent residual effect from the accident and injury, pt is going to be released from our care today and back to normal daily activity._

P: _pt is released to go back to work and ADL_

Tom _____

## TREATMENT PLAN

PATIENT: _OWENS, MITTCHELL_ DATE: _12-6-99_

DOCTOR: _Toos mashsoud_

DIAGNOSIS. _Cervical sprai/strai (R) shoulder sprain/strain (R) Knee sprain/strain_
_(R) ege laceration Rxt'd at ER_



CMT CERVICAL ✓ THORACIC ✓ LUMBAR ✓ EXTREMITY (R) Knee {(R) shoulder.

FLEXION/DISTRACTION SETS/REPS _____

| | | |
|---|---|---|
| ____ ICE PACKS | CERV THOR. LUMB. OTHER ___ | |
| ✓ HOT MOIST PACKS | (CERV) (THOR) LUMB. OTHER (R) Knee {(R) shoulder | |
| ✓ INTERFERENTIAL | HIGH/LOW SWEEP/STATIC | |
| | (CERV) (THOR) (LUMB) OTHER (R) Knee {(R) shoulder | |
| ✓ ULTRASOUND | 100% 50% 20% TIME 5 min at each area | |
| | (CERV) (THOR) (LUMB) OTHER (R) Knee {(R) shoulder | |
| | INTENSITY ____ W/CM2 | |

THERAPEUTIC EXERCISES
_____ _home stretches actively and passive stretching at onset_
_____ _of injury_
_____
_____

WEEK OF / Semaine du / Semana de

**MONDAY / LUN / LUN**
PERCY WORKS
Sr. Pulaski
~ 284-5798

**TUESDAY / MAR / MAR**
773 284 52 78#
(773)-284-52 78   776664

**WEDNESDAY / MER / MIE**
Duty Disability
333 South State Street 312 747-8661
Room 400 #312 747-8660

**THURSDAY / JEU / JOE**
Sharon Young
City of Chicago payroll
#3803 Phone # 312/747-2131

**FRIDAY / VEN / VIE**

**SATURDAY / SAM / SAB**

**SUNDAY / DIM / DOM**

Case
Closed out
11/16

atn: Linda
williams

City of Chgo
Commitee on Finance
312. 744. 3388

**Jamrocha Chi    practic, P.C**
*5725 South Archer Avenue*
*Chicago, Illinois 60638*
*(773) 735-0665*

December 11, 1999

Attn: Sharon Young/City of Chicago Payroll
      #3803

Re: Mitchell M. Owens

Mitchell M. Owens has been under my care since 11/30/99. He has
been receiving chiropractic treatment and therapies for post head
contusion as well as cervical and upper thoracic conditions
suffered as a result of a work related injury. Due to his present
condition it is necessary that he remain off of work for an
estimated 6 weeks from date therapies began. A re evaluation will
be performed on or about January 15, 2000. At that time it will
be determined if Mr. Owens will be released back to work and at
what capacity. His prognosis is good and he is expected to fully
recover from these injuries and return to normal duty.

If you have any questions or require further information please
contact the office.

Thank You,

Agnes A. Jamrocha, D.C.

**Jamrocha Chi. Practic, P.C.**
**5725 South Archer Avenue**
**Chicago, Illinois 60638**
**(773) 735-0665**

December 11, 1999

Attn: Duty Disability Room 400    *Attn: Linda Williams*

Re: Mitchell M. Owens

To Whom It May Concern:

Mitchell M. Owens has been under my care since 11/30/99. He has been receiving chiropractic treatment and therapies for post head contusion as well as cervical and upper thoracic conditions suffered as a result of a work related injury. Due to his present condition it is necessary that he remain off of work for an estimated 6 weeks from date therapies began. A re evaluation will be performed on or about January 15, 2000. At that time it will be determined if Mr. Owens will be released back to work and at what capacity. His prognosis is good and he is expected to fully recover from these injuries and return to normal duty.

If you have any questions or require further information please contact the office.

Thank You,

Agnes A. Jamrocha, D.C.

**Jamrocha Chi.. Practic..**
**5725 South Archer Avenue**
**Chicago, Illinois 60638**
**(773) 735-0665**

December 11, 1999

Attn: Mercy Works - Pulaski Site

To Whom It May Concern:

Mitchell M. Owens has been under my care since 11/30/99. He has been receiving chiropractic treatment and therapies for post head contusion as well as cervical and upper thoracic conditions suffered as a result of a work related injury. Due to his present condition it is necessary that he remain off of work for an estimated 6 weeks from date therapies began. A re evaluation will be performed on or about January 15, 2000. At that time it will be determined if Mr. Owens will be released back to work and at what capacity. His prognosis is good and he is expected to fully recover from these injuries and return to normal duty.

If you have any questions or require further information please contact the office.

Thank You,

Agnes A. Jamrocha, D.C.

**A. Jamrocha Chiropractic P.C.**
5725 South Archer Avenue
Chicago, Illinois 60638
(773) 735-0665

December 11, 1999

Attn: Mercy Works - Pulaski Site

To Whom It May Concern:

Mitchell M. Owens has been under my care since 11/30/99. He has been receiving chiropractic treatment and therapies for post head contusion as well as cervical and upper thoracic conditions suffered as a result of a work related injury. Due to his present condition it is necessary that he remain off of work for an estimated 6 weeks from date therapies began. A re evaluation will be performed on or about January 15, 2000. At that time it will be determined if Mr. Owens will be released back to work and at what capacity. His prognosis is good and he is expected to fully recover from these injuries and return to normal duty.

If you have any questions or require further information please contact the office.

Thank You,

Agnes A. Jamrocha, D.C.

APPROVED OMB-0938-0008

**PLEASE DO NOT STAPLE IN THIS AREA**

CITY CHGO COMMIT. ON FINANCE
121 N. LASALLE RM.302
ATTN: WORKERS COMP
CHICAGO, IL 60602

**P**

☐☐ PICA

## HEALTH INSURANCE CLAIM FORM

PICA ☐☐

| MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 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 | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

3. PATIENT'S BIRTH DATE: 09 25 1962  SEX M [X]  F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

5. PATIENT'S ADDRESS (No., Street)
1252 E. 96TH PLACE

6. PATIENT RELATIONSHIP TO INSURED: Self [X] Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)
1252 E. 96TH PLACE

CITY: CHICAGO  STATE: IL

8. PATIENT STATUS: Single ☐  Married [X]  Other ☐

CITY: CHICAGO  STATE: IL

ZIP CODE: 60628  TELEPHONE (Include Area Code): (773) 671 3110

Employed ☐  Full-Time Student ☐  Part-Time Student ☐

ZIP CODE: 60628  TELEPHONE (INCLUDE AREA CODE): (773) 671 3110

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
P17600-349624429

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS): YES ☐  NO [X]

a. INSURED'S DATE OF BIRTH: 09 25 1962  SEX M [X]  F

b. OTHER INSURED'S DATE OF BIRTH: MM DD YY  SEX M ☐ F ☐

b. AUTO ACCIDENT?: YES ☐  NO [X]  PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?: YES ☐  NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME
BC/BS

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES ☐  NO [X]  If yes, return to and complete item 9 a-d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED: SIGNATURE ON FILE  DATE: 12 06 1999

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED: SIGNATURE ON FILE

14. DATE OF CURRENT: 03 30 2000  ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB? YES ☐  NO [X]  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. 814.00
2. 719.40
3. 728.9
4.

22. MEDICAID RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From / To | | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS / MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12061999 | 12061999 | 11 | 1 | 99203 2S | 1 2 3 4 | 120.00 | 1 | | | | TAMBLYCHA 0162-2546 |
| 12061999 | 12061999 | 11 | 1 | 98940 | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12061999 | 12061999 | 11 | 1 | 97032 | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12061999 | 12061999 | 11 | 1 | 97010 | 1 2 3 4 | 25.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12081999 | 12081999 | 11 | 1 | 98940 | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12081999 | 12081999 | 11 | 1 | 97032 | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |

25. FEDERAL TAX I.D. NUMBER: 36-4236730  SSN ☐ EIN [X]

26. PATIENT'S ACCOUNT NO.: OWEMI000 13

27. ACCEPT ASSIGNMENT? (For govt. claims, see back) YES [X] NO ☐

28. TOTAL CHARGE: 295.00

29. AMOUNT PAID

30. BALANCE DUE: 295.00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

NES JAMROCHA D.C
SIGNED: 01 01 2000  DATE

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
A. JAMROCHA CHIROPRACTIC, P.C
5725 S. ARCHER AVENUE
CHICAGO, IL 60638
PIN# 0162-2546

FORM HCFA-1500 (1490)

π's 4 Id VB

PLEASE DO NOT STAPLE IN THIS AREA

APPROVED OMB-0938-0008

CITY CHGO COMMIT. ON FINANCE
121 N. LASALLE RM. 302
ATTN: WORKERS COMP
CHICAGO, IL 60602

**HEALTH INSURANCE CLAIM FORM**

| | |
|---|---|
| PICA | PICA |

1. MEDICARE / MEDICAID / CHAMPUS / CHAMPVA / GROUP HEALTH PLAN / FECA BLK LUNG / OTHER — 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1): **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**

2. PATIENT'S NAME (Last Name, First Name, Middle Initial): **OWENS, MITCHELL**

3. PATIENT'S BIRTH DATE: **09 25 1962**  SEX: M **X**  F

4. INSURED'S NAME (Last Name, First Name, Middle Initial): **OWENS, MITCHELL**

5. PATIENT'S ADDRESS (No., Street): **1252 E. 96TH PLACE**
CITY: **CHICAGO**  STATE: **IL**

6. PATIENT RELATIONSHIP TO INSURED: Self **X**  Spouse  Child  Other

7. INSURED'S ADDRESS (No., Street): **1252 E. 96TH PLACE**
CITY: **CHICAGO**  STATE: **IL**

ZIP CODE: **60628**  TELEPHONE (Include Area Code): **(773) 671 3110**

8. PATIENT STATUS: Single **X**  Married  Other
Employed  Full-Time Student  Part-Time Student

ZIP CODE: **60628**  TELEPHONE (INCLUDE AREA CODE): **(773) 671 3110**

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial):

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER: **P17600-349624429**

a. OTHER INSURED'S POLICY OR GROUP NUMBER:

a. EMPLOYMENT? (CURRENT OR PREVIOUS): YES  NO **X**

a. INSURED'S DATE OF BIRTH: **09 25 1962**  SEX: M **X**  F

b. OTHER INSURED'S DATE OF BIRTH:  SEX: M  F

b. AUTO ACCIDENT?: YES  NO **X**  PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME:

c. EMPLOYER'S NAME OR SCHOOL NAME:

c. OTHER ACCIDENT?: YES  NO **X**

c. INSURANCE PLAN NAME OR PROGRAM NAME: **BC/BS**

d. INSURANCE PLAN NAME OR PROGRAM NAME:

10d. RESERVED FOR LOCAL USE:

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES **X**  NO — If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED: **SIGNATURE ON FILE**  DATE: **12 06 1999**

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED: **SIGNATURE ON FILE**

14. DATE OF CURRENT ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP): **JAN 30 2000**

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY:

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM  TO:

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE:

17a. I.D. NUMBER OF REFERRING PHYSICIAN:

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM  TO:

19. RESERVED FOR LOCAL USE:

20. OUTSIDE LAB? YES  NO **X**  $ CHARGES:

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE):
1. **814.00**
2. **728.9**
3. **719.40**

22. MEDICAID RESUBMISSION CODE:  ORIGINAL REF. NO.:

23. PRIOR AUTHORIZATION NUMBER:

24.

| A. DATE(S) OF SERVICE From DD YY To DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1208 1999  1208 1999 | 11 | 1 | 97010 | | 1 2 3 4 | 25.00 | | | | | JAMROCHA 0162-2546 |
| 1211 1999  1211 1999 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | | | | | JAMROCHA 0162-2546 |
| 1211 1999  1211 1999 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | | | | | JAMROCHA 0162-2546 |
| 1211 1999  1211 1999 | 11 | 1 | 97010 | | 1 2 3 4 | 25.00 | | | | | JAMROCHA 0162-2546 |
| 1214 1999  1214 1999 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | | | | | JAMROCHA 0162-2546 |
| 1214 1999  1214 1999 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | | | | | JAMROCHA 0162-2546 |

25. FEDERAL TAX I.D. NUMBER: **36-4236730**  SSN  EIN **X**

26. PATIENT'S ACCOUNT NO.: **OWEMI000  13**

27. ACCEPT ASSIGNMENT? (For govt. claims, see back) YES **X**  NO

28. TOTAL CHARGE: **200.00**

29. AMOUNT PAID:

30. BALANCE DUE: **200.00**

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
**AGNES JAMROCHA D.C**  DATE: **01.01 2000**

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office):

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
**A. JAMROCHA CHIROPRACTIC, P.C**
**5725 S. ARCHER AVENUE**
**CHICAGO, IL 60638**
PIN: **0162-2546**  GRP:

FORM HCFA-1500  (12-90)

PLEASE
DO NOT
STAPLE
IN THIS
AREA

CITY CHGO SUMMIT. ON FINANCE
121 N. LASALLE RM.302
ATTN: WORKERS COMP
CHICAGO, IL 60602

APPROVED OMB-0938-0008

**HEALTH INSURANCE CLAIM FORM**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PICA | | | | | | | PICA |

| MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 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 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| OWENS, MITCHELL | 09 25 1962 X | M F | OWENS, MITCHELL |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| 1252 E. 96TH PLACE | Self X Spouse Child Other | 1252 E. 96TH PLACE |

| CITY | STATE | 8. PATIENT STATUS | CITY | STATE |
|---|---|---|---|---|
| CHICAGO | IL | Single X Married Other | CHICAGO | IL |

| ZIP CODE | TELEPHONE (Include Area Code) | Employed X Full-Time Student Part-Time Student | ZIP CODE | TELEPHONE (INCLUDE AREA CODE) |
|---|---|---|---|---|
| 60628 | (773) 671 3110 | | 60628 | (773) 671 3110 |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| | | P17600-349624429 |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) | a. INSURED'S DATE OF BIRTH | SEX |
|---|---|---|---|
| | YES X NO | 09 25 1962 M X F | |

| b. OTHER INSURED'S DATE OF BIRTH | SEX | b. AUTO ACCIDENT? | PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |
|---|---|---|---|---|
| MM DD YY | M F | YES X NO | | |

| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|
| | YES X NO | BC/BS |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| | | YES X NO If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE DATE 12 06 1999

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

| 14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION |
|---|---|---|
| 03 30 2000 | | FROM TO |

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|
| | | FROM TO |

| 19. RESERVED FOR LOCAL USE | 20. OUTSIDE LAB? | $ CHARGES |
|---|---|---|
| | YES X NO | |

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. 814.00
2. 719.40
3. 728.9
4.

| 22. MEDICAID RESUBMISSION CODE | ORIGINAL REF. NO. |
|---|---|
| | |

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From | | | | | | To | | | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 14 | 1999 | 12 | 14 | 1999 | | | | 11 | 1 | 97010 | 1 2 3 4 | 25.00 | | | | | JAMROCHA 0162-2546 |
| 12 | 16 | 1999 | 12 | 16 | 1999 | | | | 11 | 1 | 98940 | 1 2 3 4 | 45.00 | | | | | JAMROCHA 0162-2546 |
| 12 | 16 | 1999 | 12 | 16 | 1999 | | | | 11 | 1 | 97032 | 1 2 3 4 | 30.00 | | | | | JAMROCHA 0162-2546 |
| 12 | 16 | 1999 | 12 | 16 | 1999 | | | | 11 | 1 | 97010 | 1 2 3 4 | 25.00 | | | | | JAMROCHA 0162-2546 |
| 12 | 23 | 1999 | 12 | 23 | 1999 | | | | 11 | 1 | 98940 | 1 2 3 4 | 45.00 | | | | | JAMROCHA 0162-2546 |
| 12 | 23 | 1999 | 12 | 23 | 1999 | | | | 11 | 1 | 97032 | 1 2 3 4 | 30.00 | | | | | JAMROCHA 0162-2546 |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. BALANCE DUE |
|---|---|---|---|---|---|---|
| 36-4236730 | X | OWEMI000 13 | YES X NO | 200.00 | | 200.00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office) | 33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE # |
|---|---|---|
| AGNES JAMROCHA D.C. 01 01 2000 | | A. JAMROCHA CHIROPRACTIC, P.C. 5725 S. ARCHER AVENUE CHICAGO, IL 60638 PIN 0162-2546 GRP # |

FORM HCFA-1500 (12-90)

APPROVED OMB-0938-0008

# HEALTH INSURANCE CLAIM FORM

CITY CHGO. COMMIT. ON FINANCE
121 N. LASALLE RM.302
ATTN: WORKERS COMP
CHICAGO, IL 60602

PLEASE DO NOT STAPLE IN THIS AREA

PICA

| MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 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 |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

3. PATIENT'S BIRTH DATE   09 25 1962   SEX M [X] F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

5. PATIENT'S ADDRESS (No., Street)
1252 E. 96TH PLACE

6. PATIENT RELATIONSHIP TO INSURED
Self [X] Spouse Child Other

7. INSURED'S ADDRESS (No., Street)
1252 E. 96TH PLACE

CITY
CHICAGO   STATE IL

8. PATIENT STATUS
Single [X] Married Other

CITY
CHICAGO   STATE IL

ZIP CODE 60628   TELEPHONE (Include Area Code) (773) 671 3110

Employed Full-Time Student Part-Time Student

ZIP CODE 60628   TELEPHONE (INCLUDE AREA CODE) (773) 671 3110

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
P17600-349624429

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
YES [X] NO

a. INSURED'S DATE OF BIRTH   09 25 1962   M [X] F

b. OTHER INSURED'S DATE OF BIRTH   MM DD YY   SEX M F

b. AUTO ACCIDENT?   YES [X] NO   PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
YES [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
BC/BS

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES [X] NO   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE   DATE   12 06 1999

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   SIGNATURE ON FILE

14. DATE OF CURRENT:   03 30 2000   ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   TO

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?   YES [X] NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. 814.00
2. 728.9
3. 719.40

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12231999 | 12231999 | 11 | 1 | 97010 | | 1 2 3 4 | 25.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12271999 | 12271999 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12271999 | 12271999 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |
| 12271999 | 12271999 | 11 | 1 | 97010 | | 1 2 3 4 | 25.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01102000 | 01102000 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01102000 | 01102000 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |

25. FEDERAL TAX I.D. NUMBER   SSN EIN
36-4236730   [X]

26. PATIENT'S ACCOUNT NO.
OWEMI000   13

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
YES [X] NO

28. TOTAL CHARGE   $ 200.00

29. AMOUNT PAID   $

30. BALANCE DUE   $ 200.00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
AGNES JAMROCHA D.C
01 01 2000   DATE

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
A. JAMROCHA CHIROPRACTIC, P.C
5725 S. ARCHER AVENUE
CHICAGO, IL 60638
PIN 0162-2546   GRP#

FORM HCFA-1500 (12-90)

APPROVED OMB-0938-0008

PLEASE
DO NOT
STAPLE
IN THIS
AREA

CITY CHGO-COMMIT. ON FINANCE
121 N. LASALLE RM. 302
ATTN: WORKERS COMP
CHICAGO, IL 60602

CARRIER

PICA | | | |

## HEALTH INSURANCE CLAIM FORM

PICA | | | |

| 1. MEDICARE (Medicare #) | MEDICAID (Medicaid #) | CHAMPUS (Sponsor's SSN) | CHAMPVA (VA File #) | GROUP HEALTH PLAN (SSN or ID) | FECA BLK LUNG (SSN) | OTHER (ID) | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|
| | | | | X | | | 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 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| OWENS, MITCHELL | 09 25 1962  M X  F | | OWENS, MITCHELL |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| 1252 E. 96TH PLACE | Self X  Spouse  Child  Other | 1252 E. 96TH PLACE |

| CITY | STATE | 8. PATIENT STATUS | CITY | STATE |
|---|---|---|---|---|
| CHICAGO | IL | Single X  Married  Other | CHICAGO | IL |

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (INCLUDE AREA CODE) |
|---|---|---|---|---|
| 60628 | (773) 671 3110 | Employed  Full-Time Student  Part-Time Student | 60628 | (773) 671 3110 |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| | | P17600-349624429 |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) | a. INSURED'S DATE OF BIRTH | SEX |
|---|---|---|---|
| | YES  X NO | 09 25 1962  M X  F |

| b. OTHER INSURED'S DATE OF BIRTH | SEX | b. AUTO ACCIDENT? | PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |
|---|---|---|---|---|
| MM DD YY  M  F | | YES  X NO | | |

| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|
| | YES  X NO | BC/BS |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| | | YES  X NO  If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE  DATE 12 06 1999

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

| 14. DATE OF CURRENT: 03 30 2000  ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM    TO |
|---|---|---|

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM    TO |
|---|---|---|

| 19. RESERVED FOR LOCAL USE | | 20. OUTSIDE LAB?  YES  X NO | $ CHARGES |
|---|---|---|---|

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. 814.00    3. 719.40
2. 728.9     4.

| 22. MEDICAID RESUBMISSION CODE | ORIGINAL REF. NO. |
|---|---|

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 02 2000  01 02 2000 | 11 | 1 | 97110 | | 1 2 3 4 | 25.00 | 1 | | | | JAMROCHA 0162-2546 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. BALANCE DUE |
|---|---|---|---|---|---|---|
| 36-4236730 | X | OWEMI000  13 | X YES  NO | $ 25.00 | $ | $ 25.00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office) | 33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE # |
|---|---|---|
| AGNES JAMROCHA D.C  01 01 2000 | | A. JAMROCHA CHIROPRACTIC, P.C 5725 S. ARCHER AVENUE CHICAGO, IL 60638 PIN 0162-2546 |

PLEASE PRINT OR TYPE    FORM HCFA-1500 (12-90)

APPROVED OMB-0938-0008

PLEASE DO NOT STAPLE IN THIS AREA

CITY CHGO COMMIT. ON FINANCE
121 N. LASALLE RM.302
ATTN: WORKERS COMP
CHICAGO, IL 60602

P

## HEALTH INSURANCE CLAIM FORM

PICA | | | PICA

| MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | 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 |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

3. PATIENT'S BIRTH DATE  09 25 1962  SEX M [X] F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

5. PATIENT'S ADDRESS (No., Street)
1252 E. 96TH PLACE

6. PATIENT RELATIONSHIP TO INSURED
Self [X] Spouse Child Other

7. INSURED'S ADDRESS (No., Street)
1252 E. 96TH PLACE

CITY CHICAGO  STATE IL

8. PATIENT STATUS
Single [X] Married Other

CITY CHICAGO  STATE IL

ZIP CODE 60628  TELEPHONE (Include Area Code) (773) 671 3110

Employed Full-Time Student Part-Time Student

ZIP CODE 60628  TELEPHONE (INCLUDE AREA CODE) (773) 671 3110

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
P17600-349624429

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
YES [X] NO

a. INSURED'S DATE OF BIRTH  09 25 1962  SEX M [X] F

b. OTHER INSURED'S DATE OF BIRTH
MM DD YY  M F

b. AUTO ACCIDENT?  PLACE (State)
YES [X] NO

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
YES [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
BC/BS

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES [X] NO  If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED SIGNATURE ON FILE  DATE 12 06 1999

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED SIGNATURE ON FILE

14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)  03 30 2000

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM  TO

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM  TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?  YES [X] NO  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 814.00    3. 719.40
2. 728.9

22. MEDICAID RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01132000 | 01132000 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01132000 | 01132000 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01132000 | 01132000 | 11 | 1 | 97110 | | 1 2 3 4 | 25.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01192000 | 01192000 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01192000 | 01192000 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |
| 01192000 | 01192000 | 11 | 1 | 97110 | | 1 2 3 4 | 25.00 | 1 | | | | JAMROCHA 0162-2546 |

25. FEDERAL TAX I.D. NUMBER  36-4236730  SSN EIN [X]

26. PATIENT'S ACCOUNT NO.  OWEMI000  24

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES [X] NO

28. TOTAL CHARGE  200.00

29. AMOUNT PAID

30. BALANCE DUE  200.00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
...NES JAMROCHA D.C  01 01 2000

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE
A. JAMROCHA CHIROPRACTIC, P.C
5725 S. ARCHER AVENUE
CHICAGO, IL 60638
PIN# 0162-2546  GRP#

FORM HCFA-1500 (12-90)

PLEASE PRINT OR TYPE

PLEASE
DO NOT
STAPLE
IN THIS
AREA

APPROVED OMB-0938-0008

CITY CHGO SUMMIT. ON FINANCE
121 N. LASALLE RM.302
ATTN: WORKERS COMP
CHICAGO, IL 60602

**HEALTH INSURANCE CLAIM FORM**

| | |
|---|---|
| PICA | PICA |

1. MEDICARE ☐ MEDICAID ☐ CHAMPUS ☐ CHAMPVA ☐ GROUP HEALTH PLAN ☐ FECA BLK LUNG ☐ OTHER ☒

1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1)
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

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

3. PATIENT'S BIRTH DATE: 09 25 1962   SEX: M ☒ F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
OWENS, MITCHELL

5. PATIENT'S ADDRESS (No., Street)
1252 E. 96TH PLACE

6. PATIENT RELATIONSHIP TO INSURED: Self ☒ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)
1252 E. 96TH PLACE

CITY: CHICAGO   STATE: IL

8. PATIENT STATUS: Single ☐ Married ☒ Other ☐

CITY: CHICAGO   STATE: IL

ZIP CODE: 60628   TELEPHONE (Include Area Code): (773) 671 3110

Employed ☐ Full-Time Student ☐ Part-Time Student ☐

ZIP CODE: 60628   TELEPHONE (INCLUDE AREA CODE): (773) 671 3110

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
P17600-349624429

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS) YES ☐ NO ☒

a. INSURED'S DATE OF BIRTH: 09 25 1962   SEX: M ☒ F ☐

b. OTHER INSURED'S DATE OF BIRTH   SEX: M ☐ F ☐

b. AUTO ACCIDENT? YES ☐ NO ☒   PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT? YES ☐ NO ☒

c. INSURANCE PLAN NAME OR PROGRAM NAME
BC/BS

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES ☐ NO ☐

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE   DATE 12 06 1999

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   SIGNATURE ON FILE

14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)
03 30 2000

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   TO

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB? YES ☐ NO ☒   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 814.00
2. 728.9
3. 719.40

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02172000 | 02172000 | 11 | 1 | 99211 | 25 | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |
| 02172000 | 02172000 | 11 | 1 | 98940 | | 1 2 3 4 | 45.00 | 1 | | | | JAMROCHA 0162-2546 |
| 02172000 | 02172000 | 11 | 1 | 97032 | | 1 2 3 4 | 30.00 | 1 | | | | JAMROCHA 0162-2546 |

25. FEDERAL TAX I.D. NUMBER: 36-4236730   SSN ☐ EIN ☒

26. PATIENT'S ACCOUNT NO.
OWEMI000   112

27. ACCEPT ASSIGNMENT? (For govt. claims, see back) YES ☒ NO ☐

28. TOTAL CHARGE $ 105.00

29. AMOUNT PAID $

30. BALANCE DUE $ 105.00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
AGNES JAMROCHA D.C
SIGNED   DATE 01 01 2000

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
A. JAMROCHA CHIROPRACTIC, P.C
5725 S. ARCHER AVENUE
CHICAGO, IL 60638
PIN# 0162-2546   GRP#

PLEASE PRINT OR TYPE   FORM HCFA-1500   (1290)

THE ARBITRATOR:  Petitioner rests?

MR. KARPEL:  Petitioner rests.

THE ARBITRATOR:  Any witnesses for the Respondent?

MS. MARTIN:  We have two, we have one outside, but we are ready to proceed with our first witness.

THE ARBITRATOR:  Who is your witness?

MS. MARTIN:  I ask to call Mr. William Brown.

THE ARBITRATOR:  Mr. Brown, come on up.

THE WITNESS:  All right.

THE ARBITRATOR:  Would you raise your right hand, please, Mr. Brown?

(WITNESS SWORN)

THE ARBITRATOR:  You may proceed.

MS. MARTIN:  Thank you.

91

MR. WILLIAM BROWN,

(called as a witness on behalf of the Respondent,
having been sworn on his oath, was examined and
testified as follows, to-wit:)

DIRECT EXAMINATION

BY MS. MARTIN:

Q.    Mr. Brown, please state your name and
occupation for the record.

A.    My name is William M. Brown, I am
Assistant General Superintendent of the Bureau of
Forestry.

Q.    And that would be with the City of
Chicago; is that correct?

A.    Yes.

Q.    Are you acquainted with the individual in
this courtroom, Mr. Mitchell Owens, seated at the
back of the courtroom?

A.    Yes, I am.

92

Q.    How are you acquainted with Mr. Owens?

A.    He is one of my members of our work force on the south side's facility.

Q.    Thank you.

Mr. Owens was currently one of the people that worked on the crew in the forestry department; is that correct?

A.    That's correct.

Q.    I draw your attention to the date of approximately November 16th, 1999, and I am going to ask you to the best of your recollection do you recall Mr. Owens coming into your office on that day?

A.    No, I don't.

Q.    And to the best of your recollection do you remember having a conversation with Mr. Owens on that day in which you stated you don't look so good, go home?

A.    That's correct, I didn't have that conversation.

93

Q.    I'm sorry, your Honor, one moment.

Did there come a time on November 17th,
1999 where you had a conversation with Mr. Owens in
your office where Mr. Brown -- I'm sorry, where Mr.
Owens stated to you he was unable to work?

MR. KARPEL:  Let me raise an objection here.

You know the question is leading, it's her
witness.  He has already testified he had no
conversation with him on November 16th, 1999.  I
would object on the basis that it's a leading
question and it's already been asked and answered.

THE ARBITRATOR:  Sustain the objection as to
the leading nature of the question.

MS. MARTIN:  Actually I asked about November
17th.

THE ARBITRATOR:  I figured it was November
17th, I knew it wasn't 16th.

MR. KARPEL:  I'm sorry.

BY MS. MARTIN:

Q.    Did there come a time when you saw Mr.

94

Owens on November 17th?

    A.   No.

    Q.   Did there come a time where you had a conversation in your office with Mr. Brown regarding any condition of Mr. Owens on November 17th?

    MR. KARPEL:  Objection, asked and answered.

    THE ARBITRATOR:  Overruled.

    THE WITNESS:  Repeat the question, please.

BY MS. MARTIN:

    Q.   Did there come a time on November 17th where you had a conversation with Mr. Owens about his inability to come to work?

    A.   No.

    Q.   Did there come a time approximately one week after November 22nd where you had a conversation with Mr. Owens at the garage regarding his condition?

    A.   No.

    Q.   Did there come a time a week after November 22nd where Mr. Owens tried to give you

95

papers, a week after November 22nd where he tried to give you papers, and you directed him to give those papers to Tony behind the desk?

A.    No.

Q.    Did there come a time -- To the best of your recollection did there come a time when Mr. Owens called in sick after the date of the accident?

A.    I can't recall him calling.

MS. MARTIN:  Your Honor, I am showing Mr. Owens -- I'm sorry, Mr. Karpel Mr. Owens' 300 sheet. At this time I am going to ask the witness if there is something that could refresh his recollection; however, I would like to give Counsel an opportunity to look at what I am using.

MR. KARPEL:  All right, I will object to the use of the document at this point, your Honor.  I don't think there is anything in the testimony that would enable her to use this document.

MS. MARTIN:  I am asking him to refresh his recollection.

96

MR. KARPEL:  As to what?  He answered that
there was no conversations, he never called in sick.

THE ARBITRATOR:  Okay, overruled.

MS. MARTIN:  Your Honor, may I approach the
witness?

THE ARBITRATOR:  Sure.

BY MS. MARTIN:

Q.    Excuse me, would you look at that document
for a minute.

A.    (No response).

Q.    Mr. Brown, do you recognize that document?

A.    Yes.

Q.    What would that document be?

A.    A 300 sheet of Mr. Mitchell Owens.

Q.    How are those documents generated?

A.    How is what?

Q.    How are those documents generated?

A.    It's generated in our administrative
offices.

Q.    Are they generated basically at the same

97

time that time reports are given?

A.   Yes.

Q.   And they would be generated by a person whose general occupation is to keep those records; is that correct?

A.   That's correct.

Q.   I ask you to look down at approximately November 17th, 1999, at the bottom of the page, the second line up.

A.   Yes.

Q.   The second column.

A.   Yes.

Q.   Would that refresh your recollection?

MR. KARPEL:   As to what?

MS. MARTIN:   As to whether Mr. Owens called in sick.

THE WITNESS:   It is recorded as an SN which means he called in sick that day.

BY MS. MARTIN:

Q.   And could you please state -- It is the

98

general course to fill in as sick when an individual
says so; is that correct?

A.    That's correct.

Q.    Could you please state what AN stands for?

A.    AN is he is off with no pay and he didn't
call in.

Q.    In the general course when the keeper of
the records writes that in, is that in general what
that term means?

A.    Yes, it is.

Q.    Did there come a time when you received a
call from Mr. Owens regarding him not being able to
work for those days that are AN?

A.    No.

Q.    To the best of your recollection has Mr.
Owens come to your office since the December 22nd
date prior to him being terminated?

A.    Repeat the question.

Q.    To the best of your recollection has Mr.
Owens come to your office to speak to you between

99

the time of December 22nd and prior to him being
terminated?

    A.    Yes, he was there.

    Q.    And did he have -- Can you please tell us
approximately when that was?

    A.    Probably sometime in January or something
like that.

    Q.    I'd ask you to flip the form over.

    MR. KARPEL:  Your Honor, can I raise an
objection?

        Can we at least exhaust his recollection
before he starts looking at the form?

    THE ARBITRATOR:  I agree.

    MS. MARTIN:  Okay.

BY MS. MARTIN:

    Q.    You stated that you don't remember; is
that correct?

    A.    I don't remember the exact date, no.

    Q.    Can you recall approximately around when
it would have been?

A.    I think it was first part of January, in that neighborhood.

Q.    And at that time -- Nothing further, Judge.

THE ARBITRATOR:  Okay, Cross?

MR. KARPEL:  I have a few questions.


CROSS EXAMINATION

BY MR. KARPEL:

Q.    What does SN on the form refer to?

A.    SN means he was absent but he called in sick.

Q.    So this form indicates that he called in sick on the 17th and 18th; is that correct?

A.    That's correct, that's what the form says.

Q.    You said you don't recall whether he called in sick to you on the 17th?

A.    That's correct.

Q.    Having looked at this form does it refresh your recollection, do you now remember that he did

101

call in and speak with you and tell you he was going
to be sick?

    A.   The form says he called in sick.

    Q.   Do you recall whether you spoke with him
at that time?

    A.   No, it doesn't.

    Q.   I am asking whether you recall now after
looking at the form now whether you spoke with him
on the 17th?

    A.   I didn't speak to him.

    Q.   So when you were asked the question on
Direct Examination did he call in sick, and did you
speak with him on the 17th, you told your attorney I
don't recall; are you now telling us you do recall,
he did not call and speak with you on the 17th?

    A.   He didn't speak to me.

    MR. LEOVY:  Objection.

    MS. MARTIN:  Objection I don't believe that
that was his testimony, that was the objection.

       If I can hear the question again, please.

THE ARBITRATOR:  He wasn't paraphrasing his testimony, he was simply asking him a question, and I think the witness can answer.  Your objection is overruled.

THE WITNESS:  Repeat the question, please.

BY MR. KARPEL:

Q.  Do you now recall that you did not speak with Mitchell Owens on the 17th where he called in sick?

A.  That's correct.

Q.  The fact that it says SN on the 17th and 18th indicates he did speak with someone in your office; is that correct?

A.  That's correct.

Q.  Okay, you heard the testimony of Mr. Owens describing the dispatcher, correct?

A.  Correct.

Q.  Is there a dispatcher at this facility at 119th Street?

A.  That's correct.

Q.    What is the dispatcher's name?

A.    There would have been two of them.

Q.    What are both of their names?

A.    Tony's last name is Rodriguez.

Q.    Okay.

A.    And the last one is Eamon, E-a-m-o-n, Vaughn (phonetic) is his last name.

Q.    Does Tony sit at a location at the facility that is like the one described by Mr. Owens in his testimony?

A.    I don't know if he was on that day, but they both sit at that location.

Q.    And the location is similar to his description on Direct Examination; is that right?

A.    That's correct.

Q.    Does Tony have any responsibility in your organization for getting off-of-work slips, notes from doctors, those types of things from people in the forestry department?

A.    No.

Q.    Has he -- Do you have any knowledge as to whether he has ever taken those documents from an employee of the Department of Forestry?

A.    Repeat the question again.

Q.    Do you have any knowledge as to whether Tony has ever taken documents from an employee in forestry regarding their medical care or certifying them to be off of work?

A.    He has probably received some, yes.

Q.    If it is not his responsibility to receive those, why then would he get them?

MS. MARTIN:  Objection, Judge.

MR. KARPEL:  I am asking a question, Judge.

THE ARBITRATOR:  What's your objection?

MS. MARTIN:  He is asking why he would receive them.  I mean if he wants to ask Tony whoever why he got them.

THE ARBITRATOR:  I don't agree with that, he can ask this gentlemen this question.

MS. MARTIN:  Okay, Judge.

105

THE ARBITRATOR:  Overruled, he can answer.

THE WITNESS:  Repeat the question, please.

BY MR. KARPEL:

Q.    If they are not his responsibility, why then is he receiving them?

A.    I don't know.

Q.    On what occasions have you known him to receive those documents?

A.    He would normally receive them and then put them on my desk or something like that.

Q.    Okay.

What is your -- What are your duties or what were your duties with respect to Mr. Owens at the time he worked for your department?

A.    I set their crew assignments up every day.

Q.    Would you have been considered his ultimate supervisor?

A.    Yes.

Q.    When were you notified about his accident?

A.    That evening when I came back to the

106

office.

    Q.    Did you ever go out to look at that truck that the door fell off the hinges?

    MS. MARTIN:  Objection, relevance, Judge.

    THE ARBITRATOR:  Overruled, he can answer.

    THE WITNESS:  I think I saw pictures of it.

BY MR. KARPEL:

    Q.    When?

    A.    After the report was made out.

    Q.    So would it have been within days of the accident?

    A.    Yes.

    Q.    Was the truck fixed?

    MS. MARTIN:  Objection, Judge, relevance.

    THE ARBITRATOR:  Overruled.

    THE WITNESS:  I don't know.

BY MR. KARPEL:

    Q.    When did you first receive information regarding Mr. Owens' condition and the medical care received at MercyWorks?

107

A.    I can't recall.

Q.    Did you seek out that information?

A.    I know he was put on duty disability.

Q.    Do you know how long he was put on duty disability?

A.    He was supposed to return to work on the 16th.

Q.    Do you know if he returned to work on the 16th?

A.    He didn't return.

Q.    When he didn't return to work on the 16th, what if anything did you do?

A.    I marked him down as a duty disability.

Q.    How long has -- at that point how long had Mr. Owens been working for you?

A.    Excuse me?

Q.    How long had he been working in your department, under your supervision?

A.    Oh, about two years.

Q.    But is it correct that he had been working

108

for the department for 10 years?

    MS. MARTIN:  Relevance, Judge.  I'm sorry, objection.

    THE WITNESS:  I don't know how long --

    THE ARBITRATOR:  Overruled, he can answer.

BY MR. KARPEL:

    Q.   In the two years he worked for you did you have any problems with attendance with Mr. Owens?

    A.   That's correct, I did.

    Q.   Tell us about the problems with attendance.

    A.   He often didn't call in.

    Q.   Excuse me?

    A.   He often didn't call in for work.

    Q.   How often would that happen?

    A.   I could look at his sheet here.

    Q.   Yes, go ahead and look at it.

    A.   (No response).

    Q.   That would be reflected by the ANS?

    A.   Yes.

Q.    Prior to the date of the accident tell us
how many times he didn't call in?

A.    In October he was off 1, 2, 3, 4, 5, 6, 7,
8, 9, 10, 11, 12, 13, 14, 15, 16, 17 days in
October.

Q.    Okay.

A.    On July 9th --

Q.    One second.

      Let's go over October again.  I only see
1, 2, 3, 4, 5 ANS, then I see 6 or several SN's.
The SN's indicate that he called in; is that
correct?

A.    That's correct.

Q.    In October of 1999, that's what you are
referring to, right?

A.    Yes.

Q.    In October of 1999 there were 1, 2, 3, 4,
5 occasions where he didn't call in; is that
correct?

A.    That's correct.

Q.    How many other times did that happen?

A.    There was two days in August.

Q.    All right.

A.    ANS.

Q.    All right.

A.    There was an SN in July.

Q.    All right.

A.    I think the 9th and June 11th there was
an AN.

Q.    Okay.

A.    February 24th, AN, January 26th there was
an AN.

Q.    Did you have any conversations with Mr.
Owens about these times that he just didn't show up
and didn't call in?

MS. MARTIN:  Your Honor, I am going to have to
object, is this subject to connection of anything?
The incident happened November 11th, 1999.

THE ARBITRATOR:  Counsel, do you have reasons
for getting into this?

111

MR. KARPEL:   I think this kind of shows a motive as to why suddenly no one heard from my client after this accident.

And I want to show that --

THE ARBITRATOR:   How is the motive --

MR. KARPEL:   I think they wanted to get rid of him.

MS. MARTIN:   He can think all he wants, there is no good-faith basis in making this charge --

MR. KARPEL:   We will get into that.

THE ARBITRATOR:   How are you showing a motive?

MR. KARPEL:   I want to find out what happened on these prior occasions and whether that was different than after this particular accident.

THE ARBITRATOR:   Okay, I'll give you some more leeway.

BY MR. KARPEL:

Q.   Did you ever have a discussion with Mr. Owens before the accident about him not showing up to work and not calling in?

112

A.    You mean from this October 1st date?

Q.    I mean from the dates that you just described up until November 11th, the date of his accident.

A.    It wasn't gross until he got to October.

Q.    Okay.

A.    And when he came back from that long period of time he went to the training division for retraining.

Q.    Okay.

A.    And I saw him once or twice under my jurisdiction before the accident happened.

Q.    Did you have a conversation with him during those times about --

A.    I didn't have time.

Q.    Were you concerned about this --

A.    Yes, I was.

Q.    Why were you concerned?

A.    Because I want Mr. Owens at work.

Q.    When his time off of work from MercyWorks

113

was up, and that would have been November 15th, he
didn't return to work, did he?

    A.    No, he didn't.

    Q.    Were you upset by that?

MS. MARTIN:  Objection, Judge --

MR. LEOVY:  Objection.

MR. KARPEL:  Your Honor, --

THE ARBITRATOR:  In unison there.

MR. KARPEL:  We are getting to motive.

THE ARBITRATOR:  What was the question?

MR. KARPEL:  The question was was he upset by
the fact that he did not return to work.

THE ARBITRATOR:  On what date?

MR. KARPEL:  After MercyWorks released him on
November 15th.

THE ARBITRATOR:  I am beginning to wonder about
the relevance myself, but because you are doing
Cross I will give you some more leeway.

    Can you answer it?

THE WITNESS:  What was the question again?

114

BY MR. KARPEL:

    Q.    Were you upset when he didn't return to work when MercyWorks released him on November 15th?

    A.    I would like all my employees to be at work every day.

    Q.    So the answer was you were upset?

    A.    Same answer.

    Q.    I am not asking that question, sir?

    A.    No, I am not upset.

    Q.    You like your employees to be at work every day, and this one was not at work, what was your reaction to that?

    A.    That I was one body short.

    Q.    And this is a man you have already had problems not calling and not showing up; is that right?

    A.    That's correct.

    Q.    And it's a problem that had become gross in October just before this accident; isn't that right?

MS. MARTIN:  Objection, we are still going so far afield, I understand some leeway, but we have covered this ground over and over again.

MR. KARPEL:  I am making a point here.

THE ARBITRATOR:  You are trying to make a point, and this witness is not agreeing with you. You want the witness to say he was upset?

MR. KARPEL:  No, no.

THE ARBITRATOR:  He is not saying he was upset. You are going on and on and on, and you are bordering on actually badgering the witness, so at this point I am going to sustain the objection.

MS. MARTIN:  Thank you, Judge.

BY MR. KARPEL:

Q.    After he did not show up on November 16th, what action, if any, did you take to find out where this man is?

MS. MARTIN:  Objection, Judge, relevance.

THE ARBITRATOR:  Overruled.

THE WITNESS:  None.

116

BY MR. KARPEL:

    Q.   And on November 17th, November 18th, did
you do anything to find out where Mitchell Owens
was?

    A.   No.

    Q.   Why?

    MS. MARTIN:  Objection, Judge, relevance.

    THE ARBITRATOR:  Counsel, I am going to sustain
the objection, unless you want to lay a foundation
that it was his duty to do so, I agree.

    MR. KARPEL:  He has told us that he is the
ultimate supervisor for this man, he needs his
people to show up every day.  His guy didn't show
up, yet he doesn't call to find out why he didn't
show up.  I want to know why.

    THE ARBITRATOR:  Have you established that this
is something he has to do, he is required to do?

    MR. KARPEL:  He described himself as this man's
supervisor.

    THE ARBITRATOR:  He may not have to do it.

117

MR. KARPEL:  I think it's a fair question and let me finish.

THE ARBITRATOR:  Counsel, I am sustaining the objection, I disagree with you.

You are going to have to rephrase the question, lay a foundation or move on.

BY MR. KARPEL:

Q.   You did say it was important for you for your employees to show up to work every day; is that correct?

A.   That's correct.

Q.   You knew Mitchell Owens was released to return to work on the 15th by the MercyWork's doctor; is that correct?

A.   I didn't know that, but I found out like two days later.

Q.   By the 17th you knew that; is that correct?

A.   That's correct.

Q.   You also knew that he had not reported

118

back to work; is that right?

A.   That's correct.

Q.   I want to know what if any action did you
take to determine why this man had not returned to
work.

MS. MARTIN:  Objection, Judge, asked and
answered.

He asked him if he took --

THE ARBITRATOR:  Sustained.

MS. MARTIN:  Thank you, Judge.

MR. KARPEL:  He has already answered that,
Judge?

THE ARBITRATOR:  You don't remember the answer?

MR. KARPEL:  I don't remember the answer.

Was the answer "nothing"?

THE ARBITRATOR:  "Nothing".

MR. KARPEL:  All right.

BY MR. KARPEL:

Q.   Did you ever take any action after
November 15th to find out why Mitchell Owens had not

119

returned to work?

MS. MARTIN:  Objection, it's the same question, asked and answered.  The answer "nothing" pretty much covers that, Judge.

THE ARBITRATOR:  That's pretty good, Counsel.

MS. MARTIN:  I'm sorry, Judge.

MR. KARPEL:  No, that was on that day.  I am asking him at any time now after November 15th.

MS. MARTIN:  Then the objection would be relevance, Judge.

THE ARBITRATOR:  I agree with Counsel, "nothing" is all encompassing again, but I will allow him to answer.

THE WITNESS:  Restate the question, please.

MR. KARPEL:  Sure.

BY MR. KARPEL:

Q.    The question was what if any action did you take to find out why Mitchell Owens had not returned to work after November 15th, 1999, at any time?

120

A.    I didn't.

Q.    Have you spoken with Mr. Owens at all since his accident?

A.    Yes.

Q.    When was -- How many times have you spoken with him since his accident?

A.    More than three times.

Q.    Okay.

Do you remember when the first of those conversations took place?

A.    Yes.

Q.    When?

A.    Probably within a week of the accident.

Q.    All right.

And where did at that conversation take place?

A.    By phone.

Q.    And tell us what was said in the conversation.

A.    The exact words?

121

Q.    As best you can recall.

A.    He said, "I can't come to work, my fucking head hurts."

Q.    And you said?

A.    And I said, "Well, if you hurt you need to go back to the City physician."

Q.    Anything else said in that conversation?

A.    No.

Q.    Could that conversation have taken place on November 15th?

A.    I don't know.  I know it happened.

Q.    How long after that conversation did you have your next conversation with him?

A.    I can't recall.

Q.    Do you recall what happened in the next conversation, what was discussed?

A.    I think he tried to get some information off of me, and I referred him to Catharine Hennessey because that's where all his paperwork was at that point.

122

Q.   And what information did he try to get from you?

A.   I can't remember.

Q.   All right, and that was all that was discussed in that conversation?

A.   That's correct.

Q.   Any other conversations with him?

A.   There was one yesterday.

Q.   All right.  I'd like to hear about the conversation yesterday.

A.   And I just -- He wanted -- Mitchell said they don't have my paperwork, and I said I don't know anything about it.

Q.   Again a telephone conversation?

A.   Yes.

Q.   Were all three of these telephone conversations?

A.   Yes.

Q.   Any other conversations?

A.   Not that I know of.

123

Q.   Did you ever ask him about his condition
in any of those conversations?

A.   Just in the first one where he told me his
condition.

Q.   Other than what you have told us was there
any other conversation about his condition?

A.   No.

Q.   Did you ever ask him in any of those
conversations whether he had some sort of a slip or
authority from a doctor to be off of work?

A.   No.

Q.   Did you ever ask him in any of those
conversations when he was coming back to work?

MS. MARTIN:   Objection, Judge, I believe he has
testified as to what the conversations were.

THE ARBITRATOR:   This is Cross, overruled.

MS. MARTIN:   Okay, Judge.

BY MR. KARPEL:

Q.   Go ahead.

A.   Repeat the question.

124

Q.    Did you ever ask him in any of those conversations whether he had a doctor's -- I'm sorry, would you repeat the question for me?

THE ARBITRATOR:  Doctor's slip.

MR. KARPEL:  Is that what it was?  Doctor's authority to be off of work?

THE WITNESS:  No

BY MR. KARPEL:

Q.    One last one.

Did you ever ask him in any of those conversations when he was coming back to work?

A.    No.

MR. KARPEL:  Just give me one second.

I have nothing further, your Honor.

MS. MARTIN:  Your Honor, briefly.

THE ARBITRATOR:  Briefly.


REDIRECT EXAMINATION

BY MS. MARTIN:

Q.    You testified earlier that you had a

125

conversation with Mr. Owens yesterday, can you
please state who called whom?

A.    Say that again.

Q.    Can you please state who called who?

A.    Mr. Owens called me.

MS. MARTIN:  Nothing further.

MR. KARPEL:  I have nothing else.

THE ARBITRATOR:  Okay, you are excused.
Recessed at 12:15, come back at 1:15.

                    (WHEREUPON THE HEARING ADJOURNED

                    FOR THE NOON-HOUR RECESS

                    RECONVENING AT 1:15 O'CLOCK P.M.

                    OF THE SAME DAY WITH THE SAME

                    PARTIES PRESENT AS HERETOFORE

                    SHOWN.)

THE ARBITRATOR:  We are finished with Mr.
Brown, and you are calling another witness?

MS. MARTIN:  Catharine Brown Hennessey,
H-e-n-n-e-s-s-e-y.

                    (WITNESS SWORN)


                        126

MS. CATHARINE MULLEN HENNESSEY,

(called as a witness on behalf of the Respondent,
having been sworn on his oath, was examined and
testified as follows, to-wit:)


DIRECT EXAMINATION

BY MS. MARTIN:

Q.    Ms. Hennessey, please state your name and
occupation for the record.

A.    Catharine Mullen Hennessey, I am an
Assistant Commissioner at the Department of Streets
and Sanitation, City Hall.

Q.    That would be with the City of Chicago; is
that correct?

A.    Yes.

Q.    Would you state what your general duties
would be as assistant?

A.    I am responsible for the implementation of
all the collective bargaining agreements, the
personnel rulings for the City of Chicago, as well

127

as disciplining and discharging all department
employees.

Q.    And in the function of your capacity of
discharging employees of the City of Chicago, did
there come a time where you became acquainted with
the Petitioner sitting in the room, Mr. Mitchell
Owen?

A.    Yes.

Q.    Did there come a time when you authored a
letter to Mr. Owens regarding his discharge?

MR. KARPEL:   Objection, this testimony is
completely irrelevant to the issues in this case.

THE ARBITRATOR:   Maybe, but I am going to allow
some leeway, so overruled.

MR. KARPEL:   Let me raise another objection,
the witness is being led in this question, I think
it's her witness.

THE ARBITRATOR:   No leading, Counsel, I'll
sustain the objection.

MS. MARTIN:   Okay.

BY MS. MARTIN:

Q.    Can you please state when you first came
in contact with Mr. Mitchell Owens?

A.    I believe it was around January 12th that
Mr. Owens presented himself in my office after I had
written him a letter on January 10th basically
explaining to him that he had failed to call in
and/or report to work and/or contact anyone at work
since he had been released from MercyWorks.  And
that he was currently being carried basically AWOL,
and in order to be not discharged I gave him
instructions as to what specifically he needed to do
and who he specifically needed to see before he got
discharged.

Q.    What if anything did Mr. Owens say
pursuant to you giving him those instructions?

A.    On January 12th Mr. Owens came into my
office basically saying that he was aware that I had
written him a letter but he hadn't received it, I
guess his union had gotten in contact with him.

129

I gave him a copy of my January 10th letter and basically explained to him that he had been absent from work since he had been released from MercyWorks, and nobody knew where he had been; and that he had failed to call in, and it was his responsibility in order to retain his position to at least contact his employer to tell them where he is or why he is not coming to work.

Q.    And what if anything was his response to that?

A.    He said that he didn't understand that that was his obligation, and he was unclear as to what he needed to do.

And I specifically asked him if he was planning on reporting to work any time soon.  He said yes, and I said report immediately tomorrow which would have been January 13th, he said fine.

I then called his supervisor, Tim Vaughn, on the phone and we had a telephone conference.  And I specifically said to him, Tim Vaughn, his

130

superintendent, Mr. Owens is going to be reporting
to you directly tomorrow morning first thing, and he
will be presenting medical documentation to you
indicating why he had not been coming to work since
he had been released from MercyWorks.  And he said
he is coming to work, and he is fine now.

Q.    Where was Mr. Owens when this telephone
conversation took place?

A.    Sitting across from me.

And I wanted to have him hear everything I
said so there was no misunderstandings.

And while I was talking to Tim on the
phone for the telephone conference, I looked at Mr.
Owens, I said, Mr. Owens, do you understand what you
need to do here?  Do you understand you need to
report to Mr. Vaughn on January 13th which is
tomorrow and/or apply for medical leave right now if
you are not planning on going to work.  Do you
understand what you need to do?

Q.    Did he have a response to your question?

131

A.    He said yes, and he would be at work the next day and he would be there.

MS. MARTIN:    Your Honor, permission to approach the witness?

THE ARBITRATOR:    Sure.

MS. MARTIN:    Your Honor, I have given Counsel a copy of what I am about to hand up to Ms. Hennessey.

BY MS. MARTIN:

Q.    Ms. Hennessy, I show you a document.

Could you please state whether you recognize this document?

A.    Yes, this is my January 10th letter I had written to Mr. Owens and also handed to him on January 12th explaining to him what he needed to do in order to retain his job.

Q.    And that is the letter you handed him on that day; is that correct?

A.    That's correct, that's my signature.

Q.    And did there come a time where you had any more communication with Mr. Owens after that

132

date?

A.     Um, on January 13th I was told that Mr.
Owens never showed up for work and just handed
somebody some medical documents, a watchman I think
had gotten a pack of documents from him; and he
never came to see Mr. Vaughn, and he never requested
a leave of absence.

Q.     Did there ever come a period of time where
Mr. Owens submitted any medical documentation to
you?

A.     No.

Q.     Did there come a time where you drafted
another letter to Mr. Owens regarding his
termination?

A.     Right, as I explained to Mr. Owens if he
failed to come to work or failed to request a leave
of absence that he would be considered AWOL, and
that he would suffer a break in service per the
terms of his collective bargaining agreement.

And this is pretty much spelled out in

133

this letter also.

I could have discharged Mr. Owens at the time I was told he didn't report to work, I was giving him a break.

MR. KARPEL:  Objection to the last --

THE ARBITRATOR:  Sustained, strike the volunteered portion.

BY MS. MARTIN:

Q.  Ms. Hennessey, did there come a time where you sent out the letter of January 14th?

A.  Yes, I did send the letter basically telling him he had suffered a break in service and he had 10 days to respond and tell me where he had been and why he didn't report to work.

MS. MARTIN:  Your Honor, I have also given Counsel a copy of what I am about to hand the witness.

THE ARBITRATOR:  Counsel, let me ask you something.  You are going to introduce these.

MS. MARTIN:  Yes, your Honor.

134

                    The first document I would ask to be
marked as Respondent's Exhibit No. 1 for
identification.

          THE ARBITRATOR:  Is that the --

          MS. MARTIN:  January 10th letter.

          THE ARBITRATOR:  All right.

          MS. MARTIN:  Your Honor, additionally I am
asking that the second document I referred to,
January 14th, 2000 letter be marked Respondent's
Exhibit No. 2 for identification.

BY MS. MARTIN:

     Q.    I show you what has been marked
Respondent's Exhibit No. 2 for identification.

          I ask you if you recognize that?

     A.    Yes, that's the January 14th letter which
basically -- that I wrote, and it's signed -- I
signed it Al Sanchez.  You see my initials, CMH, I
wrote this letter, I am authorized to do this.

          Basically I explained he suffered a break
in service, and he was AWOL.


                         135

Q.    Currently is it under the rules if you suffer -- if you have a five-day break in service that you will be considered for termination?

A.    It's automatic.  It happens automatically, you have a five-day no-call, no-show under the collective bargaining agreement you are terminated unless you provide extenuating circumstances.

Q.    Pursuant to the letter the response was to be directed to you at City Hall, 121 North LaSalle, Suite 704?

A.    Yes.

Q.    And did you ever receive a reply from Mr. Owens regarding this communication?

A.    Mr. Owens again showed up in my office probably a week after this letter went out, I saw him, he was acting as though he didn't have a previous meeting with me.

MR. KARPEL:  Objection to that portion, your Honor.

THE ARBITRATOR:  Sustained.

136

THE WITNESS:  He specifically said to me that he did not remember meeting with me.  And that he was there to be reinstated.

BY MS. MARTIN:

Q.    And what was your response?

A.    I gave him a copy of the January 14th letter and explained to him that he had suffered a break in service because he had not followed the directions I had given to him, that he had not gone to work, and that he had failed to file a request for a leave of absence with any medical documentation supporting the reason why he needed to be away from work; therefore he had suffered a break in service.

And he had 10 days, I gave him an additional 10 days.  A week after I wrote this letter when I handed him the document I said you have 10 days to respond as to where you have been and why you have been out of -- why you have not reported to work.

137

Q.    And during the period of 10 days did you
ever receive a response from Mr. Owens?

A.    No --

MR. KARPEL:   Objection to that question.

I think we have heard enough of the
testimony now, my objection is that this testimony
is completely irrelevant to any issue in this case.

THE ARBITRATOR:   Counsel, I agree with him,
what's the relevancy of this?

MS. MARTIN:   Your Honor, as to whether the City
was on notice as to why he was out.   Part of this is
TTD.

THE ARBITRATOR:   Does it go beyond the period
of January 10th?

MS. MARTIN:   Yes, your Honor.

THE ARBITRATOR:   All right then, overruled.
BY MS. MARTIN:

Q.    During that 10-day period did you ever
receive a response from Mr. Owens as to your
instructions that he had 10 days additionally on top

138

of the previous period that he had already had?

    A.    No, I did not.

    Q.    And would the termination letters be sent out -- Strike that, I'm sorry.

          How were these termination letters determined as to an employee's break in service?

    MR. KARPEL:  Objection, the question is vague and I can't understand it, I don't know how the witness would be able to.

    THE ARBITRATOR:  I understand it, so I am going to overrule your objection.

    MR. KARPEL:  All right.

    THE WITNESS:  Well, I personally handed this letter to Mr. Owens, so he was aware of it.

BY MS. MARTIN:

    Q.    How is it determined that there is a break in service?

    A.    When the person has suffered five days no-call and no-show, what I usually do is talk to the supervisor to, one, find out if he had contacted his

139

designated supervisor at work during the time period
he is alleged to have not called or not showed.    I
check up on these.

 And the other part is I always ask for a
copy of the 300 card which is an attendance record
to verify that during the entire time period he was
alleged to have not called in or not showed up for
work that he was actually carried that way.

 Q.    Would it have been pursuant to your
observation of these matters that you would have
generated this letter?

 A.    It would have been pursuant to my
investigation with the supervisors and pursuant to
my review of his attendance record.

 Q.    And is it the regular course of your
employment to draft letters and send these out to
employees that have been determined to have an
unexcused break in employment?

 A.    That's correct.

 Q.    And this would be indicative of the type

140

of letter you would generally send out?

Q. A. This is a standard form letter.

Q. These are authored by you, signed by you, and sent out by you; is that correct?

A. That's correct, and I also handed this letter personally to Mr. Owens.

Q. Did you ever receive any information from Mr. Owens' supervisor as to him providing him with information as to why he was not present?

A. What I got in the inner-office mail was a packet of letters which I believe were from a Chiropractor, none of which indicated any kind of condition that would have required him to be off or at least not allow him to call in or notify his supervisor.

I guess these were the packet of letters he dropped off with a watchman, and they forwarded that information to my office.

MS. MARTIN: Nothing further, Judge.

THE ARBITRATOR: Any Cross.

141

MS. MARTIN:  I'm sorry, Judge, your Honor.

At this time I ask to move Respondent's No. 1 into evidence as being authenticated, and --

THE ARBITRATOR:  Any objection to Respondent's 1 and 2?

MR. KARPEL:  Yes, they are both hearsay documents, they are irrelevant to any issues in this case.  And she has testified to what are in the documents.

THE ARBITRATOR:  Okay, objection as to relevancy is overruled.

Objection regarding hearsay as you have indicated she has testified regarding the documents, she is here to testify, you can Cross here on these documents.

What was your other objection?

MR. KARPEL:  They are cumulative, she has testified to it already.

THE ARBITRATOR:  But the documents themselves have relevancy as far as indicating exactly what was

142

sent to the Petitioner, so that objection is
overruled.

Any other objections regarding
Respondent's 1 and 2?

MR. KARPEL:  That's all I can think of, your
Honor.

THE ARBITRATOR:  All right, Respondent's 1 and
2 are admitted into evidence.

(WHEREUPON, SAID DOCUMENT WAS

THEREUPON MARKED AND RECEIVED

IN EVIDENCE AS RESPONDENT'S

EXHIBITS NOS. 1 & 2, AND IS IN

WORDS AND FIGURES AS FOLLOWS,

TO-WIT:)

143



January 10, 2000

Mitchell Owens
6326 S. Throop
Chicago, Illinois 60636

Dear Mr. Owens:

**City of Chicago**
Richard M. Daley, Mayor

Department of
Streets and Sanitation

Al Sanchez
Commissioner

City Hall, Room 700
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-4611
(312) 744-5317 (FAX)
(312) 744-2971 (TTY)

http://www.ci.chi.il.us

On November 17, 1999, Mercyworks returned you to full duty. As of the date of this letter, you have failed to return to work, and/or provide the Bureau of Forestry with any medical documentation indicating that you are unable to work. Accordingly, you have until 5:00 p.m., January 14, 2000 to return to work, or request a leave of absence with attached medical documentation stating the medical reason you are unable to work, and a prognosis as to when you may be able to return to work. Please be informed that if you fail to take one of the directed courses of action by January 14, 2000, the Department will begin processing paperwork for your discharge. If you have any questions, I can be reached at (312) 744-7386. Thank you for your anticipated cooperation.

Sincerely,

Catharine Mullen Hennessy
Assistant Commissioner

cc:     Steve Bylina
        Tim Vaughn
        Bruno Caruso









**BY: REGULAR AND CERTIFIED MAIL**

January 14, 2000

of Chicago
Richard M. Daley, Mayor

Department of
Streets and Sanitation

Al Sanchez
Commissioner

City Hall, Room 700
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-4611
(312) 744-5317 (FAX)
(312) 744-2971 (TTY)
http://www.ci.chi.il.us

Mitchell Owens
6326 S. Throop
Chicago, Illinois 60636

Dear Mr. Owens:

I have been informed by the timekeeping section of the Department that you
have been absent from work for more than five (5) consecutive days without
notifying an authorized Department Supervisor.  You have been absent since
November 17, 1999.

Under the Break in Service provision of the collective bargaining agreement
between the Laborers, Local 1001 and the City of Chicago, an absence of five
(5) consecutive work days causes an automatic break in service and
termination from employment.

Accordingly, based upon the foregoing information, your employment has
been severed effective end of business January 14, 2000 .  If in fact you were
not absent, or believe this provision is not applicable to your situation, you
should make a written response to this letter within ten (10) days of your
receipt of this letter.

Any response should be sent to:
        Catharine Mullen Hennessy
        Assistant Commissioner
        Department of Streets and Sanitation
        City Hall
        121 North LaSalle St., Suite 704
        Chicago, Illinois 60602

    If you have any questions you may contact your Union representative
at (312) 782-4875.

Sincerely,

Al Sanchez

cc:    Steve Bylina
       John Sullivan
       Jack Drumgould
       Tim Vaughn
       Bruno Caruso







MS. MARTIN:  Now I am done, Judge, thank you.

THE ARBITRATOR:  All right.

Cross.


CROSS EXAMINATION

BY MR. KARPEL:

Q.    You said that you reviewed the documents
that his Chiropractor had provided?

A.    Cursory, yes.

Q.    Could you describe to us what were those
documents?

A.    Um, first of all it was simply a document
indicating that he was receiving some kind of
treatment, but it didn't indicate what kind of
treatment; it wasn't specific.

It didn't indicate that he had any
condition, that he couldn't come to work and/or call
into work.

And I also received these way after the
10-day period I had given to him to respond.

144

Q.    So the documents that you reviewed didn't say he should be off of work for any time?

A.    I believe it indicated that he was under treatment during a period of time, but it didn't indicate what kind of treatment or what the condition was.

Q.    My question to you was did the document indicate that he should be off of work?

A.    Without having the document in front of me I wouldn't be able to testify to that, I don't have recollection of what exactly the document said.

Q.    What did you do with the documents?

A.    I put them in his discharge file.

Q.    Did you bring that file with you today?

A.    No, I did not.

Q.    All right.

If a doctor indicates that an employee of the City is being treated for a condition which requires him to be off of work, are you in a position to substitute your opinion for the doctor

145

and say that I don't think this is a condition that requires him to be off of work?

MS. MARTIN:  Objection, very hypothetical.

THE ARBITRATOR:  Well, it is; but, Counsel, you were asking what the scope of her authority.

MR. KARPEL:  Yes, she testified on Direct Examination that she did not feel --

THE ARBITRATOR:  I know what she is testifying to.

I want to make sure that's the purpose of your question to find out the scope of her authority.

With that I will overrule the objection and allow her to answer.

THE WITNESS:  I would be unable to answer your question without a further fact pattern because it would be a case-by-case scenario.

BY MR. KARPEL:

Q.  So can I correctly infer from that that there are some instances where you can substitute

146

your judgment for an employee's doctor's judgment as
to whether they have a condition that requires them
to be off of work?

    A.    That was not my testimony; and, no, you
cannot infer that from my statement.

    Q.    So the answer is no, you cannot do that
within the scope of your authority; is that right?

    A.    My answer was no, you cannot infer that
from my testimony.

          I don't believe I answered your question
because I would need a further fact pattern to
answer the question.

    Q.    Okay.

          Is there any set of circumstances within
the scope of your authority you can overrule an
employee's doctor as to their authority?

          I shouldn't say "their authority", their
need to be off of work for a particular medical
condition?

    A.    Specifically I am in charge of, I mean

since you asked the question, it's a pretty broad
question, so I will answer it in that way.

Specifically with family medical leave
whether people apply for family medical leave and/or
medical leave we ask the person to provide us with
sufficient information for us to determine that in
fact they need a medical leave of absence.

I asked them to provide on doctor's
letterhead what their condition is, and I am asking
the doctor to provide the information.

So what I ask for is what is your
condition, give us a prognosis, I should say
diagnosis, prognosis, as to how long the condition
is going to last; and also how it specifically stops
or prevents the employee from returning to work.  We
are under the law allowed to ask for that
information.

If the employee hands us a note from a
doctor on say a prescription pad paper and/or a
letter that all it says is employee is currently

148

under treatment and can return to work on such and

such date, that isn't a sufficient amount of

information to allow the employee to go -- We are

not going to honor his request for a leave of

absence until he provides further documentation.

So in essence we don't argue with the

doctor, we don't say you don't have that condition,

we say provide us with the specific information

requested and we will honor your request for a leave

of absence.

Q.   You also described doing some

investigation with Mr. Owens' supervisors or

superiors to find out what had happened here.

Tell me what did that investigation

consist of?  Who did you speak with?

A.   Mr. Tim Vaughn who is General

Superintendent of Forestry called my office and said

that he had a MercyWorks discharge sheet for a Mr.

Mitchell Owens, and that there has been a

significant period of time in which Mr. Owens had

failed to report to work and/or call anybody or
contact anyone, and that they in fact had tried and
attempted to contact Mr. Owens with the information
that they had which apparently was incorrect.

Mr. Owens never updated if he changed his
address or phone number.  They were unable to
contact him, and they wanted to know what to do.
And I specifically said give me the address you have
for him, and I will write to him and explain to him
what he needs to do to retain his job.

Q.    Did you question anyone besides Mr. Vaughn
and his department, maybe his immediate supervisor
or the general superintendent, Mr. Brown --

A.    Yes, sir.

Q.    -- to determine whether Mr. Owens had
contacted them and what was going on with this guy?

A.    Yes.

You know what, I don't like to discharge
anybody.  I don't like to see anybody lose their
job, so before I send out any letter I like to give

150

somebody warning, do something so you can keep your job.

I went down the line, and I always ask all the supervisors has anyone called in for this person?  Does anybody know where this person is?  Has anybody heard from him?

Q.    Did you do that in this case?

A.    Yes, I do that for all cases.

Q.    Do you know who you spoke with?

A.    I talked to Tim Vaughn, I talked with Bill Brown, I talked with a Mike Brown also.  They told me who his supervisors were and verified in fact that nobody had heard from him.

I also talked to Sharon Young who is the timekeeper.  Sometimes people call her directly.  She indicated she had not heard from Mr. Owens either.

Q.    And this investigation and conversation with Sharon Young had taken place sometime around January 10th, would that be correct?

A.     That's correct, it probably took place that day.

Q.     All right.

A.     And in which case I would have sent that letter out immediately to notify him what he needed to do.

Q.     So if Sharon Young had been contacted by a -- by Mr. Owens' physician, Chiropractic physician, on December 11th, 1999; in fact, if the Chiropractor had faxed Ms. Young a short paragraph explaining that he was off of work and the treatment he was receiving and the reason for the treatment, she didn't tell you that, did she?

A.     No, she didn't.

Q.     In fact she told you that she hadn't received any notification as to what was going on with Mr. Owens?

A.     First of all, it's Mr. Owens' responsibility to call his supervisor regardless of whether he can come to work or not.  He never called

152

in.

Q.    I am asking about Ms. Young.

A.    Okay.

Q.    From your investigation Ms. Young told you
she had no information about what was going on with
Mr. Owens; is that correct?

A.    Um --

MS. MARTIN:    Objection as to speculative, as to
what happened with Ms. Young.

MR. KARPEL:    I am Cross Examining.

THE ARBITRATOR:    Overruled.

THE WITNESS:    Ms. Young never indicated she
received any information; however, Ms. Young is not
authorized to put him on a leave of absence or tell
him it's okay not to come to work.   He would have
had to report to his direct supervisor.

In addition I gave Mr. Owens every
opportunity to present information to me as to
whether he could report to work for any time period
that he was absent, and he never presented anything

153

to me

BY MR. KARPEL:

     Q.   I understand that.

     A.   Okay.

     Q.   I understand that you are trying to
explain that you gave this guy a chance, you gave
him the benefit of the doubt and he didn't take you
up on that; but I am asking you about Ms. Young.

     Ms. Young never told you that she received
anything from Mr. Owens' Chiropractor; is that
right?

     A.   You are correct; however, the problem is
it doesn't matter because I gave Mr. Owens the
opportunity to correct if anybody didn't forward
information to me, that's what I do for every
employee.

     Q.   In the conversation you had -- Strike
that.

     If Mr. Owens had brought off work notes in
from his physicians and had given those to Bill

154

Brown, the superintendent or assistant general
superintendent of his department, would that have
been sufficient to maintain his service with the
City?

A.    I would have had to review the material,
but it's my understanding he never presented Mr.
Brown with any off-work records.  I believe he gave
them to a watchman who forwarded them to Mr. Brown
who then forwarded them to my office.

Q.    Mr. Owens presented the medical documents?

A.    It was alleged Mr. Owens gave them -- I
don't know if it was Mr. Owens or somebody on his
behalf, they were medical documents related to Mr.
Owens, it was Chiropractor doctor's notes that came
through the inner-office mail that Mr. Brown had
forwarded to me because I was already taking care of
the matter.

Q.    All right.

A.    But he understood that the matter was
referred to my office already.

155

Q.    Where are those documents now?

A.    Those are the same documents we talked about before that are in his discharge file.

Q.    How many documents, do you know?  How many notes from doctors were those?

A.    I couldn't really say without looking at the file.

Q.    Do you know now without looking at the file whether those notes were insufficient to establish his authority to be off of work?

A.    I reviewed them in terms of whether they were insufficient to determine any reason why he had failed to notify us or return to work.

Q.    Okay.

A.    And in that sense I made a determination that they were insufficient, yes.

Q.    I am not sure I understand here.

You didn't look at them at that time to determine whether the notes would have been sufficient in and of themselves had he delivered

156

them to the right people at the right time, correct?

    MS. MARTIN:  I'm sorry, Judge, I don't

understand the question.

    THE ARBITRATOR:  I do.

    MS. MARTIN:  Okay, Judge.

    THE ARBITRATOR:  Do you want it read back?

    MS. MARTIN:  Can we have the question read

back?

              (WHEREUPON THE QUESTION WAS READ

              BACK BY THE COURT REPORTER.)

    THE WITNESS:  Are you talking about sufficient

to retain his job?

BY MR. KARPEL:

    Q.    No, no.

    A.    I misunderstood your question.

    Q.    Let me ask it again.

    The reason you looked at those notes at

that time was solely to determine whether he had a

sufficient explanation as to why he hadn't notified

his supervisors within the specified time period,

157

not whether the notes in and of themselves were
sufficient had he notified the supervisors timely,
correct?

A.   Actually it's two-part.

Q.   All right.

A.   I looked at them to determine whether or
not there was any family medical leave issues, with
regard to whether he had a serious medical
condition, nothing was indicated.  There is no
diagnosis indicated.  There was no information in
the letter concerning what his condition was or what
was being treated.

And then I looked at it in terms of as you
just stated to determine whether or not there was
sufficient information indicating why he couldn't
call in or have someone call in on his behalf to
work, so it's two-part.

Q.   I want you to assume hypothetically that
the doctors he treated with he got brief notes like
disability slips off of work under my care, from

158

such and such a date to such and such a date; and he
handed those in to Bill Brown, and Bill Brown each
time told him to give them to someone else in the
department.

Let me ask you had that taken place and
had you been satisfied that that had taken place,
would he fill still -- Would you not have considered
him to have had a break in service then?

MS. MARTIN:  Objection, hypothetical,
speculative, facts not in evidence.

THE ARBITRATOR:  Overruled, she can answer.

THE WITNESS:  He still would have suffered a
break in service because he did not call in, okay.

To not suffer a break in service you would
have to be in a coma, under surgery for the period
of time that you were off with no-call, no-show.

You have to have some very extenuating
circumstances indicating that you were absolutely
unable to ever call in or contact anyone about why
you can't come to work.

159

Q.    Maybe you didn't understand the question.

Certainly while he was off of work under
MercyWorks' care and direction that was sufficient
for him to be off of work at that time; is that
correct?

MS. MARTIN:   Objection, Judge, that's not the
evidence either, Judge.

THE ARBITRATOR:  He is asking a question,
Counsel.

THE WITNESS:  If MercyWorks had not released
him to return to work he would have been carried
duty disability which is a reason why you don't have
to call in to go to work.

BY MR. KARPEL:

Q.    So then after MercyWorks released him to
return to work which was November 17th, at that
point he needed to, one, talk to his supervisor;
and, two, bring in a note saying that he is
authorized to be off of work in order to not suffer
a break in service, correct?

160

A.    Specifically, and I am just going to let you know, I spelled it out in my January 10th letter; and I also explained to Mr. Owens, this does happen where MercyWorks will release you and you will still claim to have an injury.  In which case, unless you come to work and request a leave of absence with medical documentation indicating you are unable to return to work, it's not just submitting medical documentation it's actually asking for a leave of absence and filling out the paperwork.

Q.    All right.

A.    Which is what I explained to Mr. Owens.

Q.    An employee would not know that unless you tell him like you did on January 10th allegedly?

A.    Right.

Q.    And also whether his supervisor would tell him, correct?

A.    That's why I took the opportunity to tell Mr. Owens what he needed to do because he did tell

me that it was not clear on what he needed to do on January 12th, so I wanted to clear up any misconception that he had.

    Q.   I understand that.

        I want you to assume this hypothetical now. On January 17th Mr. Owens went in, spoke with Bill Brown, and Mr. Brown said you can't work like that, despite what MercyWorks said you can't work like that. Go to see your own doctor.

        Under those circumstances he doesn't report to work the next day. Is that a break in service?

    A.   No, it takes 5 days.

        No it takes 5 days no-call, no-show, and that never happened because I explained to Mr. Owens if he felt he could not report to work, and I did use those words, I said how are you feeling, can you go to work now? What's going on with you? If you feel you can't report to work we need a doctor's letter from you indicating you cannot report to

work.  You can also just request a personal leave of absence until this all gets worked out.

He told me specifically he was fine and was going to work.

Q.    I am not asking you about January 10th, I am taking these a little at a time.

A.    All right.

Q.    If it happened the way I said he would not have suffered a break in service; is that correct?

A.    It would take 5 days no-call, no-show; however, he had already suffered a break in service because he had been off for a two-month time period without anybody hearing from him, so.

Q.    Well, we are way before those two months, okay.

November 22nd he sees a doctor, the doctor gives him a note to be off of work from that date through the end of the month and refers him to another doctor.  He takes that note in to Bill Brown and gives that note to Bill Brown.

163

Assuming that that happened, would he suffer a break in service --

MS. MARTIN:  I am going to object.

MR. KARPEL:  Let me finish.

MS. MARTIN:  I'm sorry.

MR. KARPEL:  Through the time that that note says he should be off of work?

MS. MARTIN:  Renewing my objection as to hypothetical.

We are going on a speculative, it's purely hypothetical.  This witness has testified to what actually happened.

THE ARBITRATOR:  Counsel, I am about to overrule the objection.

MR. KARPEL:  Go ahead.

THE ARBITRATOR:  The evidence from what I have heard is that from the Petitioner is that this is what happened.

Now I understand Mr. Brown testified to the contrary, but this is evidence, or he is putting

164

it as a hypothetical, it doesn't make any

difference.  I think it's the proper question, and I

am going to overrule the objection.

    MS. MARTIN:  Thank you, your Honor.

    THE ARBITRATOR:  You may answer.

    THE WITNESS:  Can you repeat the question?

    MR. KARPEL:  Yes.

BY MR. KARPEL:

    Q.   The question is I explained to you that he

brought Bill Brown a note from his doctor that

authorized him to be off of work for a specific

period of time, okay.

    Assuming that that happened, during that

specified period of time would he suffer a break in

service?

    A.   No.

    Q.   So as long as he gave a note to Bill Brown

and that note specified how long he was to be off of

work, he wouldn't suffer a break in service; is that

correct?

165

A.    That's correct.  Break in service is absolutely no contact, and we don't know why you are off.

Q.    I have got another question for you then.

If Bill Brown was lying to you --

MS. MARTIN:  Objection.

MR. KARPEL:  This is a hypothetical question.

THE ARBITRATOR:  Let him finish the question.

BY MR. KARPEL:

Q.    If Bill Brown was lying to you and actually Bill Brown had received notes from Mr. Owens' physicians authorizing him to be off of work for a specific period of time, then there wouldn't have been a break in service here; is that correct?

MS. MARTIN:  Objection, Judge.

THE ARBITRATOR:  Overruled, she can answer.

THE WITNESS:  I don't know that to be the case because Mr. Owens never presented me with any documents that he would have or even alleged that he gave any documents to anybody.

166

He had every opportunity to tell me he gave doctor's notes to supervisors, and he had every opportunity to explain to me why he had been off or present any kind of medical documents to me, and he never did.

In fact, he told me he was off and he didn't know what to do after MercyWorks released him because he didn't feel he could go back to work and he did not know what to do and he had just been off.

He pretty much admitted to me that he hadn't been in contact with anyone at work, and he didn't know why it was off --

BY MR. KARPEL:

Q. I understand that, but I want the answer to my question.

I assume it's yes?

A. Well, --

Q. If he had these conversations with Bill Brown and Bill Brown didn't tell you, Bill Brown lied to you, you would have made a different

167

decision; is that correct?

A.    No, because Mr. Owens had the opportunity to present that information to me which would have covered anybody lying.

Q.    Okay.

Had the facts happened the way I just described them it would not have warranted a break in service; is that correct?

A.    I guess you don't understand what I am saying.  The answer is still no because in any situation where there is a break in service I do my investigation, I also talk to the employee, and I give them the opportunity to print information to me or tell me anything they need to tell me in case there is a supervisor who has failed to report something to me, which does happen sometimes.

Q.    I am not asking you about your conversation with Mr. Owens, I am asking you to assume some hypothetical facts, that Mr. Owens gave notes to Bill Brown from his treating physicians

168

saying that he should be off of work for a specified period of time.

If that occurred then he would not have suffered a break in service during that specified period of time; is that correct?

MS. MARTIN:  I believe she has answered the question.

THE ARBITRATOR:  I think so, I agree with Counsel, I am going to sustain the objection.

MS. MARTIN:  Thank you, Judge.

BY MR. KARPEL:

Q.  Okay, you testified that you gave Mr. Owens the opportunity to explain this to you and to give him the documents from treating physicians; is that correct?

A.  That's correct.

Q.  You also testified you got some documents from his physicians; is that correct?

A.  I got them after the 10-day response, but as I indicated there was nothing in the letters.  He

also didn't indicate to me that he had ever

presented them to any supervisors when he had been

off.

Q.    After what 10-day period?

A.    The 10-day period written into the January

14th letter.

It provides in the January 14th letter

that he had 10 days, it says you are terminated

unless you provide me with information in that 10-

day period indicating that this break in service

does not apply to you.

Q.    I guess I misunderstood.  I thought you

had gotten those documents somehow, they were

transmitted to you at the beginning of this whole

investigation.

A.    No, I never testified to that.

Q.    Do you know when you received the

documents from his physicians?

A.    When Mr. Owens dropped them off I believe

January 13th to the watchman, they were forwarded to

170

me inner-office mail, and I believe I may have
gotten them January 14th.

     Q.    All right.

     A.    And there was no -- Basically it was a
packet that he happened to drop off and it did not
indicate any reasons to why he should have been off.
He also didn't tell me he needed to be off.  He told
me he was coming back to work, so.

     Q.    How did you determine how and whether
those documents were delivered and to whom they were
delivered to?

     A.    I didn't make any determinations.  I
received a note from like a watchman saying these
are documents dropped off, they were handed to me by
Mr. Mitchell Owens, and Tim Vaughn asked me to
forward them to your office.

     Basically he never gave them to me, Mr.
Owens, he gave them to a watchman, that's what's
alleged.  I don't know where they came from, they
were just forwarded to my office.

<center>171</center>

Q.    Do you know when they were given to the watchman?

A.    I have no idea.

Q.    You don't know even if they were given to the watchman?

A.    I had a note saying on January 13th Mr. Owens gave these to a watchman at the Bureau of Forestry.

Q.    Okay, do you still have that note?

A.    I have that note, yes.

Q.    All right.

A.    And it's on the documents in his file.

MR. KARPEL:    I would make a request at this point that Ms. Mullen Hennessey preserve any of the documents that she has in this document that she described, and would make a request that they be turned over to the Commission or at least copies made available to me.

I will issue a subpoena today, but I want to make sure that there isn't any reason that the

172

file would be destroyed.

THE ARBITRATOR:  Response?

MS. MARTIN:  I have no problem, Judge, with that request.

THE ARBITRATOR:  I thought you were finishing this case today.

You want a continuance?

MR. KARPEL:  Absolutely, I have to bring witnesses in to talk about whether certain conversations took place.

THE ARBITRATOR:  All right, let's go off the record.

(WHEREUPON A BRIEF DISCUSSION WAS HAD OFF THE RECORD.)

THE ARBITRATOR:  Okay, let's go back on the record.

The motion of Counsel is actually a motion for a continuance.  During an off-the-record discussion Counsel for Respondent indicated she had no objection to the continuance, so at this point do

173

you have any additional questions from the
witnesses?

MR. KARPEL:  No, I don't.

THE ARBITRATOR:  Any Redirect?

MS. MARTIN:  Unfortunately not as brief as
before, but, Judge, maybe about 5, 6 questions.

THE ARBITRATOR:  She is going to have to come
back with the documents, so do you want to save them
for that time, or do you want to do them now if they
are on your mind?

MS. MARTIN:  They are on my mind now, Judge.

THE ARBITRATOR:  Go ahead.


REDIRECT EXAMINATION

BY MS. MARTIN:

Q.  If the records reflect that Mr. Owens was
absent on the 19th of -- Excuse me, the 20th of
November, AN, the 22nd of November, 23rd, 24th of
November and the 25th of November without requesting
leave or without submitting any medical

174

documentation, would that constitute a five-day

break in service?

    A.   Yes, it would.

    MR. KARPEL:  I want to raise an objection.

        This whole line of questioning about his

termination is completely irrelevant to this case.

I feel that it's not relevant to his entitlement to

any benefits under the Worker's Compensation Act.

    THE ARBITRATOR:  Okay, overruled, she may

answer.

BY MS. MARTIN:

    Q.   And at that time that would constitute a

break in service period; is that correct?

    A.   All it takes is five days no-call, no-show

and that constitutes a break in service.

    Q.   You testified earlier as to two different

parts as to why medical records might be submitted

to you; is that correct?

    A.   Yes.

    Q.   If a medical record is submitted to you,

175

it's submitted for the purpose of you reviewing it
and to make a determination as determination only;
is that correct?

A.    I am the only person authorized to make
any determination as far as termination is
concerned, no other employee is authorized to
authorize that.  I do review such information such
as medical documents and/or personal notes from
people indicating extenuating circumstances as to
why they were unable to report to work.

Q.    So your review would constitute reading
over the documents and determining what the
physician said was sufficient to excuse the
individual from work; is that correct?

MR. KARPEL:  Objection, your Honor, it's a
leading question, and she has already testified to
this.

MS. MARTIN:  I am trying to clarify what he
brought out on Cross.

THE ARBITRATOR:  I know you are, but I am going

176

to sustain the objection.

        Do it again.

BY MS. MARTIN:

    Q.   When medical documentation is forwarded to you what specifically are you reviewing regarding the diagnosis and the reason for time to be taken off?

    A.   All I am looking for when I get medical documentation is that there is a diagnosis in the letter, a prognosis, and the reason why they can't report to work and the time period.

    Q.   Would there be a circumstances where you would make a medical diagnosis reviewing those medical records?

    A.   Absolutely not.

    Q.   So you would not substitute a diagnosis for a reason for this person to be off; is that correct?

    A.   Absolutely not.

    Q.   Are there other cases where people have

submitted documentation to your office where you
have found that the information given was
insufficient to make that determination?

     A.    Yes.

     Q.    And what steps were taken?

     A.    The person's break in service remained
intact.  They remained terminated until they were
able to provide sufficient information such as a
diagnosis as to what their condition is, a
prognosis, and how long they needed to be off, and
why they couldn't report to work.

     MS. MARTIN:  Nothing further, Judge.

     THE ARBITRATOR:  Anything else?

     MR. KARPEL:  A couple.


RECROSS EXAMINATION

BY MR. KARPEL:

     Q.    Your testimony today is that the documents
you got from those physicians in your file that you
described do not have a diagnosis, prognosis, and a

178

reason why Mr. Owens should be off of work; is that correct?

A.    I believe without looking at the document specifically that the documents simply stated that he was under a Chiropractor.  I remember they were a Chiropractic note, he was under a Chiropractor's care, and that he was unable to return to work.  I'm pretty sure that's about all it said on it.

Q.    So it did not have a diagnosis?

A.    I don't believe it did, without looking at it.

Q.    It did not have a prognosis?

A.    I believe it stated some dates that he was unable to return to work.

Q.    That's not a prognosis, correct?

A.    No, that's not.

Q.    And it did not have a reason why, none of these documents had any reasons why he was off of work?

A.    That's correct.

179

And I went over these with Mr. Owens and told him what specifically I was looking for in the medical documents that he was going to submit if he wanted a leave of absence.

Q.   Have you ever had occasion to actually communicate with the doctor to say that was not sufficient?

A.   I have talked to doctors where the person has come into my office, and I say this isn't sufficient; and they have asked me to call their doctor and explain to them what is needed, and I have done that.   And doctors have complied with that, that's not a problem.

Q.   Are those the only circumstances where you would call the doctors, if the employee asked you to call?

A.   I also call the doctor if the letter looks suspicious in some way where there is different handwriting and where there is type and print in the letter, or it's not on letterhead I call the doctor

180

to verify that in fact this is a note from that
doctor.

     Q.   All right, any other circumstances?

     A.   No, that's pretty much it.

    MR. KARPEL:  All right, I have nothing further.


              REDIRECT EXAMINATION

BY MS. MARTIN:

     Q.   Ms. Hennessey, if the letter did not have
the cause, would it be necessary to show that the
inability to be off of work -- I'm sorry, let me
start over.

       If the Petitioner supplied a letter which
stated that he must be off of work without a cause,
would it then be necessary if he hasn't shown the
cause was duty disability for him to take ordinary
disability leave?

    MR. KARPEL:  I object, that's irrelevant, and
also that's a leading question.

    THE ARBITRATOR:  Counsel, I am not sure what


                   181

you are trying to get, but a couple of your
objections were about hypotheticals.

    MS. MARTIN: Well, Judge, he got them, so I am
just asking for the same.

    THE ARBITRATOR: But he is doing Cross also.
Just think of what question you want to ask and try
again.

    MS. MARTIN: Okay, Judge.

BY MR. KARPEL:

    Q. You testified earlier that you stated that
Mr. Owens might need to apply for a leave of
absence; is that correct?

    A. That's correct.

    Q. Under what circumstances would he have to
apply for a leave of absence?

    A. If he was unable to return to work and his
own doctor was telling him not to return to work.

    He needed to supply medical documentation
for that, and he would have gone on ordinary
disability.

Q.   And to your knowledge was there any application for ordinary disability by Mr. Owens?

A.   Not to my knowledge.  But that would have been done through the pension board.  I explained to him that's what he needed to do if he couldn't go to work.

MS. MARTIN:  Nothing further.


RECROSS EXAMINATION

BY MR. KARPEL:

Q.   That pension board, is that Sharon Young?

A.   That's a separate agency that you apply for ordinary disability through.

Q.   Who typically handles that?

A.   He would have to go directly to the pension board, they have any number of agents that they would have talked to.

MR. KARPEL:  I have nothing further, your Honor.

MS. MARTIN:  I promise nothing further, your


183

Honor.

THE ARBITRATOR:   I wasn't going to let you anyway.

You are excused.

MS. MARTIN:   Your Honor, the City has no further questions of this witness.

Is the documentation what he is requesting only?

THE ARBITRATOR:   Do you need a subpoena in order to produce the documents?

THE WITNESS:   I would like a subpoena to produce the documents, yes.

MR. KARPEL:   Okay.

THE ARBITRATOR:   She will have to come back with the documents.

THE WITNESS:   That's fine.

MR. KARPEL:   Just as a matter of expediency, could you tell me what the file is called?   I want to make sure I get the right name of it.

THE WITNESS:   Mitchell Owens.

184

MR. KARPEL:   What is the file called?

THE WITNESS:   It's a discharge file.

THE ARBITRATOR:   All right, this case is
continued.

MR. KARPEL:   Thank you.

MS. MARTIN:   Thank you.

(WHEREUPON THIS HEARING WAS

CONTINUED TO A LATER TIME AND

DATE.)

185